UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PAYSYS INTERNATIONAL, INC.,                                    :

                      *Plaintiff*,                        :

             -against-                                :

ATOS SE, WORLDLINE SA,                                         :
ATOS IT SERVICES LTD. and SEMA SA,
                                                         :

                   *Defendants*.                        :

                                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 14-cv-10105 (SAS)

VERIFIED AMENDED
COMPLAINT

JURY TRIAL DEMANDED

Plaintiff, PaySys International, Inc. ("PaySys"), by its attorneys Sutherland Asbill &

Brennan LLP, as and for its Verified Amended Complaint in this action against Defendants Atos

SE ("Atos"), Worldline SA ("Worldline"), Atos IT Services Ltd. ("Sema Parent") and Sema SA

("Sema Sub") (collectively, "Defendants"), alleges as follows:

## TABLE OF CONTENTS

| | |
|---|---|
| THE NATURE OF THE ACTION.......................................................................... | 1 |
| JURISDICTION AND VENUE ........................................................................... | 6 |
| PARTIES ......................................................................................................... | 6 |
| JURISDICTIONAL ALLEGATIONS AS TO CERTAIN DEFENDANTS ................... | 10 |
| Defendants Sema, Atos SE, and Worldline SA Are Subject to the Specific Jurisdiction of New York........................................................................... | 10 |
| Defendant Sema as Signatory................................................................ | 10 |
| Defendant Atos SE and Worldline SA Under Direct Benefits/Estoppel and "Closely Related" Principles ................................................................ | 10 |
| Specific Jurisdiction Against Defendants Under C.P.L.R. § 302(a) ................. | 11 |
| Defendants Atos SE and Worldline SA Are Subject to the General Jurisdiction of New York........................................................................................... | 14 |
| Atos SE ............................................................................................ | 14 |
| Worldline SA ................................................................................... | 23 |

| | |
|---|---|
| GENERAL ALLEGATIONS .................................................................................... | 29 |
| PaySys' Copyright Interest in Its Proprietary Software ............................................ | 29 |
| The Parties' Licensing Agreement ............................................................................ | 31 |
| Defendant's Breaches and Infringing Activities........................................................ | 35 |
| PaySys' Attempts To Rectify the Parties' Contractual Relationship ....................... | 40 |
| FIRST CAUSE OF ACTION<br>Breach of Contract ................................................................................................... | 41 |
| SECOND CAUSE OF ACTION<br>Copyright Infringement .......................................................................................... | 43 |
| THIRD CAUSE OF ACTION<br>Inducement of Copyright Infringement .................................................................... | 43 |
| FOURTH CAUSE OF ACTION<br>Contributory Copyright Infringement........................................................................ | 45 |
| FIFTH CAUSE OF ACTION<br>Misappropriation of Trade Secrets – New York Law ............................................... | 47 |
| SIXTH CAUSE OF ACTION<br>Misappropriation of Trade Secrets – FLA. STAT. § 688.001 et seq. ....................... | 48 |
| SEVENTH CAUSE OF ACTION<br>Declaratory Judgment.............................................................................................. | 48 |
| EIGHTH CAUSE OF ACTION<br>Copyright Infringement – Violation of French Intellectual Property Code ............. | 49 |
| NINTH CAUSE OF ACTION<br>Copyright Infringement – Violation of the Copyright Law of Thailand ................... | 50 |
| TENTH CAUSE OF ACTION<br>Copyright Infringement – Violation of the Copyright Law of Belgium ................... | 51 |
| ELEVENTH CAUSE OF ACTION<br>Copyright Infringement – Violation of the Copyright Law of China........................ | 51 |
| TWELFTH CAUSE OF ACTION<br>Conversion, In the Alternative – Violation of the Common Law of New York ....... | 52 |
| THIRTEENTH CAUSE OF ACTION<br>Unfair Competition................................................................................................... | 53 |
| DEMAND FOR JURY TRIAL ............................................................................. | 54 |
| PRAYER FOR RELIEF ........................................................................................ | 54 |

## THE NATURE OF THE ACTION

1.     This is a case of software piracy on a global, corporate scale involving Defendants Atos SE and Worldline SA, and is before this Court only because defendants have refused to account for their use and licensing of Plaintiff's Software as required by clear contractual requirements and industry standards.

2.     During the period 1988 through 2001, PaySys granted restricted rights in certain software known as "CardPac," including source code and other trade secrets, to a company named Sema.  PaySys and Sema amended their agreement several times during this period in order to resolve disagreements and sharpen the boundaries with respect to the scope and restrictions of Sema's rights.  It was not until 2013, when PaySys initiated an audit, like other licensors throughout the software industry, that PaySys uncovered extensive and flagrant violations of the parties' license agreement committed by Sema, as well as by Atos and Worldline, purported successors to Sema.  A strict prohibition on assignment had been utterly ignored by the Defendants, so that the single license granted to Sema was in essence shared and duplicated without PaySys' consent, first in favor of Atos and its affiliates in 2004, and then again – *in the middle of PaySys' audit!* – in favor of Worldline in 2014.

3.     Despite strict license restrictions and confidentiality obligations regarding the use of the Software, Atos and Worldline created during this period what they publicly call an "ecosystem" in which third-party resellers and service organizations – all of whom were outside the permissible scope of the license granted to Sema – received, shared, modified and relicensed modifications to PaySys' software.  Thus was created an unauthorized open network capable of propagating Atos and Worldline's software – including PaySys' source code and trade secrets – and services to a wider audience of customers, all plainly in conflict with mandatory license requirements spelled out in PaySys' agreement with Sema.  At no point was this conduct

3

disclosed to PaySys, at no point did PaySys consent to these new and supplemental licenses, and at no point was PaySys compensated for any of the many unauthorized uses of its software.  Atos and Worldline got a free ride, without obtaining or paying for their own license.  Worse still, the 2014 Worldline partial public offering monetized its possession of the PaySys to which it had no rights.  Worldline sold shares to the public having reported 2013 revenues of €400 million in financial services and licensing alone.  Worldline's partial public offering imputed a total Worldline valuation in excess of €2 billion.

4.      The Agreement contains provisions for choice of venue (selecting this Court) and choice of law (New York) that were agreed upon by PaySys and Sema in 2001 as part of a settlement of claims brought by PaySys against Sema *in this Court*.  These clear and specific provisions and other obligations under the Agreement are binding (i) on Defendants Sema Parent and Sema Sub as original signatories of the Agreement, (ii) on Defendant Atos which now owns and controls Sema Parent and which purports to claim and exercise direct benefits under the Agreement, and (iii) on Defendant Worldline – a majority-owned and directly controlled subsidiary of Atos – which likewise purports to claim and exercise direct benefits under the Agreement.

5.      In this action, PaySys contends that Defendants have:

a.      Used and continue to use PaySys' Software in a manner that exceeds the scope of rights granted to Sema in the Agreement, in violation of conditions and covenants in the Agreement.

b.      Allowed others to possess and use PaySys' Software on terms that Defendants never had any right to promise or allow, in violation of conditions and covenants in the Agreement.

4

     c.     Assigned their rights under the Agreement to defendants Atos and Worldline and to other companies without the prior written consent of PaySys, in violation of conditions and covenants in the Agreement.

     d.     Granted sublicenses, and allowed their customers to grant sublicenses, to other companies, including resellers, distributors, and service providers, including Accellence (Thailand) Ltd. ("Accellence"), that the Agreement forbids them from granting, in violation of conditions and covenants in the Agreement.

     e.     Willfully and recklessly engaged in and induced others to engage in the infringement of PaySys' U.S. and foreign copyrights, the misappropriation of PaySys' trade secrets, and the conversion of PaySys' property.

     f.     Subverted and breached the executory obligations and accord agreed to by Sema in the 2001 settlement in which the Agreement was last modified.

     g.     Failed to pay all amounts owed to PaySys in accordance with the Agreement as a result of Defendants' sales of so-called APS modules, in violation of conditions and covenants in the Agreement.

     h.     Refused to allow PaySys to review licenses granted by Defendants for compliance with minimum license provisions specified by the Agreement, in violation of conditions and covenants in the Agreement.

     i.     Failed to notify PaySys of infringement of PaySys' proprietary rights in the Software that came to the attention of Sema, in violation of conditions and covenants in the Agreement.

     j.     Refused to cooperate to halt such infringement, in violation of conditions and covenants in the Agreement.

k.      Misrepresented and concealed facts necessary for PaySys to determine and remedy noncompliance with Defendants' obligations, in violation of conditions and covenants in the Agreement.

6.      PaySys brings this action to put an end to Defendants' flagrant piracy and repudiation of the express contractual terms governing and protecting PaySys' extremely valuable software, and seeks to obtain (i) substantial fees owed by Defendants Atos and Worldline, (ii) an award of damages and equitable relief, including interest and attorneys' fees, and (iii) a declaration that Atos and Worldline possess no valid license at all covering Plaintiff's Software, and had no right at any time to grant sublicenses to others.

## JURISDICTION AND VENUE

7.      This action arises under the common law, the Copyright Act, 17 U.S.C. § 101 *et seq.*, the copyright laws of certain foreign countries, and the Florida Trade Secrets Act.  This Court has subject matter jurisdiction over the claims asserted herein under 28 U.S.C. §§ 1331 (federal question), 1332 (diversity), and 1367(a) (supplemental jurisdiction).  Plaintiff is a citizen of a different state from all Defendants, and the amount in controversy exceeds $75,000, excluding interest and costs.

8.      Venue is appropriate in this judicial district under, *inter alia*, 28 U.S.C. § 1391(b)(3) because at least one of the defendants is subject to this Court's personal jurisdiction, and there is no other district in which an action may otherwise be brought as provided in that section.

## PARTIES

9.      Plaintiff PaySys International, Inc. is a leader in licensing financial transaction processing software applications globally.  PaySys was founded as Credit Card Software, Inc. in

1981 and changed its name to PaySys International, Inc. in 1995. PaySys is organized and exists under the laws of Florida and has its principal place of business in Maitland, Florida. Since 2001 PaySys has been a wholly-owned subsidiary of First Data Corporation, a global payment processing company. First Data Corporation and PaySys have executive offices in New York.

10.     Defendant Atos SE is a French multinational IT services corporation headquartered in Bezons, France, and is organized under the laws of France and the European Union, as applicable.

11.     Defendant Worldline SA is a French multinational IT services corporation headquartered in Bezons, France, and is organized under the laws of France. Worldline is a direct or indirect subsidiary of Atos, which owns the majority of Worldline's shares and which controls and dominates the affairs of Worldline. The spin-off of Worldline from Atos was done in 2014 *while PaySys was conducting its audit of the Defendants' compliance with the Agreement.*

12.     Worldline and Atos are the alter egos of each other with respect to the subject of the Agreement and have operated in concert for their joint benefit.

13.     Atos transferred to Worldline the business unit that is using and distributing the PaySys Software. Atos did not secure PaySys' written consent to make that transfer.

14.     Defendant Atos IT Services Ltd. (the Sema Parent) is a direct or indirect subsidiary of Atos. Based solely upon written information supplied by Atos:

        a.      Atos IT Services Ltd. was named Sema Group PLC at the time of the parties' Agreement in 1988, which Sema Group PLC signed.

        b.      Sema Group PLC was renamed Sema PLC in 2000.

7

      c.      Sema PLC was acquired by Schlumberger in 2001 and became Sema Ltd. in 2001, but continued to exist and operate as an entity separate from Schlumberger.

      d.      Sema Ltd. was acquired by Atos and renamed Atos Origin IT Services Ltd. in 2004.

      e.      At some time in 2004, that entity assigned some or all of its rights under the Agreement to Atos.

      f.      Atos Origin IT Services Ltd. was renamed Atos IT Services Ltd. in 2011.

      g.      Atos IT Services Ltd. is neither organized under Florida law nor maintains its principal place of business in Florida.

PaySys has not been able to verify, independently from information supplied to it by Atos, whether Atos IT Services, Ltd. is actually conducting business, is actually in business at all, is actually a successor to Sema Group PLC, or is exercising any rights under the Agreement.

15.     Atos controls and dominates every aspect of Atos IT Services Ltd. such that Atos and Atos IT Services Ltd. are alter egos for each other.  Defendant Atos IT Services Ltd. is referred to herein as "Sema Parent."

16.     Defendant Sema SA (the Sema Sub) was the other signatory to the parties' Agreement in 1988.  At the time it was named Sema Group SA and was a wholly-owned subsidiary of Sema Group PLC.  Based solely on written information provided by Atos:

      a.      Sema Group SA was renamed Sema SA in 2001.

      b.      Following the acquisition of Sema PLC by Atos in 2004, Atos wholly controlled and dominated the affairs of Sema SA and caused it to be merged into a wholly owned and controlled subsidiary of Atos by the name of Atos Investissement 6.

c.       Next, also in 2004, Atos caused Sema SA's assets, including particularly certain of its rights under the Agreement, to be stripped from Investissement 6, and transferred in whole or in part to three other Atos subsidiaries (Atos Integration, Atos Infogerance, and Atos Consulting).

d.       In January 2015, Sema SA's successor Investissement 6 was dissolved and its remaining assets, including any residual rights under the Agreement, were transferred to Atos.

e.       Sema SA and its successor(s) are neither organized under Florida law nor maintain the principal place of business in Florida.

PaySys has not been able to verify, independently from information supplied to it by Atos, whether Sema SA is actually conducting business, is actually in business at all, was merged and its assets stripped as alleged above, or is exercising any rights under the Agreement.

17.       The foregoing transactions and changes involving each of Sema Parent and Sema Sub constitute an attempted assignment by such entity of its rights under the Agreement, in violation of the conditions and covenants under the Agreement.  None of the assignments occurred with PaySys' knowledge or permission.  Sema Parent and Sema Sub are made party Defendants herein out of caution to ensure that all the necessary parties are before the Court.

18.       Upon information and belief:  As a result of asset transfers and other reorganization steps caused by Atos, each Sema entity is now defunct or a shell and is unable to meet its obligations under the Agreement without the participation of Atos and Worldline.

19.       Atos and/or Worldline have conducted additional unauthorized assignments to others of some or all of the rights they claim to have under the Agreement.

## JURISDICTIONAL ALLEGATIONS AS TO CERTAIN DEFENDANTS

**Defendants Sema, Atos SE, and Worldline SA Are**
**Subject to the Specific Jurisdiction of New York**

### Defendant Sema as Signatory

20.      Defendants Sema Parent and Sema Sub are signatories to the Agreement wherein

the Parties agreed that this Court is the "the exclusive forum for adjudicating any dispute arising

out of or relating to the subject matter of this Agreement." Specific jurisdiction therefore exists

over Sema Parent and Sema Sub in New York. N.Y. General Obligations Law § 5-1402.

### Defendants Atos SE and Worldline SA Under
### Direct Benefits/Estoppel and "Closely Related" Principles

21.      Defendant Atos SE, since acquiring Sema Parent in 2004, has wholly controlled

and dominated the affairs of Sema Parent in relation to the Agreement, it claims the rights of

Sema Sub as successor in dissolution to Sema Sub, it is the alter ego of Sema in business

relevant to the Agreement, and it has received direct benefits from the Agreement. Atos is

therefore estopped from avoiding the consent to jurisdiction and venue contained in the

Agreement, and is subject to specific jurisdiction in New York. Atos is also subject to specific

jurisdiction in New York under the exclusive forum selection clause in the Agreement because,

as pleaded herein, it is closely related to the dispute and it was foreseeable that Atos would be

bound by the clause.

22.      Defendant Worldline SA is and has been since July 2014 a majority-owned,

controlled and dominated subsidiary of Atos, it claims the rights of Atos and Sema as the

successor to Atos via a reorganization conducted in 2013-2014, it is the alter ego of Atos and

Sema in business relevant to this Agreement, and it has claimed and purported to exercise direct

benefits from the Agreement. Worldline is therefore estopped from avoiding the consent to

jurisdiction and venue contained in the Agreement, and is subject to specific jurisdiction in New

York.  Worldline is also subject to specific jurisdiction in New York under the exclusive forum selection clause in the Agreement because, as pleaded herein, it is closely related to the dispute and it was foreseeable that Worldline would be bound by the clause.

**Specific Jurisdiction Against Defendants Under C.P.L.R. § 302(a)**

23.     In addition to the other grounds for jurisdiction asserted herein, including general jurisdiction and the "direct benefits/estoppel" and "closely related" principles, the Court also has specific jurisdiction under C.P.L.R. § 302(a) against all Defendants, who have availed themselves of the privileges of doing business in New York, and who have received the benefits and protections of its laws.

24.     As explained elsewhere herein, the Agreement at issue governs a decades-long, global relationship between sophisticated parties over licensing rights for extremely valuable credit-card processing software.

25.     The parties to the Agreement chose New York, as a center of international trade and finance, to govern that critical – and ongoing – business relationship.

26.     The terms of the Agreement are explicit that the Agreement was negotiated in New York, that New York substantive law applies to the Agreement, and that, pursuant to a 2001 Amendment, New York (specifically the Southern District of New York) should be the mandatory and exclusive forum for adjudicating any dispute arising out of or relating to the subject matter of the Agreement.

27.     The terms of the Agreement are also explicit that a significant business "transaction" occurred in New York.  (*See, e.g*., Paragraph 17 of Agreement which states "this Agreement was partially negotiated in New York and creates obligations arising out of a

*transaction* covering in the aggregate not less than one million dollars ($1,000,000.00)."
(emphasis added).)

28.     In fact, in 1999, Sema itself initiated litigation against PaySys in this very Court
to enforce the then-applicable arbitration clause (also in Paragraph 17 of the Agreement)
requiring that "any dispute arising out of or relating to the subject matter of this Agreement shall
be submitted to binding arbitration before a panel of three (3) neutral arbitrators in Washington
D.C." *Sema Group SA et al. v. American Arbitration Association Inc. & PaySys Int'l Inc*., No.
1:99-cv-02668-JSM  (S.D.N.Y. filed April 13, 1999) [Doc. 1 ¶ 10].  (The dispute in that case
was whether, under the terms of the Agreement, certain claims and counter-claims relating to the
Agreement would be administered under AAA or ICC rules.)

29.     In averring that venue was appropriate in this Court over the disputes relating to
the Agreement, Sema further noted that "*a substantial part of the events giving rise to the claim
occurred therein*." *Id*. [Doc. 1 ¶ 8 (emphasis added)].

30.     And in subsequent briefing before the Court, Sema was very clear that "New
York's is the state law applicable here both because *the Software Acquisition Agreement was
partially negotiated and executed in New York* and because Section 17 (a) contains an express
New York choice of law provision." *Id*. [Doc. 13 at 15 (emphasis added)].   In so doing, Sema
expressly relied on New York law to interpret the relevant provisions of the Agreement. *Id*.
[Doc. 13 *passim*].

31.     In April 2001, PaySys and Sema settled the dispute and agreed to certain
Amendments to the Agreement, including the parties' selection of this Court as the exclusive
forum to govern any disputes arising out of or relating to the subject matter of the Agreement.

32.     Later that year, in another proceeding before this Court, PaySys and Sema filed a joint petition to confirm the arbitration award dismissing all claims with prejudice, and they once again agreed that venue was proper in this Court, "because a substantial part of the events giving rise to this matter occurred therein," and that Paragraph 17 of the Agreement governed "a dispute arising out of or relating to the agreement." *Sema SA & PaySys Int'l Inc (Joint Petitioners)*, No. 1:01-cv-07986-JSM (S.D.N.Y. filed Aug. 24, 2001) [Doc. 1 ¶ ¶ 7, 10].

33.     Defendants Sema Parent and Sema Sub, as original signatories to the Agreement, purposefully availed themselves of the privilege of conducting a transaction within New York, and in having the predictable jurisdictional and commercial laws of New York and the United States apply to any disputes arising out of or relating to the Agreement.

34.     Thus, Defendants Sema Parent and Sema Sub are subject to jurisdiction under C.P.L.R. § 302(a)(1).

35.     As set forth herein, Defendants Atos and Worldline have purported to operate under the Agreement, and, in so doing, have issued licenses and sub-licenses to their customers to use the software that is the subject matter of the Agreement.

36.     As set forth herein, Defendants Atos and Worldline have received hundreds of millions of dollars in monetary benefits, as well as substantial good-will and other intangible benefits, through such unauthorized licensing.

37.     Thus, Defendants Atos and Worldline have availed themselves of the privilege of conducting activities in New York, and have invoked the benefits and protections of its laws, through their deliberate and repeated use of the Agreement – a transaction expressly undertaken in New York and governed by New York law – to enter into subsequent and dependent transactions with their customers across the globe.  On this basis, and under the pleaded facts

stated elsewhere herein, Defendants Atos and Worldline are subject to specific jurisdiction under C.P.L.R. § 302(a)(1), (2), and/or (3).

**Defendants Atos SE and Worldline SA Are**
**Subject to the General Jurisdiction of New York.**

38.     Both Atos SE and Worldine SA are also subject to the general jurisdiction of New York, as shown by the factual allegations of this section of the complaint.

### Atos SE

39.     Defendant Atos SE sits at the global apex of the so-called "Atos Group" of worldwide business units, is the ultimate parent company of all members of the Atos Group, and controls the business activities of all members of the Atos Group.

40.     Atos does business in New York through its North America business unit and three related U.S. subsidiaries, all of which operate as "agents" or "mere departments" of Atos SE.  Worldline is a member of the Atos Group.

41.     On its website, Atos SE states that it is an "international information technology services group" that operates under the brands Atos, Atos Consulting, Atos Worldgrid, Bull, Canopy, and Worldline. (http://na.atos.net/en-us/home/we-are.html; Atos 2013 Annual Report at 1.)

42.     In 2014, Atos SE's annual revenues approximated €10 billion and Atos stated that it operates with 86,000 employees in 66 countries around the world.  (Atos February 18, 2015 Press Release, http://atos.net/en-us/home/we-are/news/press-release/2015/pr-2015_02_18_01.html)

43.     As explained in the "company history" section in its corporate website, "*Atos is not made up of a collection of national subsidiaries*; our aim is to be a united, global company,

bound together by common values." (http://atos.net/en-us/home/we-are/company-

profile/company-history.html (emphasis added).)

44.     Atos is managed by a "General Management Committee" whose "role . . . is to

develop and execute the Group strategy to ensure value is delivered to clients, shareholders and

employees."  (Atos 2013 Annual Report at 5.)

45.     Atos SE is the "Group's parent company" and, apart from Worldline (which

recently went public), is the only company in the Group listed on a stock exchange.  (*Id*. 62; Atos

2014 Financial Report at 35.)

46.     In a 2012 report from the Chairman of Atos SE to its shareholders, Thierry Breton

explained "the internal control procedures set up within the Atos Group."  Some highlights

included:

- "Matrix organization: The Company runs a matrix organization structure that combines
  Operational Management (Global/Specialized Business Units/Service Lines) and
  Functional Management (Sales and Markets and Support Functions). *This constitutes a
  source of control with a dual view on all operation*s."

- "Responsibilities and powers: Specific attention has been paid to ensure that the right
  people are granted the appropriate responsibilities, especially through the following
  initiatives:

      Delegation of Authority:  A formal policy sets out the authorisation of
      officers of subsidiaries to incur legal commitments on behalf of the Group
      with clients, suppliers and other third parties.  *The intention of these rules
      is to ensure efficient and effective management control from the country
      level to General Management level.*"

- "Policies and procedures: The Group has designed and implemented over the last years
  several policies and procedures in order to establish *common practices and standardised
  methods*.

- "The Code of Ethics: This code sets the 'tone at the top' in line with Atos commitment to
  corporate social responsibility[.]"

- "Atos Rainbow: Rainbow is a set of procedures and tools that provides a formal and
  standard approach to bid management, balancing sales opportunities and risk

management for all types of opportunities, as well as continuous guidance and control for the decision-making process. *Rainbow is the means by which Atos' management is involved in controlling and guiding the acquisition of the Group's contracts*."

- "Process management: Along with the centralization of the Group Policies, Atos has created in 2011 a 'Business Process and Organization Management' (BPOM) department focused on creating an Atos Business Process Center of Excellence (BPCOE) in coordination with business process owners and the functions related to Internal Control, Quality, security etc."

- "Human Resource Management: The Group Human Resource management policy relies on the Global Capability Model (GCM) which is a *standard for categorising jobs by experience and expertise across the Group. A Group Policy on bonus scheme completes this system by setting additional incentives*."

- "Information Systems: Group Business Process and Internal IT department is in place to provide *common internal IT infrastructures and applications for Atos staff worldwide*."

- "Formal information reporting lines have been defined, following the operational and the functional structures. This formal reporting, based on standard formats, concerns both financial and non financial information. Communication of relevant information is also organized in the Group through several specialised escalation processes that define criteria to raise issues to the appropriate level of management, up to General Management. This covers a wide range of topics like operational risks (through Risk Management Committees), treasury (with Payment and Treasury Security Committee), or financial restructuring (Equity Committee).

   *This bottom-up communication is accompanied by top-down instructions, issued regularly, and especially for budgeting and financial reporting sessions*."

(http://atos.net/content/dam/global/documents/investor-financial-reports/atos-report-chairman-of-the-board-2012.pdf) (emphasis added).

47.    Atos prepares consolidated financial statements that "comprise the Group and its subsidiaries (together referred to as the 'Group')." (Atos 2014 Financial Report at 35.) "Subsidiaries are entities controlled directly or indirectly by the Group." (*Id*. at 37.)

48.    In its 2013 Corporate Responsibility Report, Atos stated the following regarding the top-down management of its human resources:

   *Atos approaches the management of its Human Resources through a single global policy that is applied consistently throughout the entire Atos Group. This policy*

16

is supported by a single set of carefully designed Human Resources tools designed specifically to implement our policy so that all employees feel that they play a valued role in the Atos Group.

The Atos People value chain ensures that the right people with the right skills are in the right place at the right time.  At Atos, we achieve this through a well-coordinated and optimized use of recruitment, performance management, learning and development, mobility and succession programs and tools, orchestrated by workforce planning.

(Atos 2013 Corporate Responsibility Report at 27 (emphasis added); *available at* http://atos.net/content/dam/global/reports-2013/Skins/Atos/doc/PDF_CRR_UK/atos-corporate-responsibility-report-2013_responsible-employer-section.pdf)

49.     Thierry Breton, Chairman and CEO of Atos SE, also serves as "the chief operating decision maker, who is responsible for allocating resources and assessing performance of the operating segments."  (Atos 2014 Financial Report at 51.)

50.     The operating segments of Atos SE (also referred to as "global business units") include the following:  United Kingdom & Ireland, Germany, Benelux & the Nordics, France, North America, Iberia, Other Countries, and Worldline.  (*Id.* at 52.)

51.     Financial performance, including revenues and operating margins, is tracked and reported through these geographical business units, rather than through individual, corporate subsidiaries.  (*Id.*)

52.     On information and belief:  These global business units (apart from Worldline) are not separately incorporated, but function instead as management groupings and reporting tools for Atos SE, with business and activities shared across unit lines.

53.     John Evers is the head of the North America business unit, and he serves on the Atos Group Executive Committee.  (Atos 2013 Annual Report at 7; http://na.atos.net/en-us/home/we-are/company-profile/management-executive-committee.html)  His publically

available LinkedIn profile states that he works for "Atos" as "Chief Executive Officer – North America."  (https://www.linkedin.com/pub/john-evers/80/7a3/a17)

54.     The North America business unit is "headquartered" in Purchase, New York. (http://na.atos.net/en-us/home/contact-us.html)  In 2014, the North American unit posted €597 million in revenue, and is described by Atos SE as having nearly 4,000 employees in Canada and the United States.  (Atos 2014 Financial Report at 11; Atos 2013 Annual Report at 16.)  Atos has also developed an "ecosystem of business alliances and partnerships" with "leading companies" in North America that allows Atos to "expand its reach."  (Atos 2013 Annual Report at 14.)

55.     Atos' 2014 Financial Report lists three "operating entities" in the United States, with Atos SE as the "consolidation parent company."  (Atos 2014 Annual Report at 89-95 (Note 30 "Main operating entities part of scope of consolidation as of December 31st, 2014").)  These entities include:  (1) Atos IT Solutions and Services Inc.; (2) Bull HN Information Systems Inc.; and (3) Evidian Systems Inc.  (*Id.*)  For all three entities, Atos SE is listed as having "100% of interest" and "100% of control."

56.     Atos SE is also listed as having "100% of interest" and "100% of control" of the two Canadian entities that also presumably form part of the Atos North America business unit: (1) Atos Inc. and (2) Amesys Canada Inc.  (*Id.*)

57.     All three U.S. entities, which are Delaware corporations, are registered to do business in New York, and all three entities have registered agents in New York, New York. (NYS Department of State website.)

58.     John Evers, head of the Atos North America business unit, is listed as the CEO for Atos IT Solutions and Services Inc., which has its "principal executive office" in Purchase, New York.  (*Id.*)

59.     Purchase, New York (in Westchester County) is encompassed by the Southern District of New York.

60.     On information and belief:  Atos IT Solutions and Services, Bull HN Information Systems Inc., and Evidian Systems Inc. all do business in New York, and specifically in the Southern District of New York.  All are members of the Atos Group.

61.     Hassan Maad is listed as the CEO of Evidian Systems Inc., and his address is stated by Atos SE to be Rue Jean Jaures, Les-Clayers-sous-Bois 78340 (France), which is the same address of two of Atos SE's wholly owned subsidiaries Bull SA and Evidian SA.  (*Id*.; Atos 2014 Financial Report at 89.)

62.     Bull is a global Atos brand and Evidian is a sub-brand of Bull. (http://www.bull.com/bull-story; http://www.evidian.com/company)   Atos markets both products across the world.  (http://www.bull.com/bull-story; http://www.evidian.com/company; Atos 2014 Financial Report.)

63.     On the "evidian.com" main website, one of the five "worldwide addresses" for "Evidian Company" is listed as follows:

> Evidian Systems Inc.
> 160 Broadway, Suite 10RE
> New York, NY 10038
> Tel: +1 646 233 1239
> Fax: +1 646 304 2295

(http://www.evidian.com/company/worldwide-addresses/)

64.     On information and belief:  Atos IT Solutions and Services Inc. does not maintain its own website independent from Atos.  A March 22, 2015 Google search for this company lists "Atos Global Homepage" and "Atos North America" as the first two entries.

65.     On information and belief:  The Atos North America business unit does not maintain its own website independent from Atos.  While a March 22, 2015 Google search lists "Atos North America" as an entry, the link itself sends the user to the main Atos website.  In addition, the "contact us" page for the North America business unit (http://na.atos.net/en-us/home/contact-us.html) refers to "Atos locations *in North America*." (emphasis added).  The page further lists Purchase, New York as Atos' "North America Headquarters" and Bezons, France as Atos' "Head Office."  (*Id*.)

66.     On information and belief:  Atos IT Solutions and Services Inc., Bull HN Information Systems Inc., Evidian Systems Inc., and the Atos North America business unit do not sell their own unique products and services, but are instead vehicles through which Atos SE sells and services the global Atos brands and products in New York and throughout the United States and Canada.

67.     Atos SE uses Atos IT Solutions and Services Inc., Bull HN Information Systems Inc., Evidian Systems Inc., and the Atos North America business unit to gain access to the United States and New York markets.

68.     The "locations worldwide" section in the Atos website asks the user to "Select a country from the list to view *local information about Atos*.  The information provided includes *our contact and office details*; description of services, industries and clients."  (http://atos.net/en-us/home/contact-us.html (emphasis added).)  Atos' local information for North America, once again, shows Purchase, New York as its local headquarters.  (*Id*.)

69.     In Atos' 2013 Annual Report, John Evers stated that Atos has a "strong foothold in North America" and even plans to "double the size of its business through organic growth and acquisitions:"

With a number of major contracts in the US in hand, including contracts with blue-chip organizations such as McGraw-Hill and Morgan Stanley, Atos is highly focused on developing its customer base in the world's largest IT services market. Currently, annual revenues from the US represent around 7% of global revenue at Atos. Based on a major effort in business development, and leveraging existing contracts with large US corporates, Atos expects this proportion to rise significantly. By 2016, it forecasts that it will generate approximately €1.2 billion of revenues in the US compared to €607 million in 2013.

(Atos 2013 Annual Report at 17.)

70.     As part of its plans to "strengthen [its] footprint in the US market," Atos SE announced an €840 million global cash acquisition of Xerox's IT Outsourcing business that is expected to close in the second quarter of 2015. (http://atos.net/en-us/home/investors/acquisition-of-xerox-ito-business.html) This acquisition is described as effecting a tripling of Atos' business in this country.

71.     Atos SE and Worldine also actively solicit investment in New York. For example, Atos SE and Worldline participated at the 2013 Goldman Sachs Financial Technology Conference, hosted in New York, New York, on September 18, 2013. There, Gilles Grapinet, Atos' Senior Executive Vice President, Global Functions and Chief Executive Officer for Worldline, delivered a detailed power-point presentation targeted to investors, in which he extolled the financial performance and future growth of Atos SE and Worldline. The solicitation still remains on Atos' main website and is called an "investor presentation" in the URL. (http://atos.net/en-us/home/investors/financial-calendar.html; http://atos.net/content/dam/global/documents/investor-presentations/atos-goldman-sachs-fin-tech-conference-nyc.pdf)

72.     In its marketing materials, annual statements, and financial reports, Atos SE is very specific in stating that *Atos itself* (as opposed to independently managed subsidiaries) *"operates" in the United States*. (*See, e.g.*, Atos 2013 Annual Report at 16 ("Atos operates . . .

in [the] USA."); Atos 2014 Financial Report at 82 ("Atos operates in 66 countries."); Atos 2013

Corporate Responsibility Report at 1 ("Serving a global client base, Atos SE (Societas Europaea)

delivers IT services through Consulting & Systems Integration and Managed Services.").)

73.    New York jurisdiction may be asserted over Atos SE under "mere department"

grounds based on (1) Atos SE's common ownership of Atos North America, which is

headquartered in Purchase, New York, and its three U.S. related subsidiaries, at least two of

which are headquartered in New York, New York and/or Purchase, New York; (2) Atos North

America's and its three related U.S subsidiaries' financial dependence on Atos SE; (3) Atos SE's

dominance in the selection and assignment of the executive personnel of Atos North America

and its three related U.S. subsidiaries, and Atos SE's failure to observe corporate formalities

among its business units and subsidiaries; and (4) Atos SE's control over the marketing and

operational policies of Atos North America and its three related U.S. subsidiaries.

74.    Under these pleaded facts, general jurisdiction in New York also exists over Atos

SE as a corporate defendant who "does business" in New York and whose operations here—

which house Atos' corporate headquarters over an entire continent, thousands of employees, and

millions of dollars in revenue—are so substantial and of such a nature as to render Atos at home

in New York.

75.    Under these pleaded facts, general jurisdiction also exists in New York under an

agency theory due to the extreme importance of Atos North America's operations to Atos SE.

76.    Under these pleaded facts, general jurisdiction in New York also exists over Atos

SE on other grounds including, but not limited to, alter ego, solicitation-plus, and single-

enterprise grounds.

**<u>Worldline SA</u>**

22

77.     On its website, Worldline presents itself as a "40" year-old company, though this "corporate history" is inextricably bound together with Atos' own corporate history, which dates back to Atos' predecessor companies Axime and Sligos. (http://worldline.com/en-us/home/about-us/our-story.html)

78.     As part of the Worldline corporate narrative, on July 1, 2013, Atos announced a "carve-out of all [of Atos'] payment and transactional services activities" into Worldline. (*Id.*) This carve-out included Atos Worldline, a subsidiary of Atos Origin Group, that was created in 2004. (*Id.*)  Worldline SA went public on June 27, 2014, but Atos SE retained approximately 70% of Worldline shares. (*Id.*; Atos 2014 Financial Report at 48.)

79.     On information and belief:  Prior to Worldline SA's 2014 public offering, the constituent parts of Worldline SA (including Atos Worldline) were all subject to the same Atos internal controls, as discussed *supra*.

80.     On information and belief:  Prior to Worldline SA's 2014 public offering, the constituent parts of Worldline SA (including Atos Worldline) were all treated as mere departments of Atos, as discussed *supra*.  (See also 2014 Worldline Financial Report at 26 ("The constitution of the new Worldline Group . . . resulted from transfers of entities or activities within Atos group, without modification in fine of the direct or indirect holding of Atos.  These operations were therefore a business combination between entities under common control.").)

81.     Worldline SA is now the sub-parent for the Worldline brand and Worldline subsidiaries.  (Worldline May 6, 2014 Registration Document at 2.)

82.     Worldline SA's registered office is the same as Atos SE's headquarters:  80, quai Voltaire – 95870 Bezons (France).  (Atos 2014 Financial Report at 89 (Note 30); http://atos.net/en-us/home/contact-us.html)

83.     Worldline SA's investor-relations office is located at Atos SE's headquarters in

Bezons.  (http://worldline.com/en-us/home/investors/contacts.html)

84.     Worldline SA's three public relations officers, Sarah Pearl Bokobza, Caroline

Church, and Jose de Vries all work for Atos' global public-relations office, which is based in

Bezons.  (*Id*.; http://atos.net/en-us/home/we-are/news/contacts.html)

85.     As it freely admits, Atos itself still "operates" under the "brand" Worldline.

(http://atos.net/en-us/home/we-are.html)

86.     Like other Atos' business units, brands, and subsidiaries, Worldline SA still

remains subject to the same Atos internal controls discussed *supra*.  (*See, e.g.*, Worldline May 6,

2014 Registration Document *passim*.)

87.     For example, in its 2014 Registration Document, Worldline stated:

> The principal control activities are listed in the Internal Control Manual
> developed by the Atos group and applicable to the Group. Such manual
> complements the Group's various procedures by stating the main control
> objectives required to reach a satisfactory level of control for each process. After
> the listing of the Company's shares on Euronext Paris, this manual will continue
> to apply to the Group, which will put in place additional guides or instructions as
> necessary.
>
> The Internal Control Manual does not cover only financial reporting processes,
> but also operational processes such as contract management; other functional
> processes such as legal, procurement, human resources and IT processes; and
> governance processes, such as mergers and acquisitions.

(*Id*. at 211.)

88.     "The vast majority" of Worldline's borrowings "are with Atos group as lender."

(2014 Worldline Financial Statement at 58; Worldline May 6, 2014 Registration Document at 40

("Nearly all of the Group's borrowings and cash consist of financing and cash deposits with

maturities of less than two years provided by Atos through intercompany loans, current accounts,

cash pooling and other financial instruments.").)

89.     On June 26, 2014 Worldline SA signed a €300 million revolving credit facility with Atos SE as lender to cover Worldline's liquidity requirements.  (2014 Worldline Financial Statement at 58.)

90.     Such financial dependence on Atos is consistent with Worldline's corporate history.  (Worldline May 6, 2014 Registration Document at 163 (stating that "historically" Worldline met its funding needs "principally through cash flow, current accounts, and through the cash pooling of Atos to which [Worldline] is a party").

91.     Worldline SA has a nine-member Board of Directors, six of whom are appointed by Atos SE  (*Id*. at 183-89.)

92.     All four members of the Atos General Management Committee serve on the Worldline Board.  (*Id*. at 183-84; http://atos.net/en-us/home/we-are/company-profile/management-executive-committee.html)

93.     Six members of the Atos Executive Committee serve on the Worldline Board. (Worldline May 6, 2014 Registration Document at 183-84; http://atos.net/en-us/home/we-are/company-profile/management-executive-committee.html)

94.     Worldline's Chairman of the Board, Thierry Breton, is also Chairman and CEO of Atos SE and serves on the Atos General Management Committee and the Atos Executive Committee.  (Worldline May 6, 2014 Registration Document at 183-84.; http://atos.net/en-us/home/we-are/company-profile/management-executive-committee.html)

95.     Worldline's Director and CEO, Gilles Grapinet, is also Atos' Senior Executive Vice President, Global Functions and serves on the Atos General Management Committee and the Atos Executive Committee.  (Worldline May 6, 2014 Registration Document at 183; http://atos.net/en-us/home/we-are/company-profile/management-executive-committee.html)

96.     Worldline's Director, Charles Dehelly, is also Atos' Senior Executive Vice President, Global Operations and serves on the Atos General Management Committee and the Atos Executive Committee.  (Worldline May 6, 2014 Registration Document at 183; http://atos.net/en-us/home/we-are/company-profile/management-executive-committee.html)

97.     Worldline's Director, Michel-Alain Proch, is also Atos' Senior Executive Vice President, United States, IT, Security, Internal Audit and serves on the Atos General Management Committee and the Atos Executive Committee.  (Worldline May 6, 2014 Registration Document at 184; http://atos.net/en-us/home/we-are/company-profile/management-executive-committee.html)

98.     Worldline's Director, Gilles Arditti, is also Atos' Head of M&A, Investor Relations and serves on the Atos Executive Committee.  (Worldline May 6, 2014 Registration Document at 186; http://atos.net/en-us/home/we-are/company-profile/management-executive-committee.html)

99.     Worldline's Director, Ursula Morgenstern, is also Atos' Head of UK & Ireland, Global Cloud & Enterprise Software and serves on the Atos Executive Committee.  (Worldline May 6, 2014 Registration Document at 186; http://atos.net/en-us/home/we-are/company-profile/management-executive-committee.html)

100.     On information and belief, all members of Worldline's Executive Committee are current or former members of Atos, including Gilles Grapinet and Marc-Henri Desporte, Senior Executive Vice President, Worldline, who currently serves on the Atos Executive Committee.

101.     Even though Worldline SA went public in 2014, Atos SE still treats Worldline S.A. as a mere department.

102.     For example, in Worldline's 2014 Registration Document, Worldline explained:

> ***The Group's [i.e., Worldline SA] principal shareholder [i.e., Atos] will be able to exercise significant influence over the Group's operations and strategy.***
>
> Following the listing of the Company's shares on Euronext Paris, the Atos group will remain the Group's majority shareholder and will retain control of Worldline. The Atos group will retain significant influence over the Group and may itself control decisions submitted for the approval of shareholders at combined annual general meetings and, in particular, if quorum requirements are not met at extraordinary shareholders' meetings.
>
> The Atos group will be able to control decisions that are important for the Group, such as those concerning the nomination of directors, the approval of annual financial statements, the distribution of dividends and changes to the Company's capital and bylaws. The Atos group will, therefore, continue to be able to exercise significant influence over the Group's operations and nomination of members of management as well as the Group's dividend policy.

(Worldline May 6, 2014 Registration Document at 33.)

103.    And in its 2014 Financial Report, Atos explained:

> *As Atos maintained control over Worldline after the IPO*, the net disposal result of the existing shares owned by Atos SE, as well as the proceeds from the sale of new shares issued resulting from a capital increase of Worldline is shown in Atos equity.

(Atos 2014 Financial Report at 48 (emphasis added).)

104.    Atos further reported for 2014 that it retained "70.43% of the interest" and "100% of control" over Worldline SA and the other Worldline subsidiaries.  (*Id*. at 89-99 (Note 30).)

105.    And Worldline SA reported for 2014 that it retained "100% of interest" and "100% of control" over all the Worldline subsidiaries.  (Worldline 2014 Financial Report at 60-61 (Note 25).)

106.    Worldline has reseller partnerships in the United States for its payment terminals.  (Worldline May 6, 2014 Registration Document at 80.)

107.    Worldline, like Atos, has granted its customers for the Cardlink, ASCCEND and SemaCard solutions specific rights that are worldwide—specifically, the right to make derivative

works, and the right to access the Software remotely, both of which violate the conditions and covenants of the Sema Agreement.

108.    Worldline, like Atos, has imposed no geographic limitation on the use and disclosure of PaySys' trade secrets.

109.    With regard to its intellectual property, Worldline stated that its "property rights comprise a combination of complementary rights including: . . . a portfolio of approximately 80 patents, filed *in the geographic markets where the Group* [here, Worldline] is most active, including Europe, *the United States*, Canada, and India."  (Worldline May 6, 2014 Registration Document at 174-75 (emphasis added).)

110.    New York jurisdiction may be asserted over Worldline as a "mere department" of Atos SE, which is subject to the general jurisdiction of New York, based on (1) Atos SE's common ownership of Worldline SA and other Worldline subsidiaries; (2) Worldline's financial dependence on Atos SE; (3) Atos SE's interference in the selection and assignment of the executive personnel of Worldline SA and other Worldline subsidiaries, and Atos SE's failure to observe corporate formalities among its business units and subsidiaries, including Worldline SA and other Worldline subsidiaries; and (4) Atos SE's control over the marketing and operational policies of Worldline SA and other Worldline subsidiaries.

111.    Under these pleaded facts, general jurisdiction in New York exists over Worldline SA on other grounds including, but not limited to, alter ego, agency, solicitation-plus and single-enterprise grounds.

## GENERAL ALLEGATIONS

### PaySys' Copyright Interest in Its Proprietary Software

112.    PaySys has invested tens of millions of dollars and many years of work in the development of its credit card payment processing software applications known originally as CardPac.  It is valuable financial application software that has continuously been and is currently used by banks and transaction processing companies to process payments and manage accounts made by way of credit, debit, and stored value cards.  The CardPac software consists of at least eight modules, including numerous applications within each module, which together comprise millions of lines of code.  CardPac was first released in 1983 and was enhanced by PaySys periodically during the ensuing decades.  "Software" as used herein shall refer to the CardPac software created by PaySys, including object code, source code and related documentation, any complete or partial copy thereof contained in any other work or medium, and the confidential information embodied in or associated with that software.

113.    PaySys has complied with the Copyright Act, 17 U.S.C. § 101 et seq., and has obtained from the Register of Copyrights Certificates of Registration for PaySys' software programs and related materials.  PaySys owns the following eight copyright registrations in the software programs and related materials, each registered November 7, 2014:

  a.      CardPac - OLA 606: OAS100, Reg. No. TXu001913381

  b.      CardPac - SSC 140: SSU900, Reg. No. TXu001913382

  c.      CardPac - OLC 400: OCD200, Reg. No. TXu001913412

  d.      CardPac - CSM 700: KSD200, Reg. No. TXu001913410

  e.      CardPac - APS 400: APD200, Reg. No. TXu001913414

  f.      CardPac - IMP 420: CCSUT1, Reg. No. TXu001913415

  g.      CardPac - ITS 700: ITD120, Reg. No. TXu001913416

      h.     CardPac - CPS 612: CPD110, Reg. No. TXu001913417.

True copies of the Certificates of Registration are attached hereto as Exhibit A.

      114.    PaySys' Software is also protected by the copyright laws of other nations in accordance with the Berne Convention and the TRIPS Agreement of the World Trade Organization.

      115.    PaySys is currently and at all relevant times has been the sole owner of all right, title and interest in the Software and related materials, including applicable copyrights, trade secrets, and other property rights.

      116.    The CardPac Software and related source code and technical information are PaySys trade secrets, which can be used and disclosed by Atos and its licensees only to the extent allowed by the Agreement.  The Agreement defines the Confidential Information of PaySys to mean

> the Products, all Enhancements to the Products, and all proprietary information, data, documentation and derivative works related to the products, but does not include information which is or becomes in the public domain without a breach of the License.

PaySys claims all such Confidential Information to be trade secrets of PaySys, which were licensed to Sema subject to the conditions and covenants contained in the Agreement. The Agreement contains extensive confidentiality requirements intended to protect and maintain those trade secrets.

**The Parties' Licensing Agreement**

      117.    The respective rights and responsibilities of Plaintiff PaySys and Sema were and are set forth in the Agreement.  Plaintiff has performed its obligations under the Agreement, but the Defendants (including as putative successor(s) to Sema) have not.

      118.    Under a series of agreements dating between 1988 and 2001, Sema acquired from PaySys contractually limited rights (i) to use the CardPac software itself, and (ii) to sell to others

limited licenses to use the CardPac software.  The series of agreements by which Sema acquired

its limited rights are as follows:

      a.      On or about October 31, 1988, PaySys and Sema Sub entered into a

Software Acquisition Agreement (herein, the "Base Agreement").  PaySys licensed its

software to Sema Sub, and granted certain rights to Sema Sub to sublicense the CardPac

software in 36 designated countries in Europe and Asia.

      b.      The Base Agreement was amended in a writing (the "Dec. 1988

Amendment") signed by PaySys and Sema Parent and dated December 28, 1988, but to

take effect as of October 31, 1988, the date of the Base Agreement.

      c.      On or about March 1, 1990, PaySys and Sema entered into a Second

Amendment to Software Acquisition Agreement (the "March 1990 Agreement") by

executing a writing bearing that date.   Sema Parent also signed this amendment "for the

purpose of approving and consenting to same."

      d.      On or about October 24, 1990, PaySys and Sema entered into a signed

writing (the "Oct. 1990 Amendment") in order to "clarify" the terms related to payments

due from Sema to PaySys on sales of copies of the APS module.

      e.      On or about April 27, 2001, PaySys, Sema Sub and Sema Parent entered

into a Confidential Settlement Agreement (the "Apr. 2001 Amendment") by executing a

writing bearing that date.  The Apr. 2001 Amendment settled a dispute between PaySys

and Sema concerning the scope of the parties' rights and responsibilities.  The Apr. 2001

Amendment effected further amendments to the Base Agreement, expanded Sema's

territory to the entire world other than North and South America, and was the final

amendment of the agreement sued on herein.  One of the terms of the Apr. 2001

Amendment makes this Court the "exclusive forum for adjudicating any dispute arising

out of or relating to the subject matter of this Agreement."

The currently operative agreement is referred to herein as the "Agreement."

119.    Pursuant to the Agreement, Sema received a copy of the CardPac software in object code and source code form.  Possession of the source code of a software program gives programmers an important advantage because it equips them, *inter alia*, (i) to customize the software, (ii) to port it to a different platform or operating system, and (iii) to add non-original modules to the program.  These activities cannot readily be accomplished without the source code.  If performed by someone other than the owner of the software program or without a license from the owner, all of these activities violate the owner's copyright and trade secret rights in the software program.

120.    Pursuant to the Agreement, Sema acquired the right to use the CardPac Software itself *and*, subject to the terms and conditions of the Agreement, to modify the CardPac Software as it saw fit.

121.    Sema also acquired the right to license the CardPac software to end users in countries outside North and South America.  Defendant Sema did not, however, acquire the right under the terms of the Agreement to authorize those end users (or any other person or entity besides Sema itself) to copy or modify the software or to authorize end users to assign, sublicense or distribute copies of the software (in original or modified form) to others.  All the license restrictions applicable to CardPac in the Agreement apply equally to such things as associated program and system documentation, reference manuals, user manuals and flowcharts.

122.    Under copyright law, as well as the express "subject to" terminology in the Agreement, any exercise of rights by Defendants with respect to derivative works of the CardPac

Software that the Defendants may have created or obtained are subject to the restrictions applicable to the CardPac Software itself under the Agreement, including license conditions and confidentiality terms.  The Agreement expressly includes "derivative works" in its definition of Confidential Information in Schedule F of the December 28, 1988 Letter Agreement, as well as license terms and conditions contained in Section 5(d) of the 2001 Confidential Settlement Agreement.

123.    Upon information and belief, the software that the Defendants have licensed and used under the names Cardlink, Cardlink II, ASCCEND, SemaCard, and Cardlink APS contain partial or full copies of the CardPac Software, embody or require use of PaySys Confidential Information and trade secrets, and consist in whole or in part of other property of PaySys.

124.    Under the Agreement, the covenants and conditions applicable to the rights granted by PaySys to Sema include the following:

a.    Section 17(b) of the Base Agreement states that "Neither party may assign this Agreement without the prior written consent of the other" although the Agreement permitted an assignment by Sema to an "Affiliate of SEMA." "Affiliate" is defined in section 1(a) of the Base Agreement as "any corporation or other business entity which **_controls_**, **_is_** controlled by or **_is_** under common control with a party to this Agreement." Under well-established principles of New York law, this present tense, plain language definition encompasses only those entities that were in existence and were in or under the control of Sema at the date of the Agreement.  PaySys retained the right to approve or disapprove any assignments of the Agreement to any other entity, just as it retained the right to approve or disapprove the grant of any license not expressly allowed under the Agreement.

33

b.      In Section 10 of the Base Agreement, Sema warrants that "SEMA shall not grant, and shall take reasonable measures to assure that no Distributor grants, any rights or privileges thereunder which exceed the rights granted to SEMA hereunder."

c.      In the Agreement, Sema was authorized to sublicense its rights in the software only to (i) Distributors (though the right to appoint Distributors was limited to a period of ten years ending in 1998) and (ii) User Licensees, whose rights were limited to "Use," as defined in the Agreement.  According to the Agreement, "A User Licensee does not have the further right to grant sublicenses."

d.      Section 10(iv) of the Base Agreement contains the condition that "Any purported License which violates or contradicts the terms and conditions of this Agreement shall not be a valid license."  Accordingly, Sema was not only prohibited from granting non-conforming rights to others, but was powerless to do so.

e.      Section 14(a) of the Dec. 1988 Amendment contains the condition that Sema agrees "to treat the Products . . . in the same fashion that it treats its own valuable confidential and proprietary information and to refrain from using or disclosing the Products except as permitted in this Agreement."

f.      Schedule F to the Dec. 1998 Amendment contains the condition requiring Sema to include in each license it issues a term permitting termination of the license for any breach of the licensee's confidentiality obligations.

g.      Section 7 of Schedule F of the Dec. 1998 Amendment requires Sema to include in each license it issues a term permitting it to audit the licensee's adherence to the confidentiality obligations imposed by the Agreement.

125.     Because the minimum license provisions required to be included in all licenses granted by Sema are for the express intended benefit of PaySys, PaySys is entitled as a third-party beneficiary to enforce those conditions and covenants directly against all such licensees. This principle entitles PaySys to enforce the same terms directly against Worldline and others insofar as they acquired rights directly or indirectly from Sema under the Agreement.

**Defendant's Breaches and Infringing Activities**

126.     Defendant Atos has breached its obligations under the Agreement in multiple ways, as follows.

127.     <u>First</u>:  In 2004, in reckless disregard of the requirements of the Agreement and applicable copyright law, Atos purported to cause Sema SA to assign the Agreement to a series of Atos affiliates, ultimately including Atos SE, without the consent of PaySys.

128.     None of the Sema SA assignees in 2004 or subsequently qualified as an "Affiliate of SEMA," as referenced in the Agreement.  This improper assignment of Sema's license rights was in violation of Section 17(b) of the Base Agreement as well as applicable intellectual property laws, and is void.  Such an attempted assignment is invalid and ineffective – as if a license holder were to grant a license to a stranger, and the assignee therefore acquires no rights as a result of the invalid assignment.  (As is widely recognized, a license agreement involving intellectual property is deemed non-assignable as a matter of U.S. law for three independently sufficient reasons: (i) It is a personal agreement whose benefits and value are unique to the named licensee and may not be assigned without the consent of the licensor.  (ii) As a trade secret license it is the subject of trust and confidence that may not be assigned or delegated without the consent of the trade secret owner.   (iii) The express terms of the Agreement not only prohibit assignment but declare non-compliant licenses to be void.)  Since the date of the

impermissible assignment(s), neither Atos nor Worldline nor any other licensee or sublicensee or other entity claiming rights through the license held by Sema SA has had the right to use the PaySys software products and related materials that are the subject of this Complaint.

129.    Furthermore, Atos simultaneously caused Sema SA and its successor-by-merger Investissement 6 to dissolve, resulting in the loss and abandonment of Sema SA's own license.

130.    Second:  Atos promised in the Agreement and clarified specifically in the Oct. 1990 Amendment that it was obligated to pay (i) $100,000 for each APS license sold in Japan and all European countries other than Greece and Turkey, and (ii) $50,000 for each APS module sold in Asia (ex Japan) and Greece and Turkey.  Section 7 of the Final Agreement provides for the amount instead to be $75,000 per APS license in certain cases.

131.    Defendants have in fact made numerous such sales of APS licenses, without payment to PaySys.  Plaintiff has identified additional APS licenses that were granted as a result of the transfer or expansion of previous APS licenses.  Defendants Atos and Worldline have refused to give PaySys sufficient information to verify the correct number.  Until 2014, Defendants never acknowledged or reported to PaySys making a single sale of an APS license. Even today, PaySys has not been paid for any APS licenses.

132.    Defendants' failure to identify these relevant sales and pay PaySys the agreed fees is a complete breach of Sema's obligations regarding the APS module and, as simultaneously a condition to Sema's right to license the APS module, represents a willful or reckless infringement of PaySys' copyright and trade secret rights in the APS module and conversion of PaySys' property rights in the APS module.

133.    Failure by the Defendants to comply with essential payment terms to PaySys for that license is a violation of a condition of the license and renders the license invalid.

134.   <u>Third:</u>  Based on public information and documentation provided by Defendants Atos and Worldline, PaySys in late 2014 discovered that Atos, Worldline, and their affiliates and predecessors intentionally ignored the license restrictions contained in the Agreement by granting end-user customers licenses that (1) substantially exceed the terms for sublicensing to users as defined and permitted in the Agreement, (2) do not contain minimum license terms and restrictions that the Agreement requires be included in each user license, and (3) thereby violate the conditions attached to any such sublicensing.

135.   For example, Plaintiff has reason to believe that some or all of the customer contracts signed by Atos, Worldline, or their affiliates or predecessors give the customer the explicit right to modify the licensed software.  The right to modify software (*i.e.*, in U.S. copyright terms, to make a "derivative work") was licensed by PaySys only to Sema and is otherwise an exclusive right retained by PaySys as owner of the applicable copyrights which Sema had no right to sublicense to customers or others.  The right to modify software is a very important and valuable consideration in licensing and software practice generally.  By purporting to sublicense to customers the right to modify the software without the consent of PaySys and due consideration, Defendants violated the Agreement, infringed PaySys' intellectual property rights, and have caused customers and business partners to infringe PaySys' intellectual property rights.  Defendants' practice of awarding customers and business partners license rights that Defendants have no right to confer also gives Defendants an unfair cost advantage because Defendants avoid attendant charges for such a sublicense due PaySys.

136.   In addition to the violation involving the sublicense of the right to make derivative works, the customer agreements of Atos, Worldline and their affiliates disclosed to PaySys in late 2014 fail to include certain key provisions that Schedule F of the Dec. 1998

Amendment requires Sema to include in every customer agreement.  Some of the customer agreements also contain other deviations from the requirements of the Agreement not approved by PaySys.

137.    The failure of Atos and Worldline to adhere to the sublicensing requirements and conditions contained in the Agreement is both a breach of the parties' Agreement and a violation of conditions applicable to the sublicenses, and thus places customers in the position of infringing PaySys' copyright and trade secrets and converting PaySys' property rights. According to the 1988 Agreement (page 16), "Any purported License which violates or contradicts the terms and conditions of this Agreement shall not be a valid License."   This wrongful and unlicensed conduct is continuing and is an ongoing violation of the Agreement, despite the admonition in the Agreement that Sema "may not convey any other right, title or interest" in the software without PaySys' consent.

138.    During the compliance verification initiated by PaySys in 2013, an Atos senior officer repeatedly assured PaySys that Atos was in full compliance with the requirements of the Agreement.  Atos also stated that its customer contracts were "in compliance" with the requirements of the Agreement.  In light of the facts known today, these statements were false and intended to misrepresent and conceal the truth of systematic non-compliance with the requirements of the Agreement

139.    Fourth:  Based on public information and documentation provided by Atos and Worldline since PaySys initiated its audit in 2013, PaySys has found that both Defendants and their customers are dealing extensively with third-party service providers and application developers by improperly allowing them, *inter alia*, to engage in application development and support, relicensing of modifications and enhancements they create, hosting and outsourcing, and

support activities, all of which require unlicensed access to or use of the PaySys software,
including copyrights, trade secrets and other property rights of PaySys.

140.    For example, on September 14, 2014, Worldline publicly announced that it had
entered into a five-year agreement with a Thai company called Accellence (Thailand) Ltd.
("Accellence"). According to Worldline's press release, Worldline's agreement with Accellence
provided Accellence the right to resell and support PaySys software.  The Accellence agreement
has reportedly been in place since 2009, renewed each year.  But the Agreement flatly prohibits
appointment of new distributors by Atos after 1998.  Atos gives no explanation for why it
appointed Accellence as a distributor, especially for Atos' decision to do so in the middle of an
audit in which Atos' compliance with the terms of the Agreement was under review.  Moreover,
in late 2014 Atos revealed in documentation it supplied to PaySys that Atos had purported to
assign rights originally held by Atos IT Services Ltd., first to Atos itself, and then to Accellence.
Under no theory was an assignment to Accellence allowed.

141.    Fifth:  Publicly available information shows that other business operators acting
in concert with Defendants (through Defendants' "extensive partner ecosystem")  and their
licensed end users have been given access to and use the PaySys software, including source
code, without the benefit of a valid license.  PaySys has demanded that Defendants Atos and
Worldline investigate and explain publicly reported activities of numerous third-party service
organizations that appear to involve the software, including in some cases application
development.  These service organizations appear to include Accellence, Attra, IBM,
Technological Information Consultants, iSphere Global, Apar Technologies Sdn Bhd, A-IT
Software Services Pte Ltd, iTAC MSC Outsourcing, SZ IT Center, ACI Worldwide, IAM, DL
Resources Pte. Ltd, and WiPro.  Clause 10 of the 1988 Letter Agreement requires Sema to notify

PaySys of any infringement of PaySys' rights that comes to the attention of Sema's senior management and to cooperate reasonably with PaySys to attempt to halt such infringement. Yet Atos and Worldline have concealed these violations from PaySys and have declined to provide information or assistance regarding the evidence of access and use that PaySys has uncovered involving these third parties.

**PaySys' Attempts To Rectify the Parties' Contractual Relationship**

142.    Beginning in June 2013, PaySys launched an effort, which is continuing to the present, to verify Atos' (and, subsequently, Worldline's) compliance with the requirements and conditions of the Agreement and to enforce PaySys' rights. PaySys has exercised its right under the Agreement and demanded that Defendants cooperate with PaySys to ascertain whether the conduct of Defendants, their customers, and service organizations acting in concert with them have violated the Agreement and PaySys' intellectual property rights.

143.    Plaintiff informed Defendants that payments were due and owing and have made all necessary demands for payment. Defendant refused to pay or provide PaySys with credible justification for not paying the sums that were due and owing.

144.    Through a series of correspondence and communications, Plaintiff has attempted to resolve its claim for payment for the unlicensed conduct.

145.    Despite Plaintiff's demand to Defendants in an effort to enforce its legal rights under the license agreement, Defendants have refused to permit PaySys to audit all but a small number of Defendants' agreements with their customers, which were provided by Atos only in late 2014 after repeated requests.

146.    Defendants have refused to provide PaySys with a full accounting of its sales of APS licenses.

147.    Defendants have refused to provide PaySys with information requested by PaySys to verify whether customers and third parties are using the CardPac Software consistently with the Agreement and PaySys' intellectual property rights.

148.    Despite the fact that PaySys has identified to the Defendants specific examples of breaches of the Agreement, and despite being obligated to cooperate with PaySys in any reasonable investigation, Defendants have refused to provide PaySys access to information that would allow PaySys to investigate whether Defendants or their customers have granted sublicenses to third-party service providers and application developers, such as Worldline did through its agreement with Accellence (Thailand) Ltd. as described in Worldline's press release of September 14, 2014.

### FIRST CAUSE OF ACTION
(Breach of Contract)

149.    Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 to 148.

150.    Defendants Atos and Worldline, as purported successors to Sema and/or as purported affiliates of Sema, purport to operate under written contracts with Plaintiff PaySys, including the Agreement, which require Sema to pay Plaintiff for each relevant sale of a license to the APS module.

151.    The Agreement under which Defendants purport to operate requires that customers be made subject to prescribed license limitations, but Defendants have not included those limitations in the customer agreements and Defendants instead systematically authorize or permit customers to exceed those limitations.

152.    The Agreement under which Defendants purport to operate precludes sublicensing, except of "use" rights to "user" customers.  Appointment of "distributors" after

41

1998 is prohibited.  Except for the right given to Sema in the Agreement to sublicense to a "User" the right to "Use" the software, the Agreement does not allow Defendants or their customers to sublicense third-party service providers any right in the PaySys software. Application development, resale or customization of the Software are all outside the definition of "Use," which is limited to "transferring any portion of any Product from storage units or media into equipment for processing (whether by electronic, mechanical or other means); utilizing any portion of any Product in the course of the operation of any equipment or programs; merging any Product or portion thereof into another product; or referring to any documentation included in the definition of product for the purpose of understanding or operating the Product."  [Clause 1(o), 1988 Agreement].

153.    The Agreement also prohibits Sema from assigning the Agreement without the PaySys' written consent to any other entity, except to an Affiliate of Sema.  The 2004 assignment by Sema SA to Atos and Atos subsidiaries, including its merger with Investissement 6, its subsequent transfer of assets to (i) Atos Consulting, (ii) Atos Origin Integration and (iii) Atos Origin Infogerance, and its dissolution and liquidation in favor of Atos, violates the Agreement and is invalid.  Since the date of that impermissible assignment, all activities by Atos, and its purported licensees and assignees relating to the PaySys Software have violated PaySys' rights in the Software, breached the Agreement, and are invalid.

154.    Plaintiff PaySys has demanded payment from Defendants Atos and Worldline for each of these breaches and for damages resulting from Defendants' and their purported licensees' and assignees' improper acts, and by the filing of this Complaint hereby demands payment of all unpaid sums.  Defendants have failed and refused, and they continue to fail and

42

refuse to pay a substantial amount of money that is due and owing for violations of the Agreement.

## SECOND CAUSE OF ACTION
(Copyright Infringement)

155.    Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 to 154.

156.    Defendants have infringed Plaintiff's copyrights in violation of Copyright Act, 17 U.S.C. § 101 et seq. without authorization and consent.

157.    Defendants' acts of infringement are willful, intentional, and purposeful, in disregard of Plaintiff's legal rights.

158.    As a direct and proximate result of said infringement by Defendants, Plaintiff is entitled to damages in an amount to be proven at trial.

159.    Plaintiff is further entitled to its reasonable and necessary attorneys' fees and full costs pursuant to Copyright Act, 17 U.S.C. § 505 and otherwise according to law.

## THIRD CAUSE OF ACTION
(Inducement of Copyright Infringement)

160.    Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 to 159.

161.    Third parties have engaged in the unauthorized use, reproduction, distribution, and modification of Plaintiff's copyrighted software and related materials listed in Exhibit A.  As a result, those third parties are liable for direct copyright infringement of Plaintiff's exclusive rights of reproduction and distribution under 17 U.S.C. § 106.

162.    On information and belief, those third parties include at least some of Accellence, Attra, IBM, Technological Information Consultants, iSphere Global, Apar Technologies Sdn

Bhd, A-IT Software Services Pte Ltd, iTAC MSC Outsourcing, SZ IT Center, ACI Worldwide, IAM, DL Resources Pte. Ltd, and WiPro.

163.    The infringing acts by each one of those third parties were committed with Defendants' knowledge, and have been encouraged and made possible by Defendants, whose object is to promote the unlawful use, reproduction, distribution, and modification of Plaintiff's copyrighted software and related materials.

164.    Defendants' inducement of copyright infringement is apparent from Defendants' active provision of the source code and related materials to the third parties, and allowing and encouraging the third parties to use, reproduce, distribute, and modify Plaintiff's copyrighted software and related materials listed in Exhibit A.

165.    As a result of the foregoing, Defendants are liable under the Copyright Act for inducing the infringing acts of their users, in violation of sections 106 and 501 of the Copyright Act.

166.    The infringement of Plaintiff's rights in each of its copyrighted source code and related materials constitutes a separate and distinct act of infringement.

167.    Defendants' acts of infringement are willful, intentional and purposeful, in disregard of Plaintiff's rights.

168.    As a direct and proximate result of Defendants' infringement of Plaintiff's copyrights, Plaintiff is entitled to maximum statutory damages, in the amount of $150,000 per work infringed, pursuant to 17 U.S.C. § 504(c), or for such other amount as may be proper pursuant to 17 U.S.C. § 504(b) and/or (c).

169.    Unless and until Defendants' conduct is enjoined by this Court, they will continue to cause irreparable injury that cannot fully be compensated for or measured in money, and

Plaintiff is accordingly also entitled to an injunction pursuant to 17 U.S.C. § 502 prohibiting further infringement of its exclusive rights under copyright.

170.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

### FOURTH CAUSE OF ACTION
(Contributory Copyright Infringement)

171.    Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 to 170.

172.    Third parties have engaged in the unauthorized use, reproduction, distribution, and modification of Plaintiff's copyrighted software and related materials listed in Exhibit A.  As a result, those third parties are liable for direct copyright infringement of Plaintiff's exclusive rights of reproduction and distribution under 17 U.S.C. § 106.

173.    On information and belief, those third parties include at least some of Accellence, Attra, IBM, Technological Information Consultants, iSphere Global, Apar Technologies Sdn Bhd, A-IT Software Services Pte Ltd, iTAC MSC Outsourcing, SZ IT Center, ACI Worldwide, IAM, DL Resources Pte. Ltd, and WiPro.

174.    Defendants had actual and constructive knowledge of those third parties' infringing activity and materially contributed to that activity by providing copies of Plaintiff's copyrighted software and related materials to those third parties.

175.    Defendants intended for third parties to directly infringe Plaintiff's rights, as evidenced by Defendants' active provision of the source code and related materials to the third parties, and allowing and encouraging the third parties to use, reproduce, distribute, and modify Plaintiff's copyrighted software and related materials listed in Exhibit A.  As a result of the

foregoing, Defendants are liable under the Copyright Act and/or the common law for secondary liability for contributing to infringing acts of their users.

176.    The infringement of Plaintiff's rights in each of its copyrighted source code and related materials constitutes a separate and distinct act of infringement.

177.    Defendants' acts of infringement are willful, intentional and purposeful, in disregard of Plaintiff's rights.

178.    As a direct and proximate result of Defendants' infringement of Plaintiff's copyrights, Plaintiff is entitled to maximum statutory damages, in the amount of $150,000 per work infringed, pursuant to 17 U.S.C. § 504(c), or for such other amount as may be proper pursuant to 17 U.S.C. § 504(b) and/or (c).

179.    Unless and until Defendants' conduct is enjoined by this Court, they will continue to cause irreparable injury that cannot fully be compensated for or measured in money, and Plaintiff is accordingly also entitled to an injunction pursuant to 17 U.S.C. § 502 prohibiting further infringement of their exclusive rights under copyright.

180.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

### FIFTH CAUSE OF ACTION
(Misappropriation of Trade Secrets – New York Law)

181.    Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 to180.

182.    The PaySys Software, source code, system documentation, reference manuals, user manuals and flow charts associated therewith ("PaySys Trade Secrets") constitute trade secrets under New York law.

46

183.     At all times PaySys has taken appropriate measures to protect the PaySys Trade Secrets from unauthorized disclosure or use, including, but not limited to the inclusion of specific provisions in the Agreement that require customer agreements to contain strict confidentiality terms.

184.     Any unauthorized disclosure or unauthorized use of PaySys Trade Secrets constitutes a misappropriation of trade secrets under New York law.

185.     On information and belief, and as proven by Worldline's agreement with Accellence, Defendants have (i) disclosed PaySys Trade Secrets to persons or entities other than those permitted by the Agreement, (ii) allowed its licensees to use the PaySys Trade Secrets in ways not authorized by the Agreement, and (iii) since the illegal assignment from Sema to Atos in 2004, have themselves and allowed others to use the PaySys Trade Secrets without authorization.

186.     As a direct and proximate result of said disclosures, and said unauthorized uses, Plaintiff is entitled to damages in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION
(Misappropriation of Trade Secrets – FLA. STAT. § 688.001 et seq.)

187.     Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 to 186.

188.     Defendants' conduct also constitutes actionable misappropriation of trade secrets under the Uniform Trade Secrets Act as enacted by Florida.

189.     PaySys is entitled to the remedies provided by that Act, including damages amounting to the actual loss caused by the misappropriation of the PaySys Trade Secrets and the unjust enrichment to Defendants caused by the misappropriation that is not taken into account in

computing the actual loss.  Alternatively, at PaySys' option, PaySys is entitled to a reasonable royalty for Atos' and Worldline's unauthorized disclosure or use of the PaySys Trade Secrets.

## SEVENTH CAUSE OF ACTION
### (Declaratory Judgment)

190.    Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1 to 189.

191.    The governing license issued to Sema and now claimed by Atos was improperly assigned by Sema to Atos in 2004 without the consent of PaySys.  At the time, Atos was not an Affiliate as the Agreement defines that term, and thus was not entitled to take an assignment of the governing license without PaySys' consent.  This impermissible action violated an unambiguous prohibition in the Agreement and copyright law, and voided the governing license claimed by Atos and any sublicenses granted by Sema or Atos by virtue of the governing license.

192.    Furthermore, any license issued by Defendants Atos, Worldline, their affiliates, or any distributor to a third party is invalid if as written or in practice the licensee is permitted to engage in activities with respect to the CardPac software that exceed the limited use privileges that Sema is authorized by the Agreement to convey to its licensees.

193.    There is a substantial controversy between PaySys and Defendants Atos and Worldline concerning (i) the current validity of the governing license and (ii) the validity of licenses granted by Defendants to third parties to use the CardPac software.

194.    The controversy is substantial and immediate, and warrants the issuance of a declaratory judgment.

195.    There is an actual controversy concerning the validity of such licenses.

196.    Plaintiff is entitled to a declaration that any license found to be issued by Defendants Atos and Worldline or their affiliates or any distributor or other third party appointed by them is void.

## EIGHTH CAUSE OF ACTION
(Copyright Infringement – Violation of French Intellectual Property Code)

197.    Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1-196.

198.    On information and belief, third-party direct infringers Atos and Worldline have principal places of business in France.

199.    On information and belief, Defendants have induced Atos and Worldline to engage in copyright infringement by encouraging the same to illegal reproduce, distribute, and modify Plaintiff's copyrighted works in France.

200.    On information and belief, Defendants have knowingly caused or materially contributed to the direct infringement of Plaintiff's copyrights by Atos and Worldline in France.

201.    Defendants have infringed Plaintiff's copyrights in violation of the French Intellectual Property Code, without authorization and consent.

202.    Defendants actions have prejudiced Plaintiff through loss of profit, loss of reputation, damage to moral rights, and/or loss of value in the copyrights themselves.

203.    As a direct and proximate result of said infringement by Defendants, Plaintiff is entitled to damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
(Copyright Infringement – Violation of the Copyright Law of Thailand)

204.    Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1-203.

205.    On information and belief, third-party direct infringer Accellence has a principal place of business in Thailand.

206.    On information and belief, Defendants have induced Accellence to engage in copyright infringement by encouraging the same to illegal reproduce, distribute, and modify Plaintiff's copyrighted works in Thailand.

207.    On information and belief, licensees of Atos, Worldline, and Accellence are located in Thailand, and such licensees are illegally reproducing, distributing, and modifying Plaintiff's copyrighted works, all with the knowledge of Defendants.

208.    On information and belief, Defendants have knowingly caused or materially contributed to the direct infringement of Plaintiff's copyrights by Accellence, Atos, Worldline, and other third-party licensees in Thailand.

209.    Defendants have infringed Plaintiff's copyrights in violation of the Copyright Law of Thailand, without authorization and consent.

210.    As a direct and proximate result of said infringement by Defendants, Plaintiff is entitled to damages in an amount to be proven at trial.

## **TENTH CAUSE OF ACTION**
(Copyright Infringement – Violation of the Copyright Law of Belgium)

211.    Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1-210.

212.    On information and belief, a third-party direct infringer, a bank, has a principal place of business in Belgium.

213.    On information and belief, Defendants have induced that infringer to engage in copyright infringement by encouraging the same to illegal reproduce, distribute, and modify Plaintiff's copyrighted works in Belgium.

214.    On information and belief, Defendants have knowingly caused or materially contributed to the direct infringement of Plaintiff's copyrights by that infringer, and other third-party licensees in Belgium.

215.    Defendants have infringed Plaintiff's copyrights in violation of the Copyright Law of Belgium, without authorization and consent.

216.    As a direct and proximate result of said infringement by Defendants, Plaintiff is entitled to damages in an amount to be proven at trial.

### ELEVENTH CAUSE OF ACTION
(Copyright Infringement – Violation of the Copyright Law of China)

217.    Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1-216.

218.    On information and belief, licensees of Atos, Worldline, and Accellence, including but not limited to various banks, are located in China, and such licensees are illegally reproducing, distributing, and modifying Plaintiff's copyrighted works, all with the knowledge of Defendants.

219.    On information and belief, Defendants have induced licensees of Atos, Worldline, and Accellence to engage in copyright infringement by encouraging the same to illegally reproduce, distribute, and modify Plaintiff's copyrighted works in China.

220.    On information and belief, Defendants have knowingly caused or materially contributed to the direct infringement of Plaintiff's copyrights by Accellence, Atos, Worldline, and other third-party licensees in China.

221.    Defendants have infringed Plaintiff's copyrights in violation of the Copyright Law of China, without authorization and consent.

222.     As a direct and proximate result of said infringement by Defendants, Plaintiff is entitled to damages in an amount to be proven at trial.

**TWELFTH CAUSE OF ACTION**
(Conversion, In the Alternative – Violation of the Common Law of New York)

223.     Plaintiff repeats and realleges, as if fully set forth herein, the allegations of paragraphs 1–222.

224.     Plaintiffs state a claim of ownership over electronic data, including but not limited to source code, programs, system documentation, reference manuals, user manuals and other electronic works derived from or contained within software owned by Plaintiff.

225.     Defendants have exercised dominion and control over Plaintiff's electronic data in the United States and abroad.

226.     On information and belief, Defendants are in possession of physical media containing electronic data that belongs to Plaintiff.  Defendants have assumed control and are exercising rights of ownership over such physical media to the exclusion of Plaintiff.

227.     On information and belief, Defendants are in possession of physical media and objects, such as written documentation, reference manuals, user manuals, specimen reports, and flow charts belonging to Plaintiff.  Defendants have assumed control and are exercising rights of ownership over such physical media and objects to the exclusion of Plaintiff.

228.     By their wrongful actions, Defendants have intentionally stolen and converted PaySys confidential and proprietary information and trade secrets to the exclusion of PaySys' rights.

229.     As a direct and proximate result of the wrongful conduct of Defendants, PaySys has suffered and continues to suffer irreparable injury.

230.    As a direct and proximate result of their wrongful conduct, Defendants have been unjustly enriched, and PaySys has suffered and continues to suffer money damages.

231.    As an alternative causes of action pled herein under the copyright laws of the United States and other countries, Plaintiff alleges Defendants have converted property owned by Plaintiff.

232.    As a direct and proximate result of such conversion by Defendants, Plaintiff is entitled to damages in an amount to be proven at trial.

<u>**THIRTEENTH CAUSE OF ACTION**</u>
(Unfair Competition)

233.    Plaintiff repeats and realleges, as if fully set forth herein the allegations of paragraphs 1 through 232.

234.    Defendants compete with PaySys in the market for credit card processing software in certain areas of the world.

235.    Defendants are selling licenses and related services based on PaySys' Software without securing the necessary intellectual property rights and consents from PaySys.  This gives Defendants an unfair competitive advantage because Atos and Worldline do not pay appropriate fees for the necessary licenses and they therefore obtain an unfair and unlawful advantage in their costs.

236.    Defendants have misrepresented to customers, resellers and service providers Defendants' ownership and rights in Defendants' own products and their freedom to act without obtaining necessary licenses and consents from PaySys.

237.    By failing to pay proper license fees to PaySys, Defendants have obtained cost advantages that they are not entitled to in competing with PaySys for customers.

238.    By their wrongful actions, Defendants have knowingly misappropriated confidential and proprietary information for use in their businesses and have engaged in unfair competition with PaySys.

239.    As a direct and proximate result of the wrongful conduct of Defendants, PaySys has suffered and continues to suffer irreparable injury.

240.    As a direct and proximate result of their wrongful conduct, Defendants have been unjustly enriched, and PaySys has suffered and continues to suffer money damages.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff PaySys respectfully requests a trial by jury of all issues properly triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PaySys International, Inc. demands entry of judgment in its favor and against Defendant Atos SE and Defendant Worldline SA as follows:

I.    Awarding PaySys damages in an amount to be determined for Sema Parent's, Sema Sub's, Atos' and Worldline's breach of the Agreement;

II.    Awarding PaySys damages in an amount to be determined for Sema Parent's, Sema Sub's, Atos' and Worldline's infringement of PaySys' copyright;

III.    Awarding PaySys damages in an amount to be determined for Sema Parent's, Sema Sub's, Atos' and Worldline's misappropriation of PaySys trade secrets;

IV.    Immediate injunctive relief ordering Sema Parent's, Sema Sub's, Atos' and Worldline's to submit to an audit of their, their customers' and any other purported sublicensees' compliance with the Agreement;

V.      A declaration that all licenses or sublicenses issued by Sema Parent, Sema Sub, Atos, Worldline, their affiliates, or predecessors in violation of the Agreement or used in violation of the Agreement are void;

VI.      A permanent injunction enjoining the Defendants Sema Parent, Sema Sub, Atos and Worldline, and their respective officers, agents, servants, employees, attorneys, and affiliated companies, their assigns and successors in interest, and those persons in active concert or participation with it, from continued acts in breach of the Agreement;

VII.      A permanent injunction enjoining Defendants Sema Parent, Sema Sub, Atos and Worldline, and their respective officers, agents, servants, employees, attorneys, and affiliated companies, their assigns and successors in interest, and those persons in active concert or participation with it, from the continued violation of the Florida Uniform Trade Secrets Act;

VIII.      Prejudgment interest at the statutory rate from the time payments came due;

IX.      Any other accounting for damages;

X.      Such other and further relief as to this Court shall seem just and proper.

Dated: New York, New York
      March 27, 2015

SUTHERLAND ASBILL & BRENNAN LLP

By_____
          Robert D. Owen

The Grace Building
1114 Avenue of the Americas, 40th Floor
New York, New York 10036
(212) 389-5000
*Attorneys for Plaintiff*

VERIFICATION

STATE OF NEBRASKA      )
                                        ss.:
COUNTY OF DOUGLAS   )

     GREGORY A. PIEL, being duly sworn, deposes and says:

     1.    I am the Assistant Secretary of plaintiff PaySys International, Inc.  I reside in Douglas County, Nebraska.

     2.    I have read the foregoing Amended Complaint and know the contents thereof. The contents thereof are known to me to be true or have been supplied to me by others on whom I customarily rely in the conduct of my business affairs and are true to the best of my knowledge, information or belief.  As to matters therein stated to be alleged on information and belief, I believe them to be true.

                                  Gregory A. Piel

Sworn to before me this
27th day of March 2015.

Notary Public ·

GENERAL NOTARY - State of Nebraska
PEGGY A. ETHRIDGE
My Comm. Exp. August 1, 2017

25818582_1.docx

# Exhibit A

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

**TXu 1-913-381**

**Effective date of registration:**

November 7, 2014

---

**Title**

Title of Work: CardPac - OLA 606: OAS100

**Completion/Publication**

Year of Completion: 1996

**Author**

- Author: PaySys International, Inc.

Author Created: computer program

Work made for hire: Yes

Citizen of: United States

**Copyright claimant**

Copyright Claimant: PaySys International, Inc.

495 N. Keller Road, Suite 400, Maitland, FL, 32751, United States

**Rights and Permissions**

Organization Name: Sutherland Asbill and Brennan LLP

Name: Elisabeth A. Langworthy

Email: eteas@sutherland.com          Telephone: 202-383-0100

Address: 700 Sixth Street

Suite 700

Washington, DC 20001  United States

**Certification**

Name: Daniel C. Neustadt

Date: November 7, 2014

Applicant's Tracking Number: 34250-1622

**Registration #:**  TXU001913381
**Service Request #:**  1-1882689121

.

Sutherland Asbill and Brennan LLP
Elisabeth A. Langworthy
700 Sixth Street
Suite 700
Washington, DC 20001  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**
**TXu 1-913-382**

**Effective date of registration:**
November 7, 2014

---

## Title

**Title of Work:** CardPac - SSC 140: SSU900

## Completion/Publication

**Year of Completion:** 1989

## Author

■ **Author:** PaySys International, Inc.

**Author Created:** computer program

**Work made for hire:** Yes

**Citizen of:** United States

## Copyright claimant

**Copyright Claimant:** PaySys International, Inc.

495 N. Keller Road, Suite 400, Maitland, FL, 32751, United States

## Rights and Permissions

**Organization Name:** Sutherland Asbill and Brennan LLP

**Name:** Elisabeth A. Langworthy

**Email:** eteas@sutherland.com      **Telephone:** 202-383-0100

**Address:** 700 Sixth Street

Suite 700

Washington, DC 20001  United States

## Certification

**Name:** Daniel C. Neustadt

**Date:** November 7, 2014

**Applicant's Tracking Number:** 34250-1622

**Registration #:**  TXU001913382
**Service Request #:**  1-1882689226

Sutherland Asbill and Brennan LLP
Elisabeth A. Langworthy
700 Sixth Street
Suite 700
Washington, DC 20001  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

**TXu 1-913-412**

**Effective date of
registration:**

November 7, 2014

## Title

**Title of Work:** CardPac - OLC 400: OCD200

## Completion/Publication

**Year of Completion:** 1992

## Author

■ **Author:** PaySys International, Inc.

**Author Created:** computer program

**Work made for hire:** Yes

**Citizen of:** United States

## Copyright claimant

**Copyright Claimant:** PaySys International, Inc.

495 N. Keller Road, Suite 400, Maitland, FL, 32751, United States

## Rights and Permissions

**Organization Name:** Sutherland Asbill and Brennan LLP

**Name:** Elisabeth A. Langworthy

**Email:** eteas@sutherland.com          **Telephone:** 202-383-0100

**Address:** 700 Sixth Street

Suite 700

Washington, DC 20001  United States

## Certification

**Name:** Daniel C. Neustadt

**Date:** November 7, 2014

**Applicant's Tracking Number:** 34250-1622

**Registration #:**  TXU001913412
**Service Request #:**  1-1882689031

Sutherland Asbill and Brennan LLP
Elisabeth A. Langworthy
700 Sixth Street
Suite 700
Washington, DC 20001  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**
**TXu 1-913-410**

**Effective date of**
**registration:**
November 7, 2014

---

## Title

Title of Work: CardPac - CSM 700: KSD200

## Completion/Publication

Year of Completion: 1995

## Author

■      Author: PaySys International, Inc.

Author Created: computer program

Work made for hire: Yes

Citizen of: United States

## Copyright claimant

Copyright Claimant: PaySys International, Inc.

495 N. Keller Road, Suite 400, Maitland, FL, 32751, United States

## Rights and Permissions

Organization Name: Sutherland Asbill and Brennan LLP

Name: Elisabeth A. Langworthy

Email: eteas@sutherland.com          Telephone: 202-383-0100

Address: 700 Sixth Street

Suite 700

Washington, DC 20001  United States

## Certification

Name: Daniel C. Neustadt

Date: November 7, 2014

Applicant's Tracking Number: 34250-1622

---

**Registration #:** TXU001913410
**Service Request #:** 1-1882688996

Sutherland Asbill and Brennan LLP
Elisabeth A. Langworthy
700 Sixth Street
Suite 700
Washington, DC 20001  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**
## TXu 1-913-414

**Effective date of
registration:**
November 7, 2014

---

## Title

**Title of Work:** CardPac - APS 400: APD200

## Completion/Publication

**Year of Completion:** 1992

## Author

■ **Author:** PaySys International, Inc.

**Author Created:** computer program

**Work made for hire:** Yes

**Citizen of:** United States

## Copyright claimant

**Copyright Claimant:** PaySys International, Inc.

495 N. Keller Road, Suite 400, Maitland, FL, 32751, United States

## Rights and Permissions

**Organization Name:** Sutherland Asbill and Brennan LLP

**Name:** Elisabeth A. Langworthy

**Email:** eteas@sutherland.com      **Telephone:** 202-383-0100

**Address:** 700 Sixth Street

Suite 700

Washington, DC 20001  United States

## Certification

**Name:** Daniel C. Neustadt

**Date:** November 7, 2014

**Applicant's Tracking Number:** 34250-1622

**Registration #:** TXU001913414
**Service Request #:** 1-1882689156

Sutherland Asbill and Brennan LLP
Elisabeth A. Langworthy
700 Sixth Street
Suite 700
Washington, DC 20001  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**
## TXu 1-913-415

**Effective date of
registration:**
November 7, 2014

---

## Title

**Title of Work:** CardPac - IMP 420: CCSUT1

## Completion/Publication

**Year of Completion:** 1992

## Author

- **Author:** PaySys International, Inc.

  **Author Created:** computer program

  **Work made for hire:** Yes

  **Citizen of:** United States

## Copyright claimant

**Copyright Claimant:** PaySys International, Inc.

495 N. Keller Road, Suite 400, Maitland, FL, 32751, United States

## Rights and Permissions

**Organization Name:** Sutherland Asbill and Brennan LLP

**Name:** Elisabeth A. Langworthy

**Email:** eteas@sutherland.com          **Telephone:** 202-383-0100

**Address:** 700 Sixth Street

Suite 700

Washington, DC 20001  United States

## Certification

**Name:** Daniel C. Neustadt

**Date:** November 7, 2014

**Applicant's Tracking Number:** 34250-1622

---

**Registration #:** TXU001913415
**Service Request #:** 1-1882689191

Sutherland Asbill and Brennan LLP
Elisabeth A. Langworthy
700 Sixth Street
Suite 700
Washington, DC 20001  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

## TXu 1-913-416

**Effective date of registration:**

November 7, 2014

---

## Title

**Title of Work:**  CardPac - ITS 700: ITD120

## Completion/Publication

**Year of Completion:**  1997

## Author

■  **Author:**  PaySys International, Inc.

**Author Created:**  computer program

**Work made for hire:**  Yes

**Citizen of:**  United States

## Copyright claimant

**Copyright Claimant:**  PaySys International, Inc.

495 N. Keller Road, Suite 400, Maitland, FL, 32751, United States

## Rights and Permissions

**Organization Name:**  Sutherland Asbill and Brennan LLP

**Name:**  Elisabeth A. Langworthy

**Email:**  eteas@sutherland.com                **Telephone:**  202-383-0100

**Address:**  700 Sixth Street

Suite 700

Washington, DC 20001  United States

## Certification

**Name:**  Daniel C. Neustadt

**Date:**  November 7, 2014

**Applicant's Tracking Number:**  34250-1622

---

**Registration #:** TXU001913416
**Service Request #:** 1-1882688961

Sutherland Asbill and Brennan LLP
Elisabeth A. Langworthy
700 Sixth Street
Suite 700
Washington, DC 20001  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

## TXu 1-913-417

**Effective date of
registration:**

November 7, 2014

---

## Title

**Title of Work:** CardPac - CPS 612: CPD110

## Completion/Publication

**Year of Completion:** 1997

## Author

■ **Author:** PaySys International, Inc.

**Author Created:** computer program

**Work made for hire:** Yes

**Citizen of:** United States

## Copyright claimant

**Copyright Claimant:** PaySys International, Inc.

495 N. Keller Road, Suite 400, Maitland, FL, 32751, United States

## Rights and Permissions

**Organization Name:** Sutherland Asbill and Brennan LLP

**Name:** Elisabeth A. Langworthy

**Email:** eteas@sutherland.com          **Telephone:** 202-383-0100

**Address:** 700 Sixth Street

Suite 700

Washington, DC 20001  United States

## Certification

**Name:** Daniel C. Neustadt

**Date:** November 7, 2014

**Applicant's Tracking Number:** 34250-1622

---

**Registration #:**   TXU001913417
**Service Request #:**   1-1882688925

Sutherland Asbill and Brennan LLP
Elisabeth A. Langworthy
700 Sixth Street
Suite 700
Washington, DC 20001  United States