UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ X
                                                             :
   PAYSYS INTERNATIONAL, INC.,                               :
                                                             :
                                 Plaintiff,                  :
                                                             :
              -v-                                            :
                                                             :
   ATOS SE, WORLDLINE SA, ATOS IT                            :
   SERVICES LTD.,                                            :
                                                             :
                                 Defendants.                 :
                                                             :
------------------------------------------------------------ :
                                                             :
   ATOS SE, WORLDLINE SA, ATOS IT                            :
   SERVICES LTD.,                                            :
                                                             :
                                 Counterclaim               :
                                 Plaintiffs,                 :
              -v-                                            :
                                                             :
   PAYSYS INTERNATIONAL, INC. and FIRST                      :
   DATA CORPORATION,                                         :
                                                             :
                                 Counterclaim               :
                                 Defendants.                 :
------------------------------------------------------------ X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 5, 2016

14-cv-10105 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, United States District Judge:

This action concerns claims by PaySys International, Inc. ("PaySys") that a licensee of its software has exceeded the bounds of its license agreement.  PaySys has alleged ten separate causes of action against the licensee and its affiliates for, <u>inter alia</u>, breach of the license agreement, misappropriation of trade secrets, copyright infringement and other state law claims.  (ECF No. 103.)  Various prior decisions by

this Court have narrowed those claims.  This Opinion & Order addresses a motion by Atos Se, Atos IT Services Ltd. ("Atos IT") and Worldline SA ("Wordline") for summary judgment with regard to the trade secret claims asserted under New York and Florida law in the Second and Third Causes of Action.  (ECF No. 163.)

For the reasons set forth below, this Court finds that there are two separate and equally dispositive bases to GRANT defendants' motion:  first, plaintiff has failed to identify its trade secrets with the requisite specificity, instead asserting that every line of source code in a licensed software program ("CardPac") and other materials provided under confidentiality provisions of the license agreement constitute protectable trade secrets under New York and Florida law.  This is far too broad, vague and ambiguous a claim to survive.  But, in addition, this Court finds that the statute of limitations for any such claim ran long ago.

I.      FACTUAL BACKGROUND[1]

Plaintiff PaySys owns and licenses financial transaction processing software that it first licensed to Sema Group SA in 1988.  (Pl.'s Local R. 56.1 Stmt. of Undisputed Facts ("Pl.'s 56.1", ECF No. 213) ¶¶ 8-9.)  As discussed above, this motion concerns PaySys's trade secret claims against three entities that acquired or became affiliated with Sema Group SA:  Atos Se, Atos IT and Worldline.  To understand the parties' position on this motion and the Court's decision, the Court

---

[1] The facts set forth herein are undisputed unless otherwise noted.  The facts of this case have previously been set forth in the opinion by the Honorable Shira A. Scheindlin dated July 24, 2015, No. 14-cv-10105 (SAS), 2015 WL 4533141 (S.D.N.Y. July 24, 2015) (ECF No. 73), and this Court's opinion dated July 14, 2016 (ECF No. 183).  The reader is also referred to this Court's Opinion & Order issued relatively contemporaneously herewith narrowing PaySys's copyright infringement claims.  The Court here only details those facts necessary for resolution of this motion.

begins by briefly summarizing certain aspects of the parties' corporate history, the license arrangement between the parties, plaintiff's identification of the alleged trade secrets at issue and plaintiff's copyright deposits.

A. <u>Relevant Corporate History</u>

Plaintiff PaySys was founded in 1981 under the name "Credit Card Software, Inc." ("CCSI").  (Pl.'s 56.1 ¶ 6.)  In 1995, CCSI changed its name to PaySys International, Inc.  (<u>Id.</u>)  Since 2001, PaySys has been a wholly-owned subsidiary of counterclaim-defendant First Data Corporation ("First Data").  (<u>Id.</u> ¶ 7.)

Defendants are entities that acquired or became affiliated with Sema Group SA, one of PaySys's licensees.  In a press release dated September 23, 2003, Atos Origin announced its acquisition of Sema Ltd., the parent of Sema Group SA, one of PaySys's licensees;[2] that transaction closed on January 22, 2004.  (<u>Id.</u> ¶¶ 12-13; <u>see also</u> <u>id.</u> ¶ 10 (stating that Sema Group PLC is the "parent to Sema Group SA"); ¶ 16 (stating that Sema Group PLC became known as Sema Ltd. on September 4, 2001).) Through a series of publicly disclosed name changes—the last of which occurred on June 29, 2011—Sema Ltd. became known as Atos IT, one of the three defendants in this matter.  (<u>Id.</u> ¶ 16.)[3]  On December 31, 2003, various Atos businesses merged together and Atos Origin became part of Atos Worldline.  (<u>Id.</u> ¶ 14.)  In 2013, Atos

---

[2] As discussed in more depth below, Sema Group SA was the signatory on a license agreement with PaySys that extended to its affiliates, including Sema Ltd.

[3] The following name changes are reflected on documents that Atos IT filed publicly with the U.K. Registrar of Companies:  Cap Group PLC became Sema Group PLC on September 13, 1988; Sema Group PLC became Sema PLC on December 1, 2000; Sema PLC became Sema Ltd. on September 4, 2001; Sema Ltd. became Atos Origin IT Services Ltd. on February 23, 2004; and Atos Origin IT Services Ltd. became Atos IT Services Ltd. on June 29, 2011.  (<u>Id.</u>)

Worldline became Worldline, another of the defendants in this matter.  (Id. ¶ 15.)
Worldline is a subsidiary of Atos Se, the third defendant in this matter.  (Declaration
of Leon Medzhibovsky, dated June 20, 2016 ("Medzhibovksy Decl.", ECF No. 165),
Ex. 7 at PAY00003072.)

B. The License Arrangement

On October 31, 1988, CCSI (which was later renamed "PaySys"), entered into
a software acquisition agreement (the "Software Acquisition Agreement" or "October
1988 Agreement") with Sema Group SA. (Id. ¶¶ 9-10; see also Medzhibovksy Decl.,
Ex. 1.)  That agreement was amended by letter agreement dated December 28, 1988,
an amendment dated February 19, 1990, and a memorandum agreement dated
October 24, 1990.  (Medzhibovsky Decl., Ex. 3 at ATOS007746.)  The initial Software
Acquisition Agreement and its various amendments are known collectively as the
"Software Agreement".  (Id.)  Following a dispute regarding various rights and
obligations under the Software Agreement, PaySys, Sema Group SA and Sema PLC
entered into a Confidential Settlement Agreement on April 27, 2001, pursuant to
which these parties confirmed and ratified the terms of the Software Agreement and
agreed to certain additional amendments.  (Id.)[4]

---

[4] The parties do not dispute that the signatory to the Software Acquisition Agreement, Sema Group
SA, later became a subsidiary of Atos IT, a defendant in this action.  (Pl.'s 56.1 ¶¶ 10, 16.)  A
question that need not be resolved on this motion (but is resolved in the Court's Opinion & Order
addressing PaySys's August 10, 2016 motion for summary judgment) is whether Worldline is a
licensee under the Software Agreement.  Without resolving that question here, the Court notes a
following points that would be relevant to its resolution:  the Software Acquisition Agreement
defines "Affiliate" as "any corporation or other business entity which controls, is controlled by or is
under common control with a party to this Agreement."  (Id. ¶ 21; Medzhibovsky Decl., Ex. 1 § 1(a).)
It further provides that "an Affiliate of SEMA may exercise and enjoy any and all of the benefits or
rights conferred upon SEMA under this Agreement and, provided, further, than [sic] SEMA may
assign all or any portion of this Agreement to any such Affiliate."  (Medzhibovksy Decl., Ex. 1 §

The Software Agreement defines "Products",[5] in relevant part, as:

[T]he standard IBM version of the computer software programs supplied by CCSI known as Cardpac Transaction Management System, including, without limitation, Cardpac Customer Account Management System, On-Line Collections ("OLC"), On-Line Authorizations ("OLA"), Memo Tickler System ("MTS"), Interchange Tracking System ("ITS"), Transaction Management System 1 ("TMS 1") and Transaction Management System 2 ("TMS 2"); all Enhancements and Special Enhancements thereto; and all programs and system documentation, reference manuals , user manuals and flow charts associated therewith.

(Medzhibovsky Decl., Ex. 1 § 1(i).)

The Software Agreement contains confidentiality provisions requiring the

licensees to maintain the Products supplied thereunder as confidential, except with

regard to:

any information or data supplied by CCSI that:  (i) was known to Sema or an Affiliate thereof prior to disclosure thereof by CCSI; (ii) is or becomes generally available to the public other than by breach of this Agreement; or (iii) otherwise becomes lawfully available on a non-confidential basis from a third party who is not under an obligation of confidentiality to CCSI.

(Id., Ex. 2, § 14(b).)

---

17(b).)  It additionally states that "[t]o the extent an Affiliate of either party exercises any rights or privileges under this Agreement, such Affiliate shall be deemed to be a party to this Agreement and shall be bound by all the terms and conditions hereof."  (Id. § 17(m).)  There is therefore a substantial argument that Worldline is an Affiliate of Sema's successor entity Atos IT, and is therefore a bona fide licensee.  The Court notes that there is also a substantial argument that the phrase "provided, further" in Section 17(b) of the Software Acquisition Agreement does not create a condition precedent to an Affiliate's enjoyment of any licensing rights, but rather provides a separate and additional right of assignment.  These provisions were not altered in the December 1988 amendment or in the 2001 Confidential Settlement Agreement.  (Id., Exs. 2, 3.)  The Court notes that the Confidential Settlement Agreement appears to have adopted the same definition and scope regarding the term "Affiliates" as that set forth in the October 1988 Agreement.  (See, e.g., id., Ex. 3, § 5(c) (referring to "Sema or its Affiliates" granting licenses to third parties).)

[5] As described below, PaySys identifies its trade secrets by referring to the definition of "Products" under the Software Agreement.

C. <u>PaySys's Identification of Trade Secrets in This Litigation</u>

PaySys has purported to identify the nature of the trade secrets at issue in this litigation through written discovery and employee declarations submitted in opposition to this motion.

1.    <u>Written Discovery</u>

This action was filed on December 23, 2014.  (ECF No. 1.)  When discovery commenced (which followed initiation of the litigation by a number of months), defendants began requesting that plaintiff specify the trade secrets it claimed were at issue.  On November 6, 2015, defendants served a set of interrogatories to which PaySys responded on December 16, 2015.  (Pl.'s 56.1 ¶¶ 51-52.)  In Interrogatory No. 5, defendants requested that PaySys:

> [i]dentify and describe all purported trade secrets that PaySys alleges were misappropriated by Defendants in this Action, and describe all measures, procedures and policies, if any, PaySys has adopted to ensure the confidentiality or secrecy of those alleged trade secrets, from the period of 2001 to present.

(<u>Id.</u> ¶ 51.)  PaySys responded by incorporating the definition of "Software" set forth in its Second Verified Amended Complaint (the "SVAC", ECF No. 103), and stated that this definition refers to:

> the CardPac software created by PaySys, including object code, source code and related documentation, any complete or partial copy thereof contained in any other work or medium, and the confidential information embodied in or associated with that software.

(<u>Id.</u> ¶ 52.)  PaySys further referred defendants to the "Agreement, including but not limited to its provisions regarding confidentiality required by the Agreement and required of Sema and its successors to be included in all customer agreements."  (<u>Id.</u>)

In Interrogatory No. 6, defendants requested that plaintiff "[i]dentify and describe the facts and circumstances relating to PaySys's disclosure of its purported trade secrets to Defendants, and each alleged misappropriation of PaySys's purported trade secrets by Defendants or third-parties".   (Id. ¶ 53.)  PaySys responded by stating:

> PaySys identifies as a misappropriation of its trade secrets every single transaction, use, act or omission that exceeded what was contractually permitted by, among other things, Schedule F of the 1988 letter agreement or the confidentiality or other terms of the relevant agreements, including the 2001 Settlement Agreement.

(Id. ¶ 54.)

On November 5, 2015, defendants served PaySys with requests for the production of documents.  (Id. ¶ 57)  Document Request No. 32 sought "[d]ocuments sufficient to show, describe or identify the purported trade secrets that PaySys alleges were misappropriated by Defendants."  (Id.)  PaySys responded on December 16, 2015 by objecting to the request in its entirety as "overly broad and unduly burdensome", and stating that, "The Agreement identifies the trade secrets." (Id. ¶ 58.)

On December 24, 2015, defendants requested that PaySys supplement its responses to Interrogatory No. 5 and/or Document Request No. 32 in order to describe its purported trade secrets with the requisite particularity.  (Id. ¶ 65.) Defendants repeated that request on January 26, February 26 and March 9, 2016. (Id. ¶¶ 66-68.)

On March 25, 2016, PaySys served an amended response to Document

Request No. 32, stating:

> The trade secrets at issue in this litigation are "the Products, all
> Enhancements to the Products and all proprietary information, data,
> documentation and derivative works related to the Products" (See Agreement,
> Schedule F, paragraph 2), all of which are or were in Defendants' possession.
> These contractual provisions are sufficient to identify the trade secrets.

(Id. ¶ 59.)

On April 6, 2016, defendants reiterated their request that PaySys amend its

response to Interrogatory No. 5, repeating their position that PaySys failed to

adequately describe its trade secrets with the requisite particularity.  (Id. ¶ 69.)  On

May 23, 2016, PaySys provided defendants with an amended response that identified

the trade secrets at issue as:

> The source code for each of the following CardPac software application
> systems, or any substantial portion thereof:  "CPS Application System;" "OLC
> Application System;" "OLA Application System;" "CSM Application System;"
> "IMP Application System;" "APS Application System;" "ITS Application
> System;" and "SSC Application System."

(Id. ¶ 71.)  The amendment further stated:

> The combination of the source code for each of the above-described application
> systems, working together, is a trade secret.  On information and belief, no
> portions of the source code of any of the foregoing application systems are
> publicly available or readily ascertainable, except for the binary code deposits,
> but even if a portion of any of the foregoing application systems were publicly
> available, the combination of that code with other interdependent parts of the
> application system is a trade secret.

(Id. ¶ 72.)

### 2.   Employee Declarations

In opposition to defendants' motion, PaySys submitted declarations from three

employees:  Larry Phillips, a former programmer at First Data (Declaration of Larry

Phillips, dated July 22, 2016 ("Phillips Decl.", ECF No. 210); Eva Hughes, Vice

President of Product Management of Vision*PLUS* at First Data (Declaration of Eva

Hughes, dated August 15, 2016 ("Hughes Decl.", ECF No. 208); and Greg Piel, Senior

Vice President and Associate General Counsel of First Data (Declaration of Greg

Piel, dated August 15, 2016 ("Piel Decl.", ECF No. 211).  These declarations describe

various aspects of CardPac that PaySys cites as proof that CardPac contains trade

secrets.

Phillips states that he was a member of the original development team for the

CardPac software package and "worked as part of that team from 1983 until the

early 1990's."  (Phillips Decl. ¶ 4.)  According to Phillips, CardPac was written

"entirely from scratch" and "consists of literally millions of lines of code over a

thousand component files."  (Id. ¶¶ 5, 7.)  Phillips further states that "[t]he original

CardPac development team consisted of approximately 10 people but over the years

in excess of one hundred programmers and technicians worked on the CardPac

applications."  (Id. ¶ 5.)

Phillips describes CardPac as a set of eight separate software "application

systems" that together comprise the CardPac "software package".  (Id. ¶ 8.)  The

application systems are as follows:

> OLA 606 – An online authorization system that runs the main program and
> drives updates thereto;
>
> SSC 140 – The security system and common routines system;
>
> OLC 400 – The online collections system, which processes all of the requests
> from the previous day and is the interface with the CPS system;

> CSM 700 – The customer service management system;
>
> APD 400 – The application processing system that processes credit application and interfaces with credit bureaus;
>
> IMP 420 – The installation maintenance program and credit card software utility program, "which is basically an installation wizard";
>
> ITS 700 – An interchange tracking system that handles exceptions items going to and from Visa and MasterCard; and
>
> CPS 612 – The CardPac system which does the daily posting.

(Id.)  Phillips describes these eight "application systems" as themselves being comprised of thousands of underlying "component files" that work individually and in combination to "accomplish CardPac's essential function."  (Id. ¶ 9.)  For example, the CPS application system has 1,254 component files and consists of 1,163,784 separate lines of source code; the OLC application system has 457 component files and 258,524 separate lines of source code; the CSM has 312 component files and 181,093 separate lines of source code, etc.  (See id. ¶ 11.)

Hughes has a degree in computer science and initially joined First Data in 1994.  (Hughes Decl. ¶ 2.)  Following First Data's acquisition of PaySys in 2001, she supported various PaySys affiliates in Latin America, Europe, South Africa and Australia.  (Id.)  During that time, she had responsibility for client maintenance services, product support, training and documentation for a software application called "Vision*PLUS*."  (Id.)  Vision*PLUS* is PaySys's successor to CardPac.  (Id. ¶ 3.)

Hughes describes CardPac as a payments processing software system that processes card accounts and merchant accounts that accept card transactions.  (Id. ¶ 4.)  "It was written to manage the life cycle of issuing credit cards and also for

10

the process of acquiring card transactions accepted by merchants which must handle the complex rules of international card networks such as MasterCard and Visa." (Id. ¶ 4.)  Hughes states that she "understands [that CardPac] comprises millions of lines of COBOL programming code" and was initially written to run on IBM mainframe computers.  (Id. ¶ 5.)  PaySys licensed CardPac "around the world" to bank and non-bank financial institutions as well as third-party processors.  (Id. ¶ 5.)

Hughes states that "[t]he core code of CardPac continues to be very valuable technology."  (Id. ¶ 6.)  She refers to CardPac as a "core technology [that] is a staple of the payments processing industry[,] as evident in PaySys's newer product lines (Vision*PLUS*), which is in wide use."  (Id. ¶ 6.)  Hughes also states that the "core technology" has an "extensive license base."  (Id.)  Finally, Hughes states that:

> It is common knowledge in the industry, based on public information of Atos and Worldline, that Worldline's original CardLinK program was a 1998 version of CardPac that Sema simply renamed CardLinK.

(Id. ¶ 13.)

In his declaration, Piel states that he has been employed by First Data since 2002 and is responsible for legal support of First Data's non-US businesses. (Piel Decl. ¶ 2.)  He states that as a global payment solutions company, First Data uses computer software programs extensively and obtains significant value from its possession of such software.  (Id. ¶¶ 3-4.)  He identifies CardPac as one such program.  (Id. ¶ 4.)  Piel states that "Company records show [that CardPac] was first created in the 1980s" and that "[i]t is still in use by some customers."  (Id.)  Piel further states that understands that "the CardPac source code has been incorporated

into other software programs that have been adapted to run on various data processing platforms and in various data processing operating systems." (Id.)

> Piel also states that:

> With regard to CardPac and its progeny, a high level of secrecy is necessary in order for PaySys to control and limit the use of the CardPac software and protect PaySys's ability to profit from licensing the original software and subsequent versions.

(Id. ¶ 5.)  He further states that, to the best of his knowledge, "[T]here has been no broad disclosure that placed the source code underlying the CardPac program into the public domain or otherwise destroyed the confidentiality of the CardPac source code."  (Id. ¶ 6.)  He states more affirmatively, "I know such disclosure has not occurred since I joined First Data in 2002."  (Id.)

### D. PaySys's Copyright Registrations

The Court notes that PaySys has filed for copyright registrations with regard to CardPac.  The parties dispute whether those registrations encompass some or all of the underlying source code.  Resolution of that question is unnecessary to this particular motion, and has been addressed by separate Opinion & Order issued relatively contemporaneously herewith.  All that is pertinent here is the fact that PaySys deposited copies of source code with regard to PaySys's registration; those deposit copies contain thousands of lines of code.[6]

---

[6] The registrations and deposit copies are attached to the Declaration of Ivan Zatkovich, dated August 10, 2016 ("Zatkovich Decl.", ECF No. 204), submitted in connection with a separate motion for summary judgment motion.  These materials are deposited with a governmental institution and bear obvious indicia of reliability.  The Court therefore takes judicial notice of those materials, as it is entitled to do.  See Fed. R. Evid. 201(b) (providing that a court may judicially notice a fact "that is not subject to reasonable dispute because it . . . (2) can be accurately and readily determined from sources whose accuracy cannot be readily questioned."); United States v. Alexander, 123 F. App'x

II.     RELEVANT LEGAL STANDARDS

A.  Standard of Review

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law". Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact". Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  Id. at 322-23.

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor". Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005)).  Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "mere

---

444, 445 (2d Cir. 2005) (taking judicial notice of a certificate of disposition, i.e., an official document issued by a court).

conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist". <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks, citations and alterations omitted).  In addition, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment". <u>Porter v. Quarantillo</u>, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks, citation and alterations omitted).

B. <u>Trade Secret Claims</u>

Whereas trade secret claims under Florida law are governed by the Florida Uniform Trade Secrets Act (the "FUTSA"), Fla. Stat. § 688.001 <u>et seq.</u>, New York applies a common law test, <u>Sarkissian Mason, Inc. v. Enter. Holdings, Inc.</u>, 955 F. Supp. 2d 247, 253-54 (S.D.N.Y. 2013), <u>aff'd</u>, 572 F. App'x 19 (2d Cir. 2014).  New York and Florida's trade secret laws share many key features.[7]

For a party to succeed on a claim for the misappropriation of trade secrets under New York law, it must demonstrate "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means." <u>Faiveley Transp. Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 117 (2d Cir. 2009) (quoting <u>N. Atl. Instruments, Inc. v. Haber</u>, 188 F.3d 38, 43-44 (2d Cir. 1999)).  Florida similarly requires a plaintiff to demonstrate that "(1) the plaintiff possessed secret information

---

[7] Plaintiff has asserted trade secrets claims under both New York and Florida law, both of which flow from alleged breaches of the Software Agreement.  The Court notes that the Software Acquisition Agreement contains a New York forum and choice of law provision.  (<u>See</u> Medzhibovsky Decl., Ex. 1 § 17(a).)  Although the outcome of this motion is the same irrespective of which law is applied, the Court has nevertheless analyzed the legal issues under the laws of both states.

and took reasonable steps to protect its secrecy and (2) the secret was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." XTec, Inc. v. Hembree Consulting Servs., Inc., __ F. Supp. 3d __, No. 14-21029-cv-ALTONAGA/O'Sullivan, 2016 WL 1702223, at *3 (S.D. Fla. Apr. 28, 2016) (quoting Axiom Worldwide, Inc. v. HTRD Grp. Hong Kong Ltd., No. 8:11-cv-1468-T-33TBM, 2013 WL 2712787, at *4 (M.D. Fla. June 12, 2013)); see also Fla. Stat. § 688.002(2) (defining "misappropriation" as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "[d]isclosure or use of a trade secret of another without express or implied consent" in certain enumerated circumstances).

Under New York law, "a trade secret is any pattern, formula, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Softel Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 968 (2d Cir. 1997) (internal quotation marks and citations omitted). The FUTSA defines a "trade secret" as "information" that:

> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Sea Coast Fire, Inc. v. Triangle Fire, Inc., 170 So. 3d 804, 808 (Fla. Dist. Ct. App. 2014), reh'g denied (Aug. 10, 2015) (quoting Fla. Stat. § 688.002(4)); Bright House Networks, LLC v. Cassidy, 129 So. 3d 501, 506 (Fla. Dist. Ct. App. 2014) (same).  A trade secret is "not simply information as to a single or ephemeral events in the conduct of the business; rather, it is a process or device for continuous use in the operation of the business."  Softel Inc., 118 F.3d at 968 (2d Cir. 1997) (citation omitted) (applying New York law); see also Summitbridge Nat. Investments LLC v. 1221 Palm Harbor, L.L.C., 67 So. 3d 448, 450 (Fla. Dist. Ct. App. 2011) (citation omitted) (applying Florida law); Default Proof Credit Card Sys., Inc. v. State St. Bank & Trust Co., 753 F. Supp. 1566, 1573 (S.D. Fla. 1990) (citation omitted) (applying Florida law).  A "trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable trade secret."  Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 174 (2d Cir. 1990) (citations omitted) (applying New York law); SmokEnders, Inc. v. Smoke No More, Inc., No. 73-1637, 1974 WL 20234, at *11 (S.D. Fla. Oct. 21, 1974) (citation omitted) (applying Florida law); see also Developmental Techs., LLC v. Valmont Indus., Inc., No. 8:14-cv-2796-T-35JSS, 2016 WL 1271566, at *2 (M.D. Fla. Mar. 31, 2016) (same, after passage of FUTSA).

The Copyright Office has specific procedures to protect trade secrets in computer programs for which registrations are sought.  See 37 C.F.R. §

202.20(c)(2)(vii).  Such procedures provide for redactions, inter alia, in order to protect trade secret material.  Id.  Failure to abide by such procedures—by, for instance, depositing copies without redaction—renders the deposited material publicly accessible and vitiates a trade secret claim.  See, e.g., KEMA, Inc. v. Koperwhats, 658 F. Supp. 2d 1022, 1031 (N.D. Cal. 2009) (concluding that deposit of unredacted source code with the Copyright Office defeated a trade secret claim based on such material); see also Synopsys, Inc. v. ATopTech, Inc., No. C 13-cv-2965 (SC), 2013 WL 5770542, at *7 (N.D. Cal. Oct. 24, 2013) (noting that placing a copy of a work on deposit with the Copyright Office can render such work accessible to the public, thereby vitiating a trade secret claim).

### 1.    Specificity in Identification

The plaintiff bears the burden of demonstrating that it has a protectable trade secret.  N. Atl. Instruments, 188 F.3d at 43-44 (citations omitted) (applying New York law); Am. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998) (citations omitted) (applying Florida law).  It must specify its trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated.  See Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d 224, 258 (S.D.N.Y. 2014), aff'd sub nom. Big Vision Private Ltd. v. E.I. du Pont de Nemours & Co., 610 F. App'x 69 (2d Cir. 2015) (noting that Second Circuit has not expressly required specificity, but collecting cases in this District that have done so and noting that "each Circuit Court of Appeals to have opined on this issue has required a comparable degree of specificity"); Sit-Up Ltd. v. IAC/InterActiveCorp., No. 05-cv-9292 (DLC), 2008 WL 463884, at *11 (S.D.N.Y. Feb.

17

20, 2008) ("Although the Second Circuit has not squarely articulated a specificity requirement, there is no reason to believe that it would permit a party to advance a trade secret claim in vague and ambiguous terms."); DynCorp Int'l v. AAR Airlift Grp., Inc., No. 16-10451, 2016 WL 6833333, at *3 (11th Cir. Nov. 21, 2016) ("Florida courts adjudicating FUTSA cases have said that the plaintiff is required to identify with reasonable particularity the trade secrets at issue before proceeding with discovery.") (internal quotation marks and citations omitted).

Under both New York and Florida law, failure to identify a trade secret with specificity has resulted in dismissal or a grant of summary judgment for failure to raise a triable issue on an essential element of the claim.  See, e.g., Big Vision Private Ltd., 1 F. Supp. 3d at 224 (applying New York law); Sit-Up Ltd., 2008 WL 463884, at **10-11 (applying New York law); DynCorp Int'l, 2016 WL 6833333, at *4 (applying Florida law); Enteris Biopharma, Inc. v. Clinical Pharmacology of Miami, Inc., No. 1:14-cv-22770-UU, 2015 WL 12085848, at *10 (S.D. Fla. Mar. 20, 2015) (applying Florida law).

### 2.   Statute of Limitations

While New York and Florida both have three-year statutes of limitations for trade secrets claims, they are triggered in different ways.  See Ferring B.V. v. Allergan, Inc., 932 F. Supp. 2d 493, 510 (S.D.N.Y. 2013); Knights Armament Co. v. Optical Sys. Tech., Inc., 654 F.3d 1179, 1184 (11th Cir. 2011) (quoting Fla. Stat. § 688.007).  Under New York law, trade secret "misappropriation claims must be brought within three years of when the defendant discloses the trade secret or when he first makes use of plaintiff's ideas."  Ferring B.V., 932 F. Supp. 2d at 510 (internal

quotation marks and citations omitted).  Florida, however, follows a "discovery rule", under which "[a]n action for misappropriation must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  Knights Armament Co., 654 F.3d at 1184 (quoting Fla. Stat. § 688.007)).

Under both New York and Florida law, continued acts of misappropriation do not generally give rise to separate causes of action triggering the statute of limitations anew.  See Galet v. Carolace Embroidery Co., No. 97-cv-5702 (DLC), 1998 WL 386434, at *2 (S.D.N.Y. July 10, 1998) (applying New York law and rejecting contention that defendant continued to misappropriate trade secrets because "[o]nce a defendant has disclosed the information . . . it is no longer a trade secret.") (citation omitted); Fla. Stat. § 688.07 ("For the purposes of this section, a continuing misappropriation constitutes a single claim.")  New York (but not Florida) recognizes a "continuing tort" exception that applies when a defendant keeps the alleged trade secret confidential, yet continues to use it for its own benefit.  See Ferring B.V. v. Allergan, Inc., 4 F. Supp. 3d 612, 628-29 (S.D.N.Y. 2014) (citation omitted).  Where, however, the "plaintiff had knowledge of the defendant's misappropriation and use of its trade secret, the continuing tort doctrine does not apply."  VoiceOne Commc'ns, LLC v. Google Inc., No. 12-cv-9433 (PGG), 2014 WL 10936546, at *10 (S.D.N.Y. Mar. 31, 2014) (citations omitted); Synergetics USA, Inc. v. Alcon, Inc., No. 08-cv-3669 (DLC), 2009 WL 2016872, at *2 (S.D.N.Y. July 9, 2009) (same).

III.   DISCUSSION

PaySys's Second and Third Causes of Action seek relief for misappropriation of trade secrets under New York and Florida law.  (SVAC ¶¶ 163-71.)  The allegations with regard to these claims are quite short:  PaySys alleges it possesses trade secrets, that it has taken steps to protect them including confidentiality provisions in the relevant agreement(s), and that defendants have engaged in unauthorized disclosure or use under New York and Florida law.  (Id.)  The core of PaySys's argument is two-fold:  (1) that Sema Group SA's license was never properly assigned to defendants, and therefore any licensing of CardPac by these defendants has exceeded the bounds of the Software Agreement and resulted in a misuse of its source code trade secrets; and/or (2) that defendants' own agreements with third parties to license CardLinK do not contain confidentiality provisions to protect PaySys's source code from disclosure, thereby resulting in a misappropriation of trade secrets.

There are two separate reasons why, based on the undisputed facts, the trade secret claims cannot withstand summary judgment.  First, PaySys has failed to proffer sufficient facts to raise a triable issue as to whether it has protectable trade secrets.  This failure derives from PaySys's overbroad assertion that every line of the CardPac source code—either alone or in combination—constitutes a trade secret.  This extreme position avoids the identification of a single specific (and therefore testable) trade secret; the requisite particularity is therefore lacking.  Second, and in addition, the undisputed facts demonstrate that plaintiff has long been on notice of

defendants' acquisition of the Sema entities and continued licensing thereafter. As a result, the statutes of limitations governing the trade secret claims ran prior to the commencement of this lawsuit.

   A.  Identification of Trade Secrets

   As discussed above, the first element of a trade secret claim under either New York or Florida law is the existence of a trade secret. See Faiveley Transp. Malmo AB, 559 F.3d at 117 (citation omitted); XTec, Inc., 2016 WL 1702223, at *3 (citation omitted). To support that threshold issue, a plaintiff must identify the trade secrets at issue with sufficient specificity to allow a defendant to counter the claim. See, e.g., Big Vision Private Ltd., 1 F. Supp. 3d at 258 (applying New York law); Sit-Up Ltd., 2008 WL 463884, at *11 (same); DynCorp Int'l, 2016 WL 6833333, at *3 (applying Florida law). Plaintiff here has failed to comply with this basic requirement.

   Instead, based on the procedural history set out above, PaySys has attempted throughout this litigation to avoid identifying which the trade secrets its claims are at issue. The history of plaintiff's efforts in this regard are revealing. First, PaySys objected to Document Request No. 32—which sought documents identifying the trade secrets at issue—as "overly broad and unduly burdensome" given that "[t]he Agreement identifies the [relevant] trade secrets". (Pl.'s 56.1 ¶¶ 57-58.) This answer makes little sense. In so objecting, PaySys effectively conceded its alleged trade secrets lacked the requisite specificity.

   PaySys's initial interrogatory response was no better. In response to Interrogatory No. 5, plaintiff referred to the broad definition of "Software" set forth

in the SVAC and stated that its claimed secrets constituted all of the object code and source code comprising the CardPac software, as well as "related documentation"; plaintiff did not specify what such documentation consisted of.  (Id. ¶ 52.)  Plaintiff went even further, asserting that its trade secrets constituted any "complete or partial copy [of the software] contained in any other work or medium, and the confidential information embodied in or associated with that software."  (Id.)

In March 2016, plaintiffs amended this incredibly broad identification with a nearly equally broad statement:

> The trade secrets at issue in this litigation are "the Products, all Enhancements to the Products and all proprietary information, data, documentation and derivative works related to the Products" (see Agreement, Schedule F, paragraph 2), all of which are or were in Defendants' possession. These contractual provisions are sufficient to identify the trade secrets.

(Id. ¶ 59.)  Finally, two months later, in May 2016—six months after the initial interrogatory was served and nearly a year and a half after filing suit—PaySys narrowed the claimed trade secrets to the entirety of the source code for each of CardPac's application systems.  (See id. ¶ 71.)  Specifically, plaintiff stated that its trade secrets are:

> [t]he source code for each of the following CardPac software application systems, or any substantial portion thereof:  "CPS Application System;" "OLC Application System;" "OLA Application System;" "CSM Application System;" "IMP Application System;" "APS Application System;" "ITS Application System;" and "SSC Application System."

(Id.)  Aside from the briefing on this motion, this statement represents PaySys's final articulation of the trade secrets it identifies.

22

It is worth pausing to consider what plaintiff is claiming here in light of the declarations of its own employees.  As described above, the CardPac application systems consist of millions of lines of source code with diverse functionality (Phillips Decl. ¶¶ 8-9), which was written more than thirty years ago and licensed widely (Hughes Decl. ¶ 6; Piel Decl. ¶¶ 3-4).  The application systems are further broken down into more than a thousand "component files".  (Phillips Decl. ¶ 5.)  The volume, age and dissemination of the CardPac source code undermine plaintiff's argument.  How can a million lines of code written thirty years ago and licensed to people all over the world still be trade secret?  It may be valuable, but not every asset of value constitutes a trade secret.  Both New York and Florida law require more, namely that the trade secret remain confidential.  See Softel Inc., 118 F.3d at 968 (defining "trade secret" under New York law); Fla. Stat. § 688.002(4) (defining "trade secret" under Florida law).

Even the Software Agreement acknowledges that there may be information or data supplied by CCSI (PaySys) pursuant to the Agreement that does not remain confidential.  (See, e.g., Medzhibovksy Decl., Ex. 2 § 14(b).)  In this regard, the Agreement defines as exceptions to what must be maintained as confidential (1) that which was known to Sema Group SA or its Affiliates prior to disclosure, (2) is or becomes available to the general public other than by way of a breach of the agreement, or (3) otherwise becomes lawfully available on a non-confidential basis from a third-party.  (Id.)  The record is devoid of any facts suggesting PaySys has

confirmed that the alleged trade secrets embodied within its source code have not become otherwise known to the general public.

Rather than carefully determining which code may in fact remain secret after the substantial passage of time, plaintiff has sought to shift the burden to defendants to prove what is not secret.  That is the reverse of what the law requires. See N. Atl. Instruments, 188 F.3d at 43-44 (citations omitted) (applying New York law); Am. Red Cross, 143 F.3d at 1410 (citations omitted) (applying Florida law). PaySys cannot avoid its obligation to carefully delineate precisely what in fact remains secret by designating "all" of its source code as secret.  To state the obvious, after thirty years, and in light of the breadth of PaySys's own licensing efforts, it is more than reasonable to assume that certain aspects of the CardPac systems may be widely known in the industry—different entities having arrived at the same functionality on their own.  Further, as Piel states, the code "has been incorporated into other software programs that have been adapted to run on various data processing platforms in various data processing operating systems."  (Piel Decl. ¶ 4.) Nothing in the record confirms that such software programs are all under license to PaySys as opposed to programs now owned in their entirety by third parties.

In fact, none of PaySys's declarants definitively states that each and every line of code is, ever was, or remains a trade secret.  First, neither Hughes nor Piel have firsthand knowledge of the code's development.  Hughes has worked at First Data on a product related to CardPac (Vision*PLUS*)—but that is not CardPac.  (Hughes Decl. ¶ 2.)  The most Hughes professes to know about CardPac is that the technology

comprises "millions of lines of COBOL programming code" and has been licensed "around the world." (Id. ¶ 5.)  While she states that the technology remains valuable (id. ¶ 6), she does not go so far as to say that each and every line has remained secret.  Indeed, there is a fair inference that the <u>opposite</u> is true based on her statement that "[i]n the cards software industry it is common for technology professionals that have come into contact with the evolution of CardPac to refer to Cardlink as 'CardPac for mainframe'", as CardPac code is contained in various products.  (Id. ¶ 7.)

Piel's declaration leaves even more questions open.  His experience is also with First Data, and he started with that company almost twenty years after CardPac was developed.  (Piel Decl. ¶ 2.)  There is no indication that Piel has any information regarding what disclosures may have occurred or did occur during that period.  In his declaration, he states that to the "best of his knowledge" there has been no "broad disclosure that placed the source code underlying the CardPac program into the public domain".  (Id. ¶ 6.)  This statement suggests that there has been "some" disclosure—just not what Piel would characterize as "broad" disclosure.  Plaintiff bears the burden of determining with precision what remains secret and what does not; it may not leave defendants wondering what disclosure has occurred and what has not.

Phillips—the sole declarant to have personal knowledge of the CardPac code in any granular sense—likewise never states that all of the code has remained a trade secret.  (See Phillips Decl. ¶ 4.)  Rather, he discusses how much time and

energy it took to create (id. ¶ 5), and that it was written "entirely from scratch" (id. ¶ 7).

The copies of CardPac source code deposited with the Copyright Office also undercut plaintiff's claim. (See Zatkovich Decl., Exs. 1-8.) It cannot be the case that all of the source code remains a trade secret when PaySys itself has deposited—without redaction—CardPac source code with the Copyright Office. See Synopsys, Inc., 2013 WL 5770542, at *7 ("If Plaintiff filed [with the Copyright Office] unredacted material and now claims that material as trade secrets, Plaintiff's claims fail, since that material is publicly accessible.").

Accordingly, PaySys has failed to identify its trade secrets with the requisite level of specificity. The undisputed facts reveal that at least a portion of PaySys's claimed trade secrets has been made publicly available with the Copyright Office. Plaintiff has also failed to proffer a witness who can swear that all of the lines of code—i.e., all of the thousands of components that comprise CardPac—are not only valuable but truly remain secret. Without such a factual statement, plaintiff has failed to raise a triable issue with regard to an essential element of its claim. Defendants' motion for judgment as to the trade secret claims must therefore be granted.

B. Statute of Limitations

A separate and equally dispositive basis for dismissal of the trade secret claims is the statute of limitations. The relevant statute of limitations under both New York and Florida law is three years, with the caveat that Florida permits the

26

three-year period to run from the date of discovery. The record contains undisputed facts indicating that PaySys knew about the alleged acts of misappropriation by defendants more than three years before filing the initial complaint on December 23, 2014. (ECF No. 1.) As discussed above, PaySys alleges defendants misappropriated its trade secrets by continuing to license CardPac after acquiring Sema Ltd. (ECF No. 214 at 19-22.) PaySys additionally asserts that each instance of third party licensing of CardPac constitutes a separate act of misappropriation. (Id.) There is, however, no triable issue on these points. To the contrary, the record clearly shows that PaySys was on notice long before 2011 that the Atos defendants had stepped into the shoes of PaySys's licensee, Sema Group SA, by acquiring its parent, Sema Ltd. In this regard the Court notes the following:

In its response to defendants' uncontested statement of facts, plaintiff acknowledged that, through a series of acquisitions and name changes the signatory to the Software Acquisition Agreement, Sema Group SA, became affiliated with the three defendants in this lawsuit, Atos IT, Atos Se and Worldline. (Pl.'s 56.1 ¶¶ 11-16.) It is undisputed that Atos Origin publicly announced its acquisition of Sema Group SA's parent in 2003 (id. ¶¶ 12-13), and that the Atos Origin businesses "relating to card payment processing and electronic transactional services were merged" into a subsidiary known as Atos Worldline (id. ¶ 14), which later became Wordline (id. ¶ 15.)

PaySys asserts that while these facts may have been known, it did not know that the Software Agreement it entered into with Sema Group SA would then be

utilized by defendants.  (ECF No. 214 at 20.)  Put otherwise, while plaintiff concedes it was on notice of the merger, it nevertheless claims that it did not know that defendants were continuing to license third parties under the Software Acquisition Agreement.  (Id.)  This contention is belied by several facts in the record.  First, on its face, the Software Agreement applies to Affiliates.  (Id. ¶ 21; Medzhibovsky Decl., Ex. 1 §§ 1(a), 17(b), 17(m).)  There is no change of control provision that would terminate the contract or prevent it from following Sema Group SA as it merged into another entity.  Thus, no reasonable juror could believe that plaintiff was not on notice of the continued licensing of CardPac (or derivatives thereof) following Sema Group SA's acquisition.  In addition, in a document dated March 2007, First Data recognized that Atos Origin had purchased Sema in 2003, and that its successor, Atos Worldline, "was set up in 2004, with the mission to regroup all of Atos Origin's card capabilities in one Europe-wide company."  (Pl.'s 56.1 ¶ 43.)

In addition, the undisputed facts reveal that First Data—a competitor of the defendants—was actively monitoring defendants' business more than a decade before it filed suit.  Indeed, First Data performed a high level comparison of Atos's CardLinK product to PaySys's own Vision*Plus* program in the 2004-2005 timeframe.  (Pl.'s 56.1 ¶¶ 38-39.)  Internal First Data / PaySys documents from 2005 also acknowledge active competition and comparison between Atos's CardLinK and Vision*Plus* programs.  (Pl.'s 56.1 ¶ 41.)

There are also undisputed facts with regard to defendants' licensing to third parties.  In the complaint itself—prior to any discovery—plaintiff alleges that,

"Beginning in 2008 and at several times thereafter, both Atos SE and (subsequently) Worldline granted a distributorship to Accellence and its successor NTT Data (Thailand) Co. Ltd.", contrary to rights it alleges were granted under the Agreement. (SVAC ¶ 140.)  This allegation is consistent with documents demonstrating that plaintiff internally monitored defendants' competitive licensing activities.  (E.g., Pl.'s 56.1 ¶¶ 38-42, 46, 48-49.)

Taken together, these facts, among others, leave no doubt that PaySys had long been on notice of the defendants' alleged misappropriation of trade secrets. Analysis under Florida's discovery rule does not alter the result.  The facts discussed above reveal that PaySys either in fact discovered, or with reasonable diligence could have discovered, defendants' use of the source code more than three years prior to when the suit was filed.  See Knights Armament Co., 654 F.3d at 1184 (quoting Fla. Stat. § 688.007).

IV.    CONCLUSION

For the reasons set forth above, the Court GRANTS defendants' motion for summary judgment with regard to plaintiff's trade secret claims.  Accordingly, the Second and Third Causes of Action are dismissed.

The Clerk of Court is directed to terminate the motion at ECF No. 163.

SO ORDERED.

Dated:      New York, New York
            December 5, 2016

_____
        KATHERINE B. FORREST
        United States District Judge