UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

PAYSYS INTERNATIONAL, INC.,

                              Plaintiff,

                -v-

ATOS SE, WORLDLINE SA, ATOS IT
SERVICES LTD.,

                        Defendants.

------------------------------------------------------------ :

ATOS SE, WORLDLINE SA, ATOS IT
SERVICES LTD.,

                      Counterclaim
                      Plaintiffs,
                -v-

PAYSYS INTERNATIONAL, INC. and FIRST
DATA CORPORATION,

                      Counterclaim
                      Defendants.

------------------------------------------------------------ X

14-cv-10105 (KBF)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 8, 2016

KATHERINE B. FORREST, District Judge:

      This is a copyright infringement dispute between PaySys International, Inc.

("PaySys") and defendants Atos Se, Worldline SA ("Worldline") and Atos IT Services

Ltd. ("Atos IT") regarding CardPac, a computer program owned by PaySys. Now

before the Court is defendants' motion for partial summary judgment. (ECF No.

201.) Defendants assert that PaySys's infringement claims under French, Thai,

Belgian and Chinese law set forth in the Fourth, Fifth, Sixth and Seventh Causes of

Action of the Second Verified Amended Complaint (the "SVAC", ECF No. 103) must be dismissed for two separate reasons:  (1) because PaySys lacks valid copyright registrations, and (2) because PaySys is precluded from suing its licensees Atos Se and Atos IT for infringement.[1]  (ECF No. 205 at 7-8.)  While the first argument fails, the second succeeds.

The principal question regarding plaintiff's copyright registration is whether an invalid supplementary registration invalidates an initial registration; it does not. Thus, while the Court is persuaded that the supplementary registration is invalid, PaySys continues to hold valid registrations in the portions of the work ("CardPac") it initially registered.  Nevertheless, PaySys's infringement claims based on these registrations must be dismissed because the allegedly infringing conduct is authorized by the license.  Therefore, as further set forth below, defendants' motion is GRANTED.

I.     FACTUAL BACKGROUND[2]

A.   The Software Agreement

On October 31, 1988, PaySys's predecessor, Credit Card Software Inc. ("CCSI"), entered into a software acquisition agreement (the "Software Acquisition Agreement" or "October 1988 Agreement") with Sema Group SA ("Sema").

---

[1] Defendants do not assert that PaySys is precluded from suing Worldline on this basis.

[2] The facts set forth herein are undisputed unless otherwise noted.  The facts of this case have previously been set forth in the Opinion & Order by the Honorable Shira A. Scheindlin dated July 24, 2015, PaySys Int'l, Inc. v. Atos Se et al., No. 14-cv-10105 (SAS), 2015 WL 4533141 (S.D.N.Y. July 24, 2015), this Court's Opinion & Order dated July 14, 2016 (ECF No. 183) and this Court's Opinion & Order issued on December 5, 2016 dismissing PaySys's trade secret claims (ECF No. 231).  The Court here only details those facts necessary for resolution of the instant motion.

(Pl.'s Local R. 56.1 Stmt. of Undisputed Facts Opp. Trade Secrets Mot. ("Pl.'s Trade Secrets 56.1", ECF No. 213) ¶¶ 9-10; <u>see also</u> Declaration of Leon Medzhibovsky, dated June 20, 2016 ("Medzhibovksy Decl.", ECF No. 165) Ex. 1.)[3]  The Software Acquisition Agreement is governed by and construed in accordance with New York law.  (<u>Id.</u>, Ex. 1 § 17(a).)

Pursuant to the Software Acquisition Agreement, CCSI licensed Sema certain rights in a computer program known as "CardPac".[4]  (<u>Id.</u>, Ex. 1 § 2.)  These rights are delineated in Section 2 of the Agreement, entitled "Sale of Rights".  (<u>Id.</u>) For an initial period of ten years, Sema obtained an "exclusive, royalty-free right to use, and to grant Licenses to use" CardPac within a defined international territory. (<u>Id.</u>, Ex. 1 § 2(a); <u>see also</u> <u>id.</u> § 1(m) (defining "Territory").)  The right to license the use of CardPac included the right to "market, supply, install and support the [CardPac] Products as SEMA in its sole discretion shall determine and to appoint Distributors to do the same."  (<u>Id.</u> § 2(a).)  The Software Acquisition Agreement defines "Distributor" as "a third party who pursuant to any agreement with SEMA

---

[3] In setting forth their argument concerning the Software Acquisition Agreement, defendants cite the factual record in support of their motion for summary judgment on PaySys's trade secret claims (ECF No. 163) and PaySys's allegations in the SVAC.  (<u>See</u> ECF No. 205 at 7-11, 20-25.)  Given that PaySys has either stipulated to these facts for purposes of the other motion or asserted them in the SVAC, and that PaySys has not taken issue with them in opposing this motion, the Court assumes they are part of the undisputed factual record governing the instant motion.

[4] The Software Acquisition Agreement refers to certain CardPac "Products", defined, in relevant part as "the standard IBM version of the computer software programs supplied by CCSI known as Cardpac Transaction Management System, including, without limitation, Cardpac Customer Account Management System, On-Line Collections ("OLC"), On-Line Authorizations ("OLA"), Memo Tickler System ("MTS"), Interchange Tracking System ("ITS"), Transaction Management System 1 ("TMS 1") and Transaction Management System 2 ("TMS 2"); all Enhancements and Special Enhancements thereto; and all programs and system documentation, reference manuals , user manuals and flow charts associated therewith."  (<u>Id.</u> § 1(i).)

has the further right to grant Licenses or sublicenses to use the [CardPac]

Products."  (Id. § 1(c).)  It defines "License" as:

> [A]ny license granted by SEMA (or any of its Licensees) to use the [CardPac] Products soley [sic] within the Territory.  As such, any sublicense shall itself be deemed to be a License within the meaning of this definition.

(Id. § 1(g).)

After the initial ten-year period, Sema would have a "perpetual non-exclusive

right" to:

> incorporate all or any portion of the [CardPac] Products (including the ideas, concepts, structure, sequence, organization, look or feel contained therein) into program products developed, marketed, supplied, installed and/or supported by or for SEMA within the Territory.

(Id. § 2(b).)

The Software Acquisition Agreement also conferred certain rights on any

"Affiliate" of the parties, defined as "any corporation or other business entity which

controls, is controlled by or is under common control with a party to this

Agreement."  (Pl.'s Trade Secrets 56.1 ¶ 21; Medzhibovsky Decl., Ex. 1 § 1(a).)  The

Agreement provides that "an Affiliate of SEMA may exercise and enjoy any and all

of the benefits or rights conferred upon SEMA under this Agreement and, provided,

further, than [sic] SEMA may assign all or any portion of this Agreement to any

such Affiliate."  (Medzhibovsky Decl., Ex. 1 § 17(b).)  It additionally states that "[t]o

the extent an Affiliate of either party exercises any rights or privileges under this

Agreement, such Affiliate shall be deemed to be a party to this Agreement and shall

be bound by all the terms and conditions hereof."  (Id. § 17(m).)

The Software Acquisition Agreement was amended by letter agreement dated December 28, 1988, an amendment dated February 19, 1990 and a memorandum agreement dated October 24, 1990.  (Medzhibovsky Decl., Ex. 3 at 1.)  The Software Acquisition Agreement and its various amendments are known collectively as the "Software Agreement".  (Id.)

Following a dispute regarding various rights and obligations under the Software Agreement, PaySys, Sema Group SA and Sema's parent entered into a Confidential Settlement Agreement on April 27, 2001 in which they confirmed and ratified the terms of the Software Agreement and agreed to certain additional amendments.  (Id.)  One recital clause at the outset of the Confidential Settlement Agreement states, "[T]he parties wish to clarify and amend the Software Agreement in certain respects in order to minimize the possibility of future disputes".  (Id. at ATOS007747.)

Section 5(b) of the Confidential Settlement Agreement states, in relevant part:

> PaySys hereby confirms and ratifies . . . all licenses or other authorizations to Use the [CardPac] Products or derivatives thereof (including without limitation CardLink) granted by Sema or its Affiliates to third parties on or before the date of this Agreement[.]

(Id. § 5(b).)

Section 5(d) states, in relevant part:

> PaySys acknowledges and agrees that the perpetual, non-exclusive rights granted to Sema under Paragraph 2(b) of the Software Acquisition Agreement include, without limitation, the rights to . . . grant licenses to Use all or a portion of the Products . . . or derivatives thereof . . . within the Territory[.]

5

(<u>Id.</u> § 5(d).)

Section 5(i) provides, in relevant part:

> Sema acknowledges and agrees that PaySys shall have no further obligations
> to provide maintenance, support, enhancements, development or other
> services or software to Sema or its licensees, distributors or third parties who
> use, sell, license or distribute the [CardPac] Products or derivatives thereof.

(<u>Id.</u> § 5(i).)

Defendants Atos IT and Atos Se are undisputed licensees of the Software

Agreement.  When the Software Acquisition Agreement was signed, the signatory

Sema Group SA was a subsidiary of Sema Group PLC.  (Pl.'s Trade Secrets 56.1 ¶¶

10-11.)  Through a series of name changes, Sema Group PLC became known as

Sema Ltd., and later, Atos IT, one of the three defendants in this action.  (<u>Id.</u> ¶ 16.)

Atos IT is a wholly owned subsidiary of Atos Se, another of the three defendants in

this action.  (<u>Id.</u> ¶¶ 12, 14-16.)  The third defendant in this matter, Wordline, is the

successor to Atos Origin, an entity that acquired Sema Ltd. in 2004.  (<u>Id.</u> ¶¶ 14-15.)

As explained below, Worldline is an "Affiliate" of Sema Group SA.

### B.   <u>PaySys's Initial CardPac Registrations</u>

CardPac is a software program originally licensed by a predecessor of PaySys

to Sema Group SA, an entity affiliated with defendants.  (<u>See</u> <u>id.</u> ¶¶ 9-10; <u>see also</u>

Medzhibovksy Decl., Ex. 1.)  CardPac consists of millions of lines of code organized

into eight modules or application systems; each application itself consists of

thousands component files.  (Pl.'s Local R. 56.1 Stmt. of Undisputed Facts Opp.

Intellectual Prop. Mot. ("Pl.'s 56.1", ECF No. 221) ¶¶ 18-19; Declaration of Larry

Phillips, dated August 23, 2016 ("Phillips Decl.", ECF No. 219) ¶ 5; Declaration of

Ivan Zatkovich, dated August 10, 2016[5] ("Zatkovich Decl.", ECF No. 204) ¶ 7 n.1.)

Each component file performs a discrete, specific function.  (Zatkovich Decl. ¶ 9.)

On November 17, 2014—five weeks before commencing this litigation—

PaySys registered copyrights in the following eight CardPac-related works

(collectively, the "Initial CardPac Registrations" or "Initial Registrations"):  CardPac

– OLA 606:OAS100 (Reg. No. TXu 1-913-381); CardPac – SSC140:SSU900 (Reg. No.

TXu 1-913-382); CardPac – CSM700:KSD200 (Reg. No. TXu 1-913-410); CardPac –

OLC 400:OCD200 (Reg. No. TXu 1-913-412); CardPac – APS400:APD200 (Reg. No.

TXu 1-913-414); CardPac – IMP420:CCSUT1 (Reg. No. TXu 1-913-415); CardPac –

ITS700:ITD120 (Reg. No. TXu 1-913-416) and CardPac – CPS612:CPD110 (Reg. No.

TXu 1-913-417).  (Pl.'s 56.1 ¶ 1; Zatkovich Decl., Exs. 1-8.)  The titles of the works

covered by the Initial Registrations all follow the naming convention "[Software

Package] – [Module][Version]:[Component File]" (Zatkovich Decl. ¶ 7; see also Pl.'s

56.1 ¶ 13), and refer to specific component files (Zatkovich Decl. ¶ 7; see also Pl.'s

56.1 ¶ 9).

---

[5] Defendants have proffered Ivan Zatkovich as an expert in computer sciences.  (See Zatkovich Decl.
¶¶ 1-5.)  Zatkovich holds a degree in Computer Science from the University of Pittsburgh and is a
principal consultant with eComp Consultants, a technology consulting firm.  (Id. ¶ 5.)  Zatkovich was
asked "to review certain publicly-available materials, including PaySys's copyright registration
certificates and source code deposits, and [to] opine on the content of each."  (Id. at ¶ 3.)  Although
plaintiff submitted declarations of two PaySys employees with purported knowledge of the CardPac
software, these declarations do not rebut the vast majority of the facts and opinions set forth in Mr.
Zatkovich's declaration.  As a result, these facts and opinions are unrebutted for purposes of
resolving summary judgment.  See, e.g., Kelly-Brown v. Winfrey, No. 15-697-cv, __ Fed. App'x __,
2016 WL 4945415, at *3 (2d Cir. Sept. 16, 2016) (affirming grant of summary judgment based in part
on unrebutted expert testimony).

In support of each of the Initial Registrations, PaySys submitted to the Copyright Office deposit copies of all or some portion of the source code for the eight component files.  (Pl.'s 56.1 ¶ 9; Zatkovich Decl. ¶¶ 9-10; see also Zatkovich Decl., Exs. 1-8.)[6]  The Copyright Office has certified that each of the photocopied deposits produced in connection with this litigation are "true representation[s]" of the works named in each Initial Registration.  (Zatkovich Decl., Exs. 1-8.)  That is, each Initial Registration references the same component file that PaySys deposited in support of that registration.  (See Zatkovich Decl. ¶¶ 13-60; SVAC, Ex. A at 63-80.)  For example, with respect to the work entitled "CardPac – OLA 606:OAS100", PaySys deposited an excerpt from a component file named "OAS100" and the Copyright Office certified that the reproduction of this deposit is "a true representation of the work entitled CARDPAC – OLA 606; OAS100 deposited in the Copyright Office with claim of copyright registered under TXu 1-913-381."  (Zatkovich Decl., Ex. 1 at 2-3; see also SVAC, Ex. A at 65 (certificate of registration listing "Title of Work" as "CardPac – OLA 606: OAS100".)  The other seven Initial Registrations follow a similar pattern.

C.   PaySys's Supplementary CardPac Registrations

On July 28, 2016, PaySys submitted eight Form CA Supplementary Registrations (the "Supplementary CardPac Registrations" or "Supplementary

---

[6] Although the parties have stipulated that all deposits consist of the first and last ten pages of source code of eight different component files (Pl.'s 56.1 ¶ 9), Mr. Zatkovich opines that the deposit for one component file, CardPac – SC140;SSU900, consists of the full file (Zatkovich Decl. ¶ 10).  This discrepancy is not material to the Court's reasoning.  Since it appears to the Court that the deposit for CardPac – SC140; SSU900 is a full document, not an excerpt, and plaintiff has failed to proffer facts suggesting otherwise, the Court proceeds on this basis.  (See Zatkovich Decl., Ex. 2.)

Registrations"). PaySys asserts that these "Supplementary Registrations" "amplified" the titles of the works registered in the Initial CardPac Registrations by deleting the reference to the deposited component file and inserting a description of the module as a whole. (Pl.'s 56.1 ¶¶ 12-13; Declaration of Marc E. Miller, dated August 10, 2016 ("Miller Decl.", ECF No. 203), Ex. 1.) For example, PaySys asserts that it "amplified" the title of the work initially registered as "CardPac – OLA:606:OAS100" to "CardPac – Online Authorization (OLA) Application System (Rel. 6.06)." (Pl.'s 56.1 ¶ 13; Miller Decl., Ex. 1 at 5.) On each of its Supplementary Registrations, PaySys offered the following "Explanation of Information": "Title of work in original registration chosen based on programing excerpt from work selected for deposit per Circular 61.[7] Revised title denotes entire work more clearly." (Pl.'s 56.1 ¶ 13; Miller Decl., Ex. 1 at 5.) Whether the Supplementary Registrations are in fact "amplifications" or are instead an attempt to register additional works or portions of works is a key question to be answered on this motion.

## II. PROCEDURAL HISTORY

PaySys commenced this action against defendants on December 23, 2014, alleging, through a variety of claims, that Atos Se's acquisition of Sema violated PaySys's contractual rights under the Software Acquisition Agreement and also violated other intellectual and personal property rights. (ECF No. 1.) The case was

---

[7] As described in greater detail infra, Circular 61 is a guidance produced by the Copyright Office entitled "Copyright Registration for Computer Programs", available at http://www.copyright.gov/circs/circ61.pdf (last visited December 8, 2016).

initially assigned to Judge Scheindlin.  On March 31, 2015, PaySys filed the
Verified Amended Complaint, which added Atos IT as a defendant.  (ECF No. 24.)
On July 24, 2015, Judge Scheindlin dismissed PaySys's domestic copyright claims
for failure to state a claim.  See PaySys Int'l, Inc., 2015 WL 4533141, at *5.

On December 10, 2015, PaySys filed the SVAC—the operative complaint in
this action—alleging ten claims:  (1) breach of contract, (2) trade secret
misappropriation under New York law, (3) trade secret misappropriation under
Florida law, (4) copyright infringement under French law, (5) copyright
infringement under Thai law, (6) copyright infringement under Belgian law, (7)
copyright infringement under Chinese law, (8) conversion under New York law, (9)
unfair competition under New York law, and (10) replevin under New York law.
(ECF No. 103.)  Defendants answered and counterclaimed seeking declaratory
judgment as to certain of PaySys's claims.  (ECF No. 108.)

Most pertinent to the instant motion are the copyright infringement claims
asserted under foreign law.  Although PaySys's domestic infringement claims were
dismissed by Judge Scheindlin, see PaySys Int'l, Inc., 2015 WL 4533141, at *5,
PaySys's domestic copyright registrations form the basis for its foreign copyright
claims under the Berne Convention and the TRIPS Agreement of the World Trade
Organization (see SVAC ¶ 123; see also ECF No. 205 at 12 (discussing, without
disputing, this allegation)).  As a result, PaySys's domestic copyright registrations
determine the scope of its foreign copyright claims.

In support of its claims, PaySys alleges that it obtained "eight copyright registrations" in the "CardPac software", which PaySys defines as:

> the CardPac software created by PaySys, including object code, source code and related documentation, any complete or partial copy thereof contained in any other work or medium, and the confidential information embodied in or associated with that software.

(SVAC ¶¶ 121-22.)  PaySys alleges that defendants infringed its copyrights and breached the Software Acquisition Agreement by (1) assigning rights and obligations to various Atos affiliates without PaySys's consent (id. ¶ 138); (2) assigning rights and obligations to Worldline without imposing the requisite prohibitions on the use of PaySys's intellectual property (id. ¶ 139); (3) granting a distributorship to Accellence and its successor, NTT Data (Thailand) Co. Ltd. ("NTT Data") after its right to do so expired in 1998 (id. ¶ 140); (4) providing Equens, a merger partner of defendants, with access to PaySys's intellectual property (id. ¶ 141); (5) selling a software known as "APS" without following certain provisions in a license agreement signed by CCSI and Sema (the "APS Agreement") (id. ¶¶ 142-43); (6) failing to document licenses granted to defendants' customers (id. ¶ 144); and (7) transferring rights and obligations without imposing requisite restrictions on remote access from outside the defined territory (id. ¶¶ 145-48).

On April 12, 2016, this action was transferred to the undersigned.  Since then, defendants have filed three motions for partial summary judgment (ECF Nos. 127, 163, 201), the last of which is now before the Court.  On May 26, 2016, the Court granted the first of these motions (ECF No. 127), dismissing PaySys's tort claims (for unfair competition, conversion and replevin) as time-barred under New

11

York law.  (ECF No. 183.)  In a separate Opinion & Order issued on December 5, 2016, the Court has also resolved the second motion, dismissing PaySys's trade secret claims.  (ECF No. 231.)

In this motion, filed on August 10, 2016,[8] defendants argue that PaySys lacks valid copyright registrations in CardPac, requiring dismissal of its foreign copyright claims that depend on those registrations.  (ECF No. 205 at 7-8.)  In addition, defendants argue that Atos Se and Atos IT cannot be sued for infringement because their allegedly infringing conduct is authorized by the Software Agreement, of which they are licensees.  (Id.)

## III.  LEGAL STANDARDS

### A.  <u>Summary Judgment Standard</u>

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law".  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact".  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party

---

[8] Defendants previewed their intent to file this motion during a July 19, 2016 status conference.  (<u>See</u> ECF No. 181 (setting briefing schedule for motion following conference).)  PaySys filed the Supplementary CardPac Registrations on July 28, 2016—nine days following the July 19, 2016 status conference and a week before the original deadline set by the Court for defendants to file the instant motion.  (<u>See id.</u>, ECF No. 196.)

lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  Id. at 322-23.

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor".  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005)).  Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist".  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks, citations and alterations omitted).  In addition, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment".  Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks, citation and alterations omitted).

B.   Copyright Law

1.   Copyright Infringement Actions

"Subject to certain exceptions, [Section 411(a) of] the Copyright Act [] requires copyright holders to register their works before suing for copyright infringement."  Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 157 (2010) (citing 17

13

U.S.C. § 411(a)).  "To prove a claim of copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original."  Urbont v. Sony Music Entm't, 831 F.3d 80, 88 (2d Cir. 2016) (citing Boisson v. Banian, Ltd., 273 F.3d 262, 267 (2d Cir. 2001)); see also Feist Publ'ns., Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991) (citation omitted).

With respect to the first prong, under 17 U.S.C. § 410(c), "[a] certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright".  Hamil Am. Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999) (citations omitted); see also Folio Impressions, Inc. v. Byer California, 937 F.2d 759, 763 (2d Cir. 1991) (same); Fonar Corp. v. Domenick, 105 F.3d 99, 104 (2d Cir. 1997) (same).  This presumption of validity is rebutted, however, "where other evidence in the record casts doubt on the question", Urbont, 831 F.3d at 88 (quoting Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 166 (2d Cir. 2003)); Fonar Corp., 105 F.3d at 104 (quoting Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 908 (2d Cir.1980)) (alterations omitted), such as "proof of deliberate misrepresentation", Medforms, Inc. v. Healthcare Mgmt. Sols., Inc., 290 F.3d 98, 114 (2d Cir. 2002) (citing Whimsicality, Inc. v. Rubie's Costume Co., 891 F.2d 452, 455  (2d Cir. 1989)); see also Eckes v. Card Prices Update, 736 F.2d 859, 861-62 (2d Cir. 1984) ("Only the knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitutes reason for holding the registration invalid and thus incapable of supporting of an

infringement action.") (internal quotation marks, citations and alterations omitted);

Tradescape.com v. Shivaram, 77 F. Supp. 2d 408, 414-15 (2d Cir. 1999) (labeling the

"deliberate misstatement" standard a "scienter" requirement).  The party

challenging the validity of the copyright registration bears the burden of rebutting

the presumption.  Urbont, 831 F.3d at 89 (quoting Hamil Am., Inc., 193 F.3d at 98).

    With respect to the second prong, ordinarily "[a] copyright owner who grants

a nonexclusive license to use his copyright material waives his right to sue the

licensee for copyright infringement."  Graham v. James, 144 F.3d 229, 236 (2d Cir.

1998) (citations omitted); Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 235-

36 (2d Cir. 2008) (quoting Graham, 144 F.3d at 236); Davis v. Blige, 505 F.3d 90,

100 (2d Cir. 2007) (same).  "However, the fact that a party has licensed certain

rights to its copyright to another party does not prohibit the licensor from bringing

an infringement action where it believes the license is exceeded or the agreement

breached."  Tasini v. N.Y. Times Co., 206 F.3d 161, 170-71 (2d Cir. 2000), aff'd, 533

U.S. 483 (2001).  The Second Circuit has recognized that a licensor may recover

against a licensee for copyright infringement where (1) the licensee's alleged

infringement is outside the scope of the license; (2) the licensee failed to satisfy a

condition precedent to the license, such that the license is invalid; or (3) the licensor

rescinded the license after the licensee materially breached one of its covenants.

See Graham, 144 F.3d at 235-38.  "[W]hen the contested issue is the scope of a

license, rather than the existence of one, the copyright owner bears the burden of

proving that the defendant's copying was unauthorized under the license".  Id., 144

F.3d at 236 (emphasis in original); see also Smith v. Barnesandnoble.com, LLC, 839 F.3d 163, 166-67 (2d Cir. 2016); Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995); Tasini, 206 F.3d at 171 (quoting Bourne, 68 F.3d at 631).

2.   Copyright Registration of Computer Programs

It is well-established that the written code underlying computer programs is entitled to protection under the Copyright Act.[9]   Computer Assocs. Int'l, Inc., 982 F.2d at 702 (collecting cases); see also Member Servs., Inc. v. Sec. Mut. Life Ins. Co. of N.Y., No. 3:06-cv-1164, 2010 WL 3907489, at *17 n.33.  (N.D.N.Y. Sept. 30, 2010) ("Computer programs are works of authorship entitled to protection under the Copyright Act.") (citing 17 U.S.C. §§ 101, 102).  In order to register a copyright—the prerequisite for filing an infringement action, see Reed Elsevier, 559 U.S. at 157 (citing 17 U.S.C. § 411(a))—a copyright holder must submit to the Copyright Office a "deposit" of the work to be registered, an application and a filing fee.  17 U.S.C. § 408(a); see also U.S. Copyright Office, Circular 61, Copyright Registration for Computer Programs (2012), available at http://www.copyright.gov/circs/circ61.pdf (last visited December 8, 2016) ("Circular 61") ("An application for copyright registration contains three essential elements:  a completed application form, a nonrefundable filing fee, and a nonreturnable deposit—that is, a copy or copies of

---

[9] The Copyright Act defines a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."  17 U.S.C. § 101; see also Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 697-98 (2d Cir. 1992) (discussing architecture of "computer programs" and defining "source code" and "object code").  The parties do not dispute that PaySys's copyrighted eight "computer programs"; rather, the dispute centers on the scope of those eight computer programs.

16

the work being registered and 'deposited' with the Copyright Office.").  "[A] key purpose of the Section 408(b) deposit requirement is to prevent confusion about which work the author is attempting to register."  Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1162 (1st Cir. 1994) abrogated on different grounds by Reeds Elsevier, Inc., 559 U.S. 154.  The application itself has a similar objective.  Id.

The requirements for the deposit vary with the type of work being registered. Computer programs require a deposit of "one copy of identifying portions of the program".  37 C.F.R. § 202.20(c)(2)(vii)(A).  What qualifies as an "identifying portion" of the program depends, in turn, on whether the registrant asserts that the program contains trade secrets material.  See id.  37 C.F.R. § 202.20(c)(2)(vii)(A) provides that:

"identifying portions" shall mean one of the following:

(1) The first and last 25 pages or equivalent units of the source code if reproduced on paper, or at least the first and last 25 pages or equivalent units of the source code if reproduced in microform, together with the page or equivalent unit containing the copyright notice, if any.  If the program is 50 pages or less, the required deposit will be the entire source code. . . .; or

(2) Where the program contains trade secret material, the page or equivalent unit containing the copyright notice, if any, plus one of the following:  the first and last 25 pages or equivalent units of source code with portions of the source code containing trade secrets blocked-out, provided that the blocked-out portions are proportionately less than the material remaining, and the deposit reveals an appreciable amount of original computer code; or the first and last 10 pages or equivalent units of source code alone with no blocked-out portions; or the first and last 25 pages of object code, together with any 10 or more consecutive pages of source code with no blocked-out portions; or for programs consisting of, or less than, 50 pages or equivalent units, entire source

17

code with the trade secret portions blocked-out, provided that the blocked-out portions are proportionately less than the material remaining, and the remaining portion reveals an appreciable amount of original computer code. . . . Whatever method is used to block out trade secret material, at least an appreciable amount of original computer code must remain visible.

### 3.   Supplementary Copyright Registration

Section 408(d) of the Copyright Act and the regulations promulgated thereunder permit supplementary copyright registrations only "to correct an error in a copyright registration or to amplify the information given in a registration."  17 U.S.C. § 408(d); 37 C.F.R. § 201.5(b)(2) ("Supplementary registration may be made either to correct or to amplify the information in a basic registration."); see also Maxwood Music Ltd. v. Malakian, 713 F. Supp. 2d 327, 346 (S.D.N.Y. 2010) (quoting 37 C.F.R. § 201.5(b)(2)).  "A correction is appropriate if information in the basic registration was incorrect at the time that basic registration was made, and the error is not one that the Copyright Office itself should have recognized."  Id. § 201.5(b)(2)(i).  An "amplification" is appropriate:

(A) To supplement or clarify the information that was required by the application for the basic registration and should have been provided, such as the identity of a co-author or co-claimant, but was omitted at the time the basic registration was made, or

(B) To reflect changes in facts, other than those relating to transfer, license, or ownership of rights in the work, that have occurred since the basic registration was made.

Id. § 201.5(b)(2)(ii). "The information contained in a supplementary registration augments but does not supersede that contained in an earlier registration."  17 U.S.C. § 408(d).  In other words, filing a supplementary registration does not

18

"expunge[]" or "cancel[]" the initial registration, 37 C.F.R. § 201.5(d)(2); the initial

registration remains valid and may continue to support an infringement action.

Kenbrooke Fabrics, Inc. v. Holland Fabrics, Inc., 602 F. Supp. 151, 153 n.1

(S.D.N.Y. 1984) (citing 17 U.S.C. § 408(d)).

A "[s]upplementary registration can be made only if a basic copyright

registration for the same work has already been completed."  37 C.F.R. § 201.5(b)(1)

(emphasis added).  The converse is also true.  A supplementary registration "is not

appropriate", inter alia, "to reflect changes in the content of a work".  Id. §

201.5(b)(2)(iii)(B); see also Jones v. Virgin Records, Ltd., 643 F. Supp. 1153, 1159

(S.D.N.Y. 1986) (citing 37 C.F.R. § 201.5(b)(2)(iii)(B)).  Courts in this Circuit have

disfavored attempts to supplement registrations that are the subject of pending

copyright infringement actions.  See, e.g., Family Dollar Stores, Inc. v. United

Fabrics Int'l, Inc., 896 F. Supp. 2d 223, 234 (S.D.N.Y. 2012) ("UFI's delay in

'amending' its registration is, giving all benefit of the doubt to UFI, extremely poor

lawyering, and, at worst, a deliberate attempt to impose costs on its adversary; it

has wasted the Court's time, and it has wasted the FD Defendants' time and

money."); R.F.M.A.S., Inc. v. Mimi SO, 619 F. Supp. 2d 39, 54 (S.D.N.Y. 2009) ("By

waiting until after the close of fact discovery to correct the Registration, despite

being aware [of] its supposed inaccuracies for several months, RFMAS forfeited any

presumption as to the accuracy of the statements contained in the Supplementary

Registration.").

IV.  DISCUSSION

    A.  <u>The Validity of PaySys's Copyright Registrations</u>

Defendants argue they are entitled to summary judgment on PaySys's copyright claims because PaySys's copyright registrations are invalid.  (<u>See</u> ECF No. 205 at 17-26.)  In the alternative, Defendants submit that PaySys's copyright claims should "be limited to the eight narrow component files PaySys originally registered and deposited."  (<u>Id.</u> at 26.)  These arguments turn on the resolution of three related questions:  (1) do PaySys's Initial Registrations cover the CardPac software as a whole, or merely some part?; (2) are PaySys's Supplementary Registrations valid?; and (3) if the Supplementary Registrations fail, do the Initial Registrations remain valid?  Having analyzed these questions, the Court finds that dismissal of the copyright claims is not warranted on this basis (as discussed below the claims are dismissed on a separate basis), but that, in all events, PaySys's copyrights are limited in scope to the Initial Registrations, and that those Registrations cover limited material.

    1.  <u>The Scope of PaySys's Initial CardPac Registrations</u>

PaySys initially registered copyrights in eight CardPac-related "computer programs".  (SVAC, Ex. A at 63-80 ("Author Created" field on certificates of Initial Registrations states "computer program")).  While the CardPac software is undisputedly a "computer program" within the meaning of the Copyright Act, <u>see</u> <u>Computer Assocs. Int'l., Inc.</u>, 982 F.2d at 697 (defining "computer program" by quoting 17 U.S.C. § 101), CardPac's many constituent parts—the eight modules or

application systems and the thousands of component files—are also undisputedly "computer programs" in their own right.  This raises a technical question as to which level of "computer program" within the overall CardPac software PaySys initially registered.  See Fonar Corp., 105 F.3d at 105 (observing that "[a] single computer program" will "necessarily be composed of various modules, subroutines, and sub-subroutines, which through their intra-program interactions accomplish the ultimate function or purpose of the program.") (citing Computer Assocs. Int'l., Inc., 982 F.2d at 697-68).  While PaySys submits it registered the entirety of CardPac's eight modules or application systems (that is, the broader registration), defendants argue PaySys merely registered eight of CardPac's thousands of component files.  The undisputed evidence is that PaySys's applications and deposits relate to the eight particular component files, not the eight broader modules or application systems that form the entire software.  As a matter of law, the Registrations are therefore limited to those works alone.  The Court's conclusions in this regard are based upon the following points.

The titles of the work on PaySys's applications all consist of a string of identifiers with the format "[Software Package] – [Module][Version]:[Component File]".  (Zatkovich Decl. ¶ 7; see also Pl.'s 56.1 ¶ 13.)  As PaySys points out, these titles name both a particular component file and the module or application system in which that file resides.  (See ECF No. 217 at 17-18.)  Nevertheless, there is no genuine dispute that the titles identify specific component files as the works being registered.  Defendants' unrebutted computer software expert, Mr. Zatkovich, has

interpreted these titles to refer to specific component files.  (Zatkovich Decl. ¶ 7.)
More tellingly, PaySys admitted to the Court on July 18, 2016—and again, in the
context of admitting facts as undisputed for purposes of resolving this motion—
that "[t]he filenames listed in PaySys's copyright applications . . . refer to [] specific
component files".  (Pl.'s 56.1 ¶ 9 (quoting ECF No. 180 at 3).)

PaySys's deposits make even clearer that PaySys's Initial Registrations cover
only select component files, not all eight of CardPac's modules or application
systems.  A deposit submitted to the Copyright Office is intended to reflect and
avoid confusion as to the "work" being registered.  See 17 U.S.C. § 408(a) (setting
forth deposit requirement for all works); Circular 61 at 1 (defining "deposit" as "a
copy or copies of the work being registered and 'deposited' with the Copyright
Office."); Data Gen. Corp., 36 F.3d at 1162 ("[A] key purpose of the Section 408(b)
deposit requirement is to prevent confusion about which work the author is
attempting to register.").  In the case of computer programs containing trade
secrets, the copyright laws require registrants to deposit one of three types of
"identifying portions" of the program:  (1) the first and last 25 pages of the
program's source code with portions of the source code containing trade secrets
blocked-out; (2) the first and last 10 pages of the program's source code with no
blocked-out portions; or (3) if the program is 50 pages or less, the program's "entire
source code with the trade secret portions blocked-out".  37 C.F.R. §
202.20(c)(2)(vii)(A).

Here, PaySys availed itself of the last two of the above options, depositing the first and last 10 pages of the component file and, in one instance, a full copy of a component file that is less than 50 pages.  (Zatkovich Decl. ¶¶ 9-10; see also Pl.'s 56.1 ¶ 9.)  For all Initial Registrations, the deposited component file is the very same component file labeled as the title of work on PaySys's corresponding application.  (Zatkovich Decl. ¶¶ 13-60; SVAC, Ex. A at 63-80.)  This is exactly what is required to register copyrights in the component files themselves.

Furthermore, assuming arguendo that PaySys sought to register copyrights in the CardPac modules and application systems, PaySys's deposits would not suffice to register these larger chunks of CardPac software.  Under 37 C.F.R. § 202.20(c)(2)(vii)(A), the only way PaySys could have registered copyrights in CardPac's modules and application systems would have been to deposit the first and last 10 or 25 pages of the entire module or application system, or a full copy thereof if less than 50 pages.  These are the only three options permitted by the copyright law, and PaySys did not follow any of them.

PaySys concedes it did not utilize these three options, but argues that its deposits suffice because it took the "conservative approach" of selecting and depositing "an important component file for each application system" as an "identifying portion" of that application system or module.  (ECF No. 217 at 16; see also Phillips Decl. ¶ 7; Declaration of Karen Hrkach, dated August 24, 2016 ("Hrkach Decl.", ECF No. 218) ¶ 4.)  PaySys's position rises and falls on a false assumption that the copyright holder gets to choose which "identifying portion" of a

23

"computer program" it will deposit.  It is hard to imagine a rule that creates more confusion over the nature of the work being registered, thereby gutting the purpose of the deposit requirement.  See Data Gen. Corp., 36 F.3d at 1162.  Moreover, the plain text of 37 C.F.R. § 202.20(c)(2)(vii)(A) unambiguously forecloses PaySys's interpretation; it defines the term "identifying portion" to mean, with respect to computer programs containing trade secrets, the three forms of deposit outlined above—and only these three types.  See 37 C.F.R. § 202.20(c)(2)(vii)(A).

Neither of the two authorities PaySys cites proves its point.  PaySys first submits that Circular 61 modifies the deposit rules for computer programs with no obvious beginning or end, and that CardPac is such a program.  (See ECF No. 217 at 14-15 ("[A] CardPac application system does not consist of components structured to be read or heard from beginning to end or having an obvious linear sequence."); Phillips Decl. ¶ 7 (stating that CardPac is a program that has "no identifiable beginning or end").)  Circular 61 does state, in a section entitled "Computer Programs without Trade Secrets" (emphasis added), and in seeming modification to the deposit requirement set forth in 37 C.F.R. § 202.20(c)(2)(vii)(A):

> In any case where the program is so structured that it has no identifiable beginning or end, the applicant should make a determination as to which pages may reasonably represent the first 25 and last 25 pages.

(Circular 61 at 2.)  However, there is no corresponding instruction in Circular 61's section on "Computer Programs Containing Trade Secrets".  (See id. at 3.)  This Court generally defers to an agency's interpretation of its own regulations, see, e.g., Ramos v. Baldor Specialty Foods, 687 F.3d 554, 559 (2d Cir. 2012) (stating "'we will

generally defer to an agency's interpretation of its own regulations so long as the interpretation is not plainly erroneous or inconsistent with the law'") (alterations omitted) (quoting <u>Cordiano v. Metacon Gun Club, Inc.</u>, 575 F.3d 199, 207 (2d Cir. 2009)), and accordingly finds no basis to read-in language to an agency's guidance that would create parallelism across the deposit requirements for two different types of works (computer programs with and without trade secrets).

The Second Circuit's decision in <u>Fonar Corp.</u> likewise does not support PaySys's position. <u>Fonar Corp.</u> involved a situation opposite to that presently before the Court. Unlike PaySys, the plaintiff in <u>Fonar Corp.</u> sought to register copyrights in computer software by filing a portion of the first and last pages of the entire program's source code. <u>See</u> 105 F.3d at 105. The defendant raised a challenge akin to what PaySys argues here, namely that the plaintiff was required to deposit source code for each of the 78 subprograms within the software. <u>See</u> <u>id.</u> Invoking the presumption of validity afforded copyright registrations, the Court deferred to the Copyright Office's determination that the plaintiff's submission of portions of the entire software program satisfied the deposit requirement for the entire program. <u>Id.</u> PaySys's citation to this case is puzzling, as the Second Circuit validated the registration approach PaySys failed to follow here (depositing a set of first and last pages of the whole software program). <u>See</u> <u>id.</u> ("Whether Fonar had to submit source code for each of the many subprograms (and possibly sub-subprograms) is a question we are content to leave to the judgment, expertise, and practices of the Copyright Office", as the "alternative . . . would impose burdens on

Fonar and the resources of the Copyright Office that the Copyright Office may deem unnecessary or excessive.")  Accordingly, the Court finds that PaySys's Initial Registrations cover only the component files from which it deposited source code, not the entirety of the software package.

> 2.   The Validity of PaySys's Supplementary CardPac Registrations

PaySys's Supplementary Registrations are invalid because they impermissibly attempt to expand the scope of the registered work.  Supplementary registrations may only be used to either "correct an error" or to "amplify" information in an initial registration.  17 U.S.C. § 408(d); 37 C.F.R. §§ 201.5(a)(1), (b)(2).  The supplementary registration must correct or amplify the "same work" registered in the initial registration, see id. § 201.5(b)(1), as a supplementary registration may not be used to "reflect changes in the content of the work", id. § 201.5(b)(2)(iii)(B); see also Jones, 643 F. Supp. at 1159 (citing id.).

Here, PaySys submitted Supplementary Registrations purporting to rename the registered works.  In each instance, PaySys changed the title from a string of identifiers ending with the deposited component file (see Zatkovich Decl. ¶ 7) to a descriptive title referencing only the name "CardPac" and the relevant application system (e.g., "CardPac – Online Authorization (OLA) Application System"). (Compare SVAC, Ex. A at 63-80 (Initial Registrations) with Miller Decl., Ex. 1 (Supplementary Registrations).)  PaySys has attempted—both in its submissions to the Copyright Office and to this Court—to cast these Supplementary Registrations as permissible amplifications to the titles of registered works, not their scope.  (See

Pl.'s 56.1 ¶ 13 ("In its July 28, 2016 Form CA Supplementary Registrations, PaySys 'amplified' the title of each registered work", explaining that the "[r]evised title[s] denote[] [the] entire work more clearly."); ECF No. 217 at 17 ("PaySys further contends that its supplemental registration was intended to clarify the scope of those registrations, not expand it").)  However, these changes amount to far more than cosmetic adjustments to various titles; they would, if valid, affect both the titles <u>and</u> the content of the registered works— introducing thousands of additional CardPac component files not registered in PaySys's Initial Registrations and impermissibly expanding the scope of the Initial Registrations from eight discrete component files to the entire CardPac software package.

Courts have consistently rejected such attempts to squeeze additional works into a registered copyright through the supplementary registration process.  <u>See, e.g.</u>, <u>Muench Photography, Inc. v. Houghton Mifflin Harcourt Publ'g Co.</u>, No. 09-cv-2669 (LAP), 2012 WL 1021535, at *4 (S.D.N.Y. Mar. 26, 2012) (holding that supplementing a registration by adding new works impermissibly changes the content of the originally registered work in violation of 17 U.S.C. § 408(d) and 37 C.F.R. § 201.5(b)(2)) (citations omitted); <u>Schiffer Publ'g, Ltd. v. Chronicle Books, L.L.C.</u>, No. 03-cv-4962, 2005 WL 67077, at **3-4 (E.D. Pa. Jan. 11, 2005) (same); <u>see also</u> <u>Mahavisno v. Compendia Bioscience, Inc.</u>, No. 13–12207, 2015 WL 248798, at **11-12 (E.D. Mich. Jan. 20, 2015) (discussing distinction between permissible amplification and impermissible change to content of a work); <u>Kluber Skahan & Assocs., Inc. v. Cordogen, Clark & Assoc., Inc.</u>, No. 08-cv-1529, 2009 WL 466812, at

*6 (N.D. Ill. Feb. 25, 2009) (same).  The concerns are magnified where, as here, a plaintiff files a supplementary registration after litigation has commenced and fact discovery is underway.  See R.F.M.A.S., Inc., 619 F. Supp. 2d at 54 (finding that supplementary registration filed "over a year and a half after initiating this action", "more than three months after the close of fact discovery", and "more than five months after having been made aware of inconsistencies" in the initial registration could not be presumed accurate); Family Dollar Stores, Inc., 896 F. Supp. 2d at 234 (finding supplementary registration filed after fact discovery closed "extremely poor lawyering, and, at worst, a deliberate attempt to impose costs on its adversary").

In any event, even if it were permissible to alter the content of a registered work, PaySys's Supplementary Registrations would still fail because the supporting deposits only identify eight discrete component files, not the CardPac application systems and modules named in the Supplementary Registrations.

### 3.   The Continued Validity of PaySys's Initial Registrations

Defendants further argue that PaySys's improper Supplementary Registrations destroy the presumption of validity afforded its Initial Registrations, and that PaySys has not otherwise carried its burden to prove their validity.  (ECF No. 205 at 18-20.)  Although the presumption of validity may be rebutted "where other evidence in the record casts doubt on" a registration's validity, Urbont, 831 F.3d at 89 (quoting Estate of Burne Hogarth, 342 F.3d at 166); Fonar Corp., 105 F.3d at 104 (quoting Durham Indus., Inc., 630 F.2d at 908) (alterations omitted), defendants have adduced no facts suggesting that PaySys deliberately

misrepresented any facts in its Initial Registrations, see Medforms, Inc., 290 F.3d at

114 (citing Whimsicality, Inc., 891 F.2d at 455); Tradescape.com, 77 F. Supp. 2d at

414-15.  Instead, defendants' allegations of misrepresentation revolve entirely

around PaySys's Supplementary Registrations, specifically the charge that PaySys

"us[ed] the supplemental registrations to fundamentally alter the scope of its

copyrighted works."  (ECF No. 205 at 18.)  In this regard, defendants' allegations

are materially distinguishable from those in Watkins v. Chesapeake Custom

Homes, L.L.C., 330 F. Supp. 2d 563 (D. Md. 2004), the sole case defendants cite

involving both the presumption of validity and the supplementary registration

process.  In Watkins, the court did not presume plaintiff's initial registrations valid

because, in addition to submitting supplementary registrations that "reinvented

their infringement case" by re-classifying the registered work, 330 F. Supp. 2d at

572, "Plaintiffs supplied the Copyright Office with false and misleading

information" in their initial registrations, id. at 571.  Unlike in Watkins, here,

defendants identify no misrepresentations in PaySys's Initial Registrations.

An invalid supplementary registration does not, in itself, call into question an

otherwise sound initial registration.  Rather, Section 408(d) of the Copyright Act

and its attendant regulation make clear that supplementary registrations can never

"supersede", "expunge[]" or "cancel[]" the information in an earlier registration.  See

17 U.S.C. § 408(d) ("The information contained in a supplementary registration

augments but does not supersede that contained in the earlier registration."); 37

C.F.R. § 201.5(d)(2) ("[T]he information contained in a supplementary registration

augments but does not supersede that contained in the basic registration.  The basic registration will not be expunged or cancelled."); see also Kenbrooke Fabrics, Inc., 602 F. Supp. at 153 n.1 (citing 17 U.S.C. § 408(d).)  Thus, absent any evidence that PaySys intentionally misrepresented any information about its component files in its Initial Registrations, these registrations are presumed valid despite PaySys's late-filed and invalid Supplementary Registrations.  See R.F.M.A.S., 619 F. Supp. 2d at 53 (presuming initial registrations valid even though plaintiff filed a supplementary registration a year and a half after filing suit and more than three months after fact discovery closed correcting certain errors).

*            *            *

As a result of the above analysis, PaySys's claims for copyright infringement are restricted to claims concerning the eight discrete component files registered in its Initial Registrations.

### B.   Contractual Waiver of PaySys's Copyright Infringement Claims

While covered by copyright registrations, PaySys's copyright claims fail because PaySys long ago granted defendants a license to the very works at issue within the territory at issue.

It is well-established that a licensor generally may not sue its licensee for copyright infringement.  E.g., Graham, 144 F.3d at 236 ("A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement."); Jasper v. Sony Music Entm't, Inc., 378 F. Supp. 2d 334, 338 (S.D.N.Y. 2005) ("It is a hallmark principle of copyright law that

30

licensors may not sue their licensees for copyright infringement."). However, such claims may be brought when the licensee's infringing conduct exceeds the scope of the license, or when the licensee violates a condition precedent to obtaining the license. Graham, 144 F.3d at 235-38; Tasini, 206 F.3d at 170-71.

Defendants contend that PaySys may not assert any of its seven theories of copyright infringement against Atos IT and Atos Se, which are licensees under the Software Agreement. (See SVAC ¶¶ 138-48.) In opposition, PaySys identifies three instances of actionable conduct: the appointment of Accellence and NTT Data as distributors of CardPac (id. ¶ 140), the initial assignment of intellectual property rights to Wordline (id. ¶ 139), and defendants' failure to fulfill certain conditions precedent to the APS agreement (id. ¶¶ 142-43). (See ECF No. 217 at 23.) In light of PaySys's failure to oppose defendants' motion as to the other four types of infringement, the Court grants summary judgment as to the infringement claims based on that alleged conduct. (See SVAC ¶¶ 138, 141, 144, 145-48.)[10] The Court additionally grants summary judgment with respect to the three types of infringement PaySys identifies, as described below.

### 1. Reseller Appointments of Accellence and NTT Data

At various times after defendants' exclusive license expired in 1998, certain entities in the Atos family entered into "Reseller Agreements" with Accellence and

---

[10] Specifically, the Court grants summary judgment on PaySys's claims that defendants infringed its copyrights by: assigning rights and obligations to various Atos affiliates without PaySys's consent (id. ¶ 138); providing Equens, a merger partner of defendants, with access to PaySys's intellectual property (id. ¶ 141); failing to document licenses granted to defendants' customers (id. ¶ 144); and transferring rights and obligations without imposing requisite restrictions on remote access from outside the territory defined in the Software Acquisition Agreement (id. ¶¶ 145-48).

31

NTT Data, two third parties.  (See Defs.' Local R. 56.1 Counterstmt. of Undisputed Facts Supp. Trade Secrets Mot. ("Defs.' Trade Secrets 56.1", ECF No. 224 ¶¶ 17, 19, 23, 29, 33; see also Declaration of Robert D. Owen, dated August 15, 2016 ("Owen Decl.", ECF No. 212), Exs. 37-40, 66.)  PaySys contends these agreements exceeded the scope of the Software Agreement.  (See ECF No. 217 at 26-27.)  The crux of PaySys's argument is that CCSI only licensed the right to distribute CardPac during the initial ten-year exclusive license period; according to PaySys, when that period ended in 1998, so too did its right to appoint distributors.  This Court disagrees.

A licensee acts outside the scope of a license, and hence may be held liable for copyright infringement, where it continues to use copyrighted material after the license expires.  See, e.g., Kamakazi Music Corp. v. Robbins Music Corp., 684 F.2d 228, 230 (2d Cir. 1982) ("Once the contract had expired, Robbins was liable for infringement of Kamakazi's copyrights."); Palmer/Kane LLC v. Rosen Book Works LLC, __ F.3d __, 2016 WL 4534896, at *14 (S.D.N.Y. Aug. 30, 2016) (holding that licensee's use of photograph after license expired infringed licensor's copyright).  Here, the parties dispute whether the right to appoint distributors expired in 1998 along with the expiration of the ten-year exclusive license.  (See Medzhibovsky Decl., Ex. 1 § 2(a)); see Defs.' Trade Secrets 56.1 ¶ 14 (disputing fact).)  The Software Agreement unambiguously contemplates that the distribution right persists.

Throughout the Software Agreement, it is clear that Sema's business involves licensing software—in this instance, CardPac—to distributors.  Section 2 of the Software Agreement grants Sema broad rights in this regard.  That provision provides Sema with an exclusive license for ten years (see Medzhibovsky Decl., Ex. 1 § 2(a)), and a non-exclusive license in perpetuity thereafter (see id. § 2(b)).  There is no suggestion that the parties anticipated the change in the license from exclusive to non-exclusive would alter Sema's business or constrict Sema's ability to do that which it had been otherwise licensed to do.  Rather, it is clear from the structure of Section 2, its language and the intent of the parties gleaned from their overall contractual relationship that Sema never loses the basic licensing rights it initially acquires (though its rights become non-exclusive).  To illustrate this, the Court turns first to Section 2, and then to the other contractual provisions in the Software Agreement.

A key distinction between Sections 2(a) and 2(b) of the Software Acquisition Agreement is when the license is exclusive, not—as plaintiff would argue—whether Sema may utilize distributors after the exclusive license expires (it may always do so).  Although Section 2(a) expressly references Sema's right "to appoint Distributors" and Section 2(b) does not, that distinction is immaterial.  (Compare Medzhibovksy Decl., Ex. 1 § 2(a) with id. § 2.b.)  Other terms relating to the scope of rights also do not appear in Section 2(b).  For instance, Section 2(b) does not contain the term "use"—but it is nonetheless clear that Section does not alter the fundamental rights PaySys granted to Sema in this regard, and that Sema has an

ongoing right to "use" the CardPac products and to "grant Licenses to use" them. (Compare id. § 2(a) with id. § 2.b.)  Section 2(b) is directed at two points:  after ten years, altering Sema's rights to be non-exclusive and ensuring that Sema may create derivative works (e.g., "to incorporate . . . any portion of the [CardPac] Products . . . into program products") and to use the entirety of the CardPac Products (e.g., "to incorporate all . . . of the [CardPac] Products . . . into program products").  (See id. § 2(b).)

In terms of Sema's continued right to use "Distributors" during the non-exclusive license period, Section 2(b)'s language that Sema may market "all" or "any portion" of the CardPac products—without temporal limitation—in the defined territory implicitly captures distributors.  (See id.)  That is, Section 2(b) does not limit or require any particular manner or method of such marketing—it allows Sema to continue marketing the software in an unrestricted, but non-exclusive, manner.  In addition, support for the inclusion of distributors is found in the portion of Section 2(b) that uses the words "by or for SEMA" following the phrase "developed, marketed, supplied, installed and/or supported".  (See id. (emphasis added).)  Plainly, marketing done "for" Sema or supplying done "for" Sema anticipates a distribution relationship.  (See id. § 1(c) (defining "Distributor").)

The definition of "License" also supports the lack of temporal limitations on defendants' right to appoint distributors.  That definition states explicitly that "any sublicense shall itself be deemed to be a License within the meaning of this

definition."  (Id.)  Thus, by definition, the word "License"—used throughout the Software Agreement—includes the concept of a sublicense.  (See id.)

Further, in the 2001 Confidential Settlement Agreement—an amendment to the Software Agreement entered into three years after Sema's exclusive license expired (Medzhibovsky Decl., Ex. 3 at ATOS007746-47)—the parties expressly acknowledged and agreed that CCSI (now PaySys) had no further obligations to provide certain services to "Sema or its licensees, distributors or third parties who use, sell, license or distribute the [CardPac] Products or derivatives thereof."  (Id. § 5(i) (emphasis added).)  Additionally, the parties repeatedly affirmed that, as of the date of the agreement, Sema had granted licenses to use CardPac to third parties. (Id. §§ 5(b), (d).)  Together, these provisions suggest defendants continued to distribute CardPac three years after the exclusive license ended, and that plaintiff was aware of, and did not object to, this practice.

Thus, despite explicit use of the term "Distributors" from Section 2(b) of the Software Acquisition Agreement, no reasonable juror could conclude that defendants' distribution right expired in 1998, as PaySys argues.  As a result, defendants' alleged distributions to Accellence and NTT Data are authorized by the Software Agreement, and PaySys may not assert copyright claims based on that alleged conduct.

### 2. Assignment to Worldline

PaySys next argues that Atos IT and Atos Se improperly assigned certain rights under the Software Agreement to Worldline, and that these defendants may

therefore be held vicariously liable for any infringing conduct undertaken by Worldline.  (ECF No. 217 at 25-26.)  This argument ignores that Worldline is a subsidiary of Atos Se (id., Ex. 7 at 46), and, therefore, an "Affiliate" under the Software Agreement (id., Ex. 1 § 1(a) (defining "Affiliate" as "any corporation or other business entity which controls, is controlled by or is under common control with a party to this Agreement.").  As a result, Atos IT and Atos Se may "assign all or any portion of [the Software] Agreement" to Worldline (see id. § 17(b)), and Worldline's conduct is deemed to comply with the Software Agreement (see id. § 17(m)).  Nothing in the record refutes the finding that an assignment to Worldline is authorized by the Software Agreement, thereby barring PaySys's infringement claims based on this alleged conduct.

### 3.  Conditions Precedent to the APS Agreement

On January 15, 1991, the parties entered into an agreement regarding the licensing of the APS software (the "APS Agreement").  (Defs.' Trade Secrets 56.1 ¶ 42; Owen Decl., Ex. 30 at ATOS031124.)  The APS Agreement permitted Sema to license the APS software to CardPac customers within certain parameters.  (Defs.' Trade Secrets 56.1 ¶ 42; Owen Decl., Ex. 30 at ATOS031124.)  One provision entitled "Order" (the "Order Provision") stated:

> When SEMA receives a signed contract from a customer, SEMA will formally notify CCSI of the contract and will place with CCSI an order for one license copy.  SEMA will also inform CCSI of the payment terms together with anticipated implementation dates.

(Owen Decl., Ex. 30 at ATOS031124.)

PaySys argues that certain sales defendants made under the APS Agreement

constitute infringement because defendants made these sales without following the Order Provision.  PaySys's ability to maintain these claims "turns—and fails—on the distinction in contract between a condition and a covenant."  See Graham, 144 F.3d at 236.

There is no triable issue as to the nature of the Order Provision; it plainly constitutes a covenant.  Contractual terms may be characterized as either conditions or covenants.  A condition precedent is, by definition, an act or event that must occur before a duty to perform a promise in an agreement arises.  See Powlus v. Chelsey Direct, LLC, No. 09-cv-10461 (PKC), 2011 WL 135822, at *4 (S.D.N.Y. Jan. 10, 2011) ("A condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'") (quoting Oppenheimer Co., Inc. v. Oppenheim, Appel, Dixon & Co., 86 N . Y.2d 685, 689 (1995)) (emphasis added); see also Graham, 144 F.3d at 237 (defining "condition precedent" as "any fact or event which qualifies a duty to perform") (citations omitted).  The Order Provision, however, creates obligations that arise after the licensee "receives a signed contract from a customer" to whom it is selling the APS software.  (Owen Decl., Ex. 30 at ATOS031124.)  The fact that the Order Provision does not apply until after a sales contract has been executed bars any argument that it is a condition precedent.  This finding comports with New York law's "presumption that terms of a contract are covenants rather than conditions."  Graham, 144 F.3d at 237 (citation omitted).

Since the Order Provision is a covenant, it cannot support a claim for copyright infringement.[11]

## V.   CONCLUSION

For the reasons set forth above, the Court GRANTS defendants' motion for partial summary judgment on the scope of plaintiff's intellectual property claims. (ECF No. 201).

The Clerk of Court is directed to terminate the motion at ECF No. 201.

SO ORDERED.

Dated:       New York, New York
             December 8, 2016


                                          _____
                                          KATHERINE B. FORREST
                                          United States District Judge

---

[11] This finding does not in any way impact any breach of contract claim PaySys asserts based on this provision.