UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
PAYSYS INTERNATIONAL, INC.,           :
                                      :
                        Plaintiff,    :
              -v-                     :           14cv10105(DLC)
                                      :
ATOS SE, WORLDLINE SA, ATOS IT        :           OPINION AND ORDER
SERVICES LTD.,                        :
                                      :
                        Defendants.   :
                                      :
------------------------------------- :
ATOS SE, WORLDLINE SA, ATOS IT        :
SERVICES LTD.,                        :
                                      :
                        Counterclaim  :
                          Plaintiffs, :
              -v-                     :
                                      :
PAYSYS INTERNATIONAL, INC. and FIRST  :
DATA CORPORATION,                     :
                        Counterclaim  :
                          Defendants. :
                                      :
------------------------------------- X

APPEARANCES:

For the Plaintiff:
Robert D. Owen
Travis J. Mock
Eversheds Sutherland, LLP
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, NY 10036

Peter C. Quittmeyer
Anna C. Halsey
Eversheds Sutherland, LLP
999 Peachtree Street, Ne
Atlanta, GA 30309

Jack Massey
Mark Thibodeaux

Eversheds Sutherland, LLP
1001 Fannin, Suite 3700
Houston, TX 77002

James H. Neale
Winslett Studnicky McCormick & Bomser
6 East 39th Street, 8th Floor
New York, NY 10016

For the Defendants:
Leon Medzhibovsky
Francis W. Ryan
Airina L. Rodrigues
Melissa A. Reinckens
Marc E. Miller
Matthew N. Ganas
DLA Piper US LLP
1251 Avenue of the Americas
New York, NY 10020

DENISE COTE, District Judge:

　　This Opinion resolves dueling motions for summary judgment
in a longstanding litigation between plaintiff PaySys
International, Inc. ("PaySys") and defendants Atos Se, Worldline
SA ("Worldline") and Atos IT Services Ltd. ("Atos IT")
(collectively, "Atos") regarding the rights to CardPac, a
computer program owned by PaySys.  After a series of decisions
over the course of several years, all but one of PaySys's causes
of action have been dismissed.  Remaining is PaySys's breach of
contract claim, which encompasses two allegations of breach, one
relating to Atos's alleged violation of contractual territorial
restrictions on software licensing and the second relating to
Atos's alleged sale of software modules without following the

contractually agreed upon procedures or paying PaySys the required fees.  Atos filed a motion for summary judgment seeking dismissal of both allegations and PaySys filed a motion for partial summary judgment on one of its breach of contract theories.  For the reasons explained below, PaySys's motion is granted and Atos's motion is granted in part.

## Background

The following facts are undisputed or taken in the light most favorable to the non-moving party unless otherwise noted. The parties' dispute centers on licensing agreements for credit card payment processing software, originally known as "CardPac," that was developed by PaySys.[1]  CardPac was first released in 1983 and PaySys executives testified that CardPac has been retired since at least 2001.  Through a series of agreements beginning in 1988, Atos acquired the right, under the terms of the agreements, to use and modify the CardPac software, as well as to grant licenses to CardPac and modified versions of the software.  For the purposes of this Opinion both the original CardPac software as well as modifications will be referred to as

---

[1] PaySys defines CardPac Software in its Second Amended Complaint ("SAC") as "the CardPac software created by PaySys, including object code, source code and related documentation, any complete or partial copy thereof contained in any other work or medium, and the confidential information embodied in or associated with that software."

"CardPac Products."[2]  Pursuant to the parties' agreements, PaySys also provided Atos with certain rights to use and license a software program, separate from CardPac, called an "APS Module."

The Software Acquisition Agreement

In 1988, Paysys's predecessor company, Credit Card Software, Inc. ("CCSI") and Atos's predecessor, Sema Group SA ("Sema"), entered into a Software Acquisition Agreement ("SAA") pursuant to which CCSI agreed to sell Sema rights to CardPac.[3] The SAA gave Sema certain rights in CardPac, including a ten-year "exclusive, royalty-free right to use, and to grant Licenses to use" CardPac within a defined international territory (the "Territory").  The SAA defines "Use" as:

> transferring any portion of any Product from storage units or media into equipment for processing (whether by electronic, mechanical or other means); utilizing any portion of any Product in the course of the operation of any equipment or programs; merging any Product or portion thereof into another product; or referring to any documentation included in the definition of Product for the purpose of understanding or operating the Product.

---

[2] PaySys originally claimed that a series of products licensed by Atos, including ASCCEND and CAS, contained partial or full copies of the CardPac software and were therefore subject to the terms of the parties' agreements.  Following software code comparison on March 21-22, 2017, the parties agree that ASCCEND and CAS do not contain software code licensed from PaySys.  As such, allegations arising for licensing agreements for ASCCEND and CAS have been withdrawn.

[3] This agreement was subsequently amended twice, once in December 1988 and again in March 1990.

Territory is defined in the SAA as listed countries in Europe and Asia.

This agreement also gave Sema the right to alter the CardPac source code and create new modules or derivative products of CardPac and to license such modified products to customers "solely within the Territory."  A schedule attached to the December 1988 amendment to the SAA set out mandatory license provisions, including that the "License may convey to the Licensee a non-transferable license to use the Products solely in the Territory."

The SAA also conferred the rights obtained by Sema through the agreement on any "Affiliate" of Sema, defined as "any corporation or other business entity which controls, is controlled by or is under common control with a party to this Agreement."  An earlier Opinion in this case held that Worldline -- one of the three defendants in this matter and the successor to Atos Origin, an entity that acquired Sema Ltd. in 2004 -- is an "Affiliate" of Sema for purposes of the SAA.  See PaySys Int'l, Inc. v. Atos Se, Worldline SA, Atos IT Servs. Ltd., 226 F. Supp. 3d 206, 211 (S.D.N.Y. 2016).  The SAA is governed by New York law.

The APS Agreement

In 1990, the parties entered into a related agreement ("the APS Agreement") which authorizes Sema to sell licenses for APS

Modules to CardPac customers within the Territory and establishes specific protocols for such sales, including the fees to which CCSI is entitled for each APS license that was issued.  The Agreement provides that Atos must pay PaySys "$100,000 for each sale in Japan or Europe (excluding Greece and Turkey)" and "$50,000 for each sale in Asia (excluding Japan) but including Greece and Turkey."  The APS Agreement states that these fees are to be paid by Sema to CCSI "in line with payments from the customer to Sema," but are in "no event [to] be delayed for more than six months after the signature of the customer contract."

Under the APS Agreement Sema must inform CCSI whenever it sells an APS license.  Whenever a customer signs a contract with Sema for an APS license, Sema is required to "formally notify CCSI of the contract and . . . place with CCSI an order for one license copy" and to "inform CCSI of the payment terms."

The APS Agreement also contains a section entitled "Cancellation," which provides: "In the event that an APS contract with a customer of Sema is cancelled, Sema will be entitled to no refund but CCSI will allow Sema to license APS to future customers to the equivalent value at no additional charge."  The agreement does not define the term "cancellation."

The APS agreement includes a "Product Updates" provision, which states that "CCSI will supply to Sema new releases of the

APS product and documentation as these become available."  It

also includes a "Product Maintenance" provision, which states

that "CCSI will supply to Sema a second line maintenance service

on the same basis as the remaining license products."

The Confidential Settlement Agreement

In 2001, the parties entered into the Confidential

Settlement Agreement ("the CSA"), which settled a then-pending

arbitration between the parties.  In the CSA, the parties

clarified and amended the scope of their rights and obligations

under the SAA and the APS Agreement.  Specifically, the CSA

acknowledges Sema's

> perpetual, non-exclusive rights . . . to: (x) grant
> licenses to Use all or a portion of the Products
> (including for purposes of this subparagraph APS,
> subject to the payment provisions of the memorandum
> agreement dated October 24, 1990) or derivatives
> thereof . . . within the Territory; and (y) itself Use
> or operate all or a portion of the Products . . . or
> derivatives therof . . . for any purpose whatsoever,
> within the Territory.

The CSA also modified the price terms of the APS Agreement with

respect to sales of APS to licensees within countries added by

the CSA to the definition of Territory and redefined the

Territory as "the entire world other than North America . . .

South America, Central America and the Caribbean islands."

The parties agreed in the CSA that "PaySys shall have no

further obligations to provide maintenance, support,

enhancements, development or other services or software to Sema

or its licensees, distributors or third parties who use, sell, license or distribute the Products or derivatives thereof." The CSA also released the parties from then-existing claims arising under the SAA and the APS Agreement.

The CSA addresses Sema's rights to grant customers remote access to the licensed products from outside the Territory. Section 5(c) of the CSA states:

> Notwithstanding any provision or prohibition of the Software Agreement, the parties acknowledge and agree that Sema or its Affiliates may at no charge grant, but only to a customer to whom Sema or its Affiliates on or before the date of this Agreement granted a license or other written authorization to Use the Products or derivatives thereof, the right to Use the Products or derivatives thereof (including without limitation CardLink) by remote access from terminals or workstations located outside the Territory, provided, however that the Products or their derivatives must be hosted solely within the territory.

(Emphasis supplied.)

The CSA also contains a damages provision whereby the parties agreed that damages would be PaySys's exclusive remedy should Sema breach the agreement. This section also provides for liquidated damages for breach of the agreement's territorial restrictions:

> In the event of a violation of the territorial restrictions of this Agreement, for each such violation Sema shall be liable for, and only for, liquidated damages equal to seventy-five percent (75%) of the revenue received by Sema or any of Sema's Affiliates for the grant of rights constituting the territorial violation.

8

The same section also provides that "[i]n the event of litigation between the parties with respect to any claim that Sema or any of Sema's Affiliates has committed a territorial violation, the prevailing party shall be entitled to an award of its reasonable attorneys' fees."  The CSA is also governed by New York Law

Third-Party Licensing Agreements

Between December 23, 2008, and December 23, 2014,[4] Atos and its affiliates entered into a number of licensing agreements for CardPac Products with new customers.  PaySys identifies eight such agreements as the subjects of its claim that Atos breached the territorial restrictions in their contract.

Between December 23, 2008, and December 23, 2014, Atos sold three customer licenses for APS Modules.  One of these sales arose from an April 2010 addendum to a 2001 agreement with a third party based in Thailand and provided that the licensed software was to be installed in Thailand, and the other two arose from a May 2009 agreement with a third party based in

_____

[4] The parties agree for purposes of these motions that this is the relevant time period for PaySys's breach of contract claims in light of New York's statute of limitations for breach of contract claims. See CPLR § 213(2).  PaySys, however, reserves the right to demonstrate at any trial that the statute was tolled by Atos.

Europe and provided that the licensed software was to be installed in Europe.

Atos did not notify PaySys of these two licensing agreements.  The parties agree that Atos never placed orders with PaySys for license copies of its APS module in connection with the May 2009 and April 2010 third-party agreements.  The parties also agree that Atos never made any payment to PaySys in connection with these agreements.

According to Atos, since January 1999, seventeen licenses it issued for APS Modules have been terminated.  Atos produced a chart that purports to list each APS Module license it has sold since 1991, the year the purchase occurred, and the year of termination, but has not submitted any admissible evidence that the information in the chart is accurate.[5]

## **Procedural History**

PaySys filed this case against Atos on December 23, 2014, alleging violation of contractual rights and of other intellectual and personal property rights.  The case was initially assigned to the Honorable Shira Scheindlin.  On July

---

[5] PaySys also argues that this document should not be considered because it was produced on April 3, 2017, after the close of document discovery.

24, 2015, Judge Scheindlin dismissed PaySys's domestic copyright claims for failure to state a claim.

On December 10, 2015, PaySys filed its SAC, under which the current motions arise, alleging ten claims: (1) breach of contract, (2-3) trade secret misappropriation under New York and Florida laws, (4-7) copyright infringement under French, Thai, Belgian, and Chinese laws, and (8-10) conversion, unfair competition, and replevin under New York law. On February 26, 2016, Atos answered the SAC and asserted seven counterclaims for declaratory judgment. In April 2016, the case was reassigned to the Honorable Katherine Forrest. On July 14, 2016, Judge Forrest granted Atos's motion for partial summary judgment, dismissing PaySys's claims for unfair competition, conversion, and replevin. On December 5, 2016, Judge Forrest granted Atos's motion for summary judgment on trade secret misappropriation claims, dismissing PaySys's second and third causes of action. On December 8, 2016, Judge Forrest granted Atos's motion for summary judgment regarding the scope of intellectual property at issue, dismissing PaySys's infringement claims under French, Thai, Belgian and Chinese law.

On April 6, 2017, PaySys moved to voluntarily withdraw its sole remaining claim for breach of contract pursuant to Rule 41(a)(2). While this motion was pending, the parties filed dueling summary judgment motions on the same claim. On July 7,

2017, Judge Forrest granted PaySys's motion to voluntarily withdraw on the condition that it pay Atos's attorney's fees, denied PaySys the opportunity to avoid that condition by withdrawing its motion, and denied as moot the pending summary judgment motions. PaySys appealed this order and on August 20, 2018, the Second Circuit vacated the district court's July 7, 2017 judgment, concluding that the district court erred by denying PaySys an opportunity to withdraw its motion rather than comply with the attorneys' fees condition. The Second Circuit remanded the case to give PaySys the opportunity to withdraw its motion for voluntary dismissal.

On September 25, 2018, this case was reassigned to this Court. On October 3, PaySys moved to withdraw its motion for voluntary dismissal. Atos did not oppose this motion. On October 8, this Court granted PaySys's motion to withdraw its motion for voluntary dismissal and granted the parties leave to renew their already briefed motions for summary judgment on PaySys's contract claim. On October 9, Atos renewing its prior motion for summary judgment and on October 10 PaySys renewed its prior motion for summary judgment.

## Discussion

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Smith v. Cnty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d 46, 48 (2d Cir. 2015).  "[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented."  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (citation and emphasis omitted).

    Once the moving party has asserted facts showing that the non-movant's claims or affirmative defenses cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)

(citation omitted).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

Both motions for summary judgment address PaySys's first cause of action for breach of contract.  This claim encompasses two allegations: (1) that Atos has issued software license agreements that violate provisions of the parties' agreements that prohibit Atos from granting licensees permission to remotely access the products from terminals or workstations located outside the prescribed Territory; and (2) that Atos sold three APS Modules without following the procedures required by the APS Agreement and without paying the contractually required fees to PaySys.

The elements of a breach of contract claim under New York law are well established.  They are "(1) the existence of an

agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted).

Under New York law, "a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties." In re MPM Silicones, 874 F.3d 787, 795 (2d Cir. 2017). If the intent of the parties is clear from the four corners of a contract, its interpretation is a matter of law that the court may determine by summary judgment. American Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 316 (2d Cir. 2006). "The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous." In re MPM Silicones, 874 F.3d at 795.

> An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.

Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010) (citation omitted). By contrast, a contract is unambiguous if its "language has a definite and precise meaning about which there is no reasonable basis for a

difference of opinion." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 69 (2d Cir. 2014).

"If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." Torres v. Walker, 356 F.3d 238, 245 (2d Cir. 2004) (citation omitted). In interpreting contracts, "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." Mastrovincenzo v. City of New York, 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted). Additionally, "an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted).

Territorial Restriction Claim

PaySys identifies eight agreements entered into by Atos with third parties between December 23, 2008, and December 23, 2014 that it alleges violated the parties' agreements' territorial restrictions. PaySys argues that these agreements violated the territorial restrictions because they permitted remote access to the licensed CardPac software from outside the Territory. PaySys does not argue that these agreements

explicitly permit licensees to access the software from outside the Territory, but rather that the terms of these agreements do not adequately restrict or forbid such access.

The SAA (executed in 1988) permits Atos to grant licenses to "Use" the software "solely within the Territory" and defines "Use" as "transferring any portion of any Product from storage units or media into equipment for processing" and "utilizing any portion of any Product in the course of the operation of any equipment or programs."  The parties agree that under the terms of the CSA, Atos may not grant new customers as of April 27, 2001 -- the date of the CSA -- the right to use the CardPac software by remote access from outside the Territory. Similarly, because the CSA provides that Atos may grant remote access to the software from outside the Territory "only to a customer to whom [Atos] or its Affiliates on or before the date of the [CSA] granted a license," the CSA plainly does not permit Atos to affirmatively grant remote access from outside the Territory to post-CSA customers.  (Emphasis supplied.)  Nothing in the SAA or the CSA, however, requires that Atos include language in its licensing agreements that expressly prohibits remote access from outside the Territory.

PaySys argues that the eight licenses could be read as implicitly permitting remote access from outside the Territory because they do not expressly prohibit such use.  This strains

the ordinary reading of the licenses.  A grant of territorial rights is ordinarily understood to approve use of the product only in the identified territory.  Paysys's argument is insufficient to create a genuine issue of material fact.  Atos is granted summary judgment on PaySys's remote access territorial violation claim.

APS Agreement Claim

PaySys's second breach of contract claim alleges that Atos violated the APS Agreement with regard to the three APS licenses that it sold during the statute of limitations period.  PaySys alleges that Atos violated the APS agreement by failing to notify PaySys of these sales, failing to obtain a copy of APS from PaySys for each sale, and failing to pay PaySys the contractually required fees for these sales.

The APS Agreement unambiguously requires Atos to notify PaySys of APS contracts it enters into and to place orders with PaySys for one license copy for each APS contract it enters into.  PaySys has shown that Atos did neither.  These two obligations serve to put PaySys on notice that it is entitled to a payment of fees.  Where, as here, Atos also fails to make the contractually required payments, the failures to give notice and obtain a copy of APS also constitute material breaches of the APS Agreement.

Atos contends that the fact that it did not notify PaySys of these contracts does not constitute a breach because after the parties entered into the CSA, Atos "d[id] not know who to talk to" at PaySys regarding the APS Agreement and, after one attempt in 2001 or 2002 to determine to whom it should report information regarding its APS sales, concluded that PaySys "d[id] not seem to be interested in this part of the arrangement." In opposing summary judgment, Atos has the burden to present evidence of its attempts to provide notice. It has failed to point to any admissible evidence of any attempt to inform PaySys about any of these three licenses, whether by telephone, email, or letter. Atos's reliance on vague testimony that it fruitlessly attempted to contact PaySys about APS licensing at least seven years before the three licenses were issued is insufficient to rebut PaySys's showing that it breached the APS Agreement's notification and ordering provisions.

With respect to the third prong of this breach of contract claim, PaySys has shown as well that it is entitled to summary judgment. Atos admits that it never paid PaySys royalties for these three APS licenses and presents no compelling arguments in defense of this failure to pay.

Atos first argues that it was not obligated to make any payments to PaySys for these three licenses because, under the

APS Agreement's Cancellation Provision, it was entitled to issue these licenses at no additional cost in substitution for seventeen terminated APS license agreements. The Cancellation Provision states: "In the event that an APS contract with a customer of [Atos] is cancelled, [Atos] will be entitled to no refund but [PaySys] will allow [Atos] to license APS to future customers to the equivalent value at no additional charge."

The APS Agreement's Cancellation Provision is ambiguous. It does not define "cancellation", or provide any indication of which terminated customer contracts are deemed "cancelled" and would thus entitle Atos to issue a future license at no additional charge. While the Cancellation Provision cannot be read to apply to every customer contract that ends for any reason, its precise application cannot be discerned from the four corners of the contract.

Regardless of the precise meaning of the Cancellation Provision, Atos has presented no competent evidence of "cancelled" contracts that would entitle it to withhold payment from PaySys on the three licenses at issue in this claim. The evidence presented by Atos in support of its cancellation argument consists primarily of a chart listing APS customer contract terminations. Although document discovery in this case closed on July 22, 2016, this chart was first provided to PaySys on April 3, 2017, as an attachment to Atos's expert damages

report. The one-page chart has three columns and lists nineteen
licenses that were "terminated" between the years 1994 and 2015.
Those licenses vary in length from two to fourteen years. The
chart provides no definition of its label "termination." Nor
does Atos present any information regarding the sources of the
information presented in the chart. For instance, Atos did not
produce any documents to support the information contained in
the chart. The chart merely states that the information is
"based on data and information known to the company." The only
evidence Atos presents is deposition testimony from an Atos
executive that attests broadly to the fact that "many
cancellation[s]" occurred. Atos has failed to present evidence
from which a factfinder could conclude that the licenses listed
on the chart existed, that they were terminated on the date
listed, and those terminations qualify as "cancellations"
contemplated by the APS Agreement. Atos has failed to show
therefore that the Cancellation Provision relieves Atos of the
APS Agreement's requirement that it pay PaySys for these three
licenses.

Atos's failure to notify PaySys of the three licenses takes
on added significance in light of Atos's assertion that the
Cancelation Provision allowed it to substitute these licenses
for terminated licenses identified on its chart. If Atos had
given PaySys notice of the three licenses and explained why it

could substitute them for terminated license, the parties would have had an opportunity to grapple with the ambiguities of the Cancellation Provision and apply it to the facts as they existed at that time. Without such notice, and without any evidentiary record that would permit a fact finder to conclude today that such a substitution was within the contemplation of the parties when they executed the APS Agreement, Atos cannot escape its obligation to pay PaySys for those licenses.

Atos also argues that PaySys's breach of contract claim with regard to the APS licenses fails because PaySys failed to perform its obligations under the APS Agreement. Specifically, Atos claims that PaySys failed to provide product updates and maintenance as required by this agreement. This argument is also unavailing. The CSA, executed after the APS Agreement, releases PaySys of further obligations to provide Atos with maintenance, support, enhancements, and developments related to its products. The three licenses that form the basis of PaySys's APS breach claim were sold after the CSA and, per the terms of the CSA, PaySys had no obligation to provide maintenance or support to Atos.

The APS Agreement requires Atos to notify, place an order for a license copy, and pay PaySys for each APS license it sells. PaySys performed its obligations under the APS Agreement as modified by the CSA. It is undisputed that Atos never

contacted or submitted payment to PaySys regarding the three APS licenses it issued pursuant to the 2009 and 2010 third-party agreements and Atos has not presented evidence sufficient to show that there is a genuine issue of material fact requiring a trial to determine whether this failure constitutes a breach of the contract. Finally, because of this breach, PaySys was damaged in the amount of $250,000, which is the amount that it was entitled to receive from Atos for the three APS licenses, per the terms of the APS Agreement. Accordingly, PaySys's motion for summary judgment on its APS Agreement breach of contract claim is granted.

## Conclusion

Atos's October 9, 2018 motion for summary judgment is granted with respect to PaySys's territorial restrictions breach of contract claim and denied with respect to PaySys's APS Agreement breach of contract claim. PaySys' October 10, 2018 motion for partial summary judgment on its APS Agreement claim is granted.

Dated:     New York, New York
           November 20, 2018

                            _____
                                      DENISE COTE
                            United States District Judge

23